**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KATHERINE PONTIUS EBEL,

*Plaintiff*,

-against-

G/O MEDIA INC., ONION, INC.,
GREAT HILL PARTNERS, LP, *and*
JAMES SPANFELLER, *individually,*

*Defendants.*

**Case No.** 20-CV-7483

**JURY TRIAL DEMANDED**

## COMPLAINT

### NATURE OF ACTION

1.      Plaintiff Katherine Pontius Ebel, by her attorneys, Crumiller P.C., brings this action against G/O Media Inc. ("G/O Media" or the "Company"), Great Hill Partners, LP ("Great Hill Partners"), The Onion Inc. ("The Onion") and James Spanfeller (together with G/O Media and The Onion, "Defendants") to remedy claims of gender discrimination and retaliation, by Defendants in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*., ("NYSHRL"); and the New York City Human Rights Law, NYC Admin. Code § 8-107 *et seq.,* ("NYCHRL").

2.      This action is also brought to remedy common law claims of breach of employment contract.

### PARTIES

3.      Plaintiff is a woman, and a former employee of Defendants as that term is defined in Title VII (42 U.S.C. § 2000e(f)), the New York State Human Rights Law (N.Y. Exec. Law §

292(6)), the New York City Human Rights Law (N.Y.C. Admin. Code § 8-102), and entitled to the remedies of said statutes for purposes of the claims brought in this Complaint.

4.     G/O Media is a collection of digital-first brands including Gizmodo, Jalopnik, Jezebel, Deadspin, Splinter, Lifehacker, Kotaku, The Root, The Onion, the A.V. Club, The Takeout, and *deals.kinja.com*. G/O Media is a Delaware corporation with its headquarters and primary place of business located at 1540 Broadway, 27th Floor, New York, New York 10036.

5.     Great Hill Partners is a foreign limited partnership with its principal place of business in Boston, Massachusetts. Great Hill Partners is a private equity firm that invests in high growth mid-market companies and has more than 75 portfolio companies and over 150 consolidating acquisitions in its portfolio.

6.     The Onion is a Wisconsin corporation with its principal place of business in Chicago, Illinois. The Onion is a satirical digital media company which produces online content under several online publications including The A.V. Club, and The Takeout.

7.     Defendant Spanfeller is a man over 18 years of age who, upon information and belief, is domiciled in New York County, New York, and serves as the Chief Executive Officer ("CEO") of G/O Media.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, as Plaintiffs have asserted claims that arise under federal laws of the United States, and diversity jurisdiction pursuant to 28 U.S.C. § 1332. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

9.     Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2), because Defendant G/O Media has its headquarters and principal office within the Southern District of New York, and that office is where the discriminatory and/or retaliatory decisions alleged herein were made. Further, Plaintiff's employment contract governing her employment by Defendants includes a "Choice of Law" provision that states:

> (e) Choice of Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in such State and without regard to conflicts of law doctrines, except to the extent that federal law preempts certain matters.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     On August 29, 2019, Plaintiff filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

11.     On June 15, 2020, the EEOC issued Plaintiff a notice of right to sue.

## LEGAL FRAMEWORK

12.     Under Title VII, it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual" with respect to the terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 200e-2(a)(1).  This includes discrimination on the basis of "pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).

13.     The NYSHRL provides that it shall be an unlawful discriminatory practice "to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment" on the basis of an individual's sex, N.Y. Exec. Law § 296(1)(a), or "familial status", *id.,* which includes pregnancy.  N.Y. Exec. Law § 292(26)(a).

14.     The NYCHRL similarly provides that it is unlawful for an employer to "discharge from employment" any person on the basis of her gender or caregiver status, N.Y.C. Admin. Code § 8-107(1)(a)(2), or to "discriminate against such person . . . in terms, conditions or privileges of employment."  (a)(3).

## FACTUAL ALLEGATIONS

### *History of Employment*

15.     Plaintiff was hired by The Onion on July 13, 2011, as a Human Resources Generalist at The Onion's Chicago office.

16.     She quickly established herself as dependable and hardworking, and excelled in her role, securing a number of merit-based raises and promotions over the next several years. She was hired to centralize The Onion's operations in Chicago at headquarters and spent the first six months of the job managing a challenging relocation process of the New York editorial team. She simultaneously transitioned veteran editorial leadership out of the job and implemented The Onion's first recruiting strategy and infrastructure. She led all hiring efforts, staffed the first in-house programing/technology team and was heavily involved in executing the company's strategy to fully pivot from a print operation to a digital publishing model.

17.     On July 23, 2012, Plaintiff's base annual salary was increased in recognition of her strong job performance. On September 9, 2013, Plaintiff was promoted to Human Resources Director, and her base annual salary was increased again. Just a few months later, on December 20, 2013, Plaintiff's base annual salary was increased again in recognition of her strong job performance. On September 8, 2014, Plaintiff was promoted to Vice President of Human Resources, and her base annual salary was increased once more.

18.     As the Vice President of Human Resources, Plaintiff's salary was increased twice in 2014 and then again in 2015, in recognition of her strong job performance. In or about January of 2016, Plaintiff was promoted to Chief Resource Officer ("CRO") and Chief of Staff ("COS"), and her annual compensation was increased once again.

19.     Indeed, over five short years, her annual salary increased by five times the amount she was initially making.

20.     Throughout those five years, Ms. Pontius was also charged with leading several rounds of layoffs, which she executed thoroughly and fairly.[1]

21.     Plaintiff's dual role as both CRO and COS was originally designed as two separate positions. However, given her commendable performance in her prior roles at the Company, the positions were merged into a combined role for Plaintiff.

22.     In this dual role, Plaintiff had broad duties, responsibilities and authority, including but not limited to: (i) assisting in setting strategy, (ii) determining tactics to implement strategy, (iii) authority to implement strategies and tactics, (iv) managing Onion Studios, (v) managing The Onion's LA operations, (vi) direct reporting line management of A.V. Video, (vii) general authority delegated by, and as proxy of the CEO (including oversight management of A.V. Editorial).

23.     In January 2016, The Onion was purchased by Univision Communications Inc.

24.     Shortly thereafter, Univision offered Employment Agreements to Ms. Pontius as well as Onion Chief Operating Officer Kurt Mueller and Onion Chief Executive Officer and President Mike McAvoy to govern their employment by The Onion's new ownership.

---

[1] Ms. Pontius was heavily involved in laying people off over the course of her time at The Onion.

25.     As part of The Onion's negotiation with Univision, the management team – 13 department leaders including Ms. Pontius, McAvoy and Mueller – were collectively represented by one attorney, paid for by the shareholders of The Onion.

26.     In this process, all parties negotiated and signed an engagement letter with this attorney and agreed that deals would be negotiated where everyone would have the same language in terms of contractual obligations and protections. In this way, compensaton and role would be unique to each individual but the rest of the contract language would be standardized. The Onion paid for this as a part of the sale process with Univision as it was the most efficient route to get all management members on board with the new ownership. This process was transparent to all 13 management team members and they had several meetings as a group with the attorney to discuss the terms.

27.     Mueller and McAvoy accepted and executed their Employment Agreements, as did Ms. Pontius on January 14, 2016.

***Plaintiff's Employment Agreement with Univision***

28.     Univision's Employment Agreement with Plaintiff was for a term of three years as Chief Resource Officer ("CRO") to govern her employment by The Onion's new ownership.

29.     As CRO, her focus was on three core goals: developing employees, furthering business initiatives and growth plans and mitigating company liability by managing personnel issues and risks.

30.     The Employment Agreement specified that Plaintiff would be employed by The Onion for a term of three (3) years, commencing from the effective date of the agreement.

31.     The Employment Agreement additionally provided that Plaintiff's principal place of employment would be "Chicago, Illinois, or at such other place as may be mutually determined by Company and Employee."

32.     Plaintiff's Employment Agreement was set to expire on January 15, 2019.

33.     The Employment Agreement provided that if, prior to the expiration date, Ms. Pontius was terminated without cause, or if termination resulted from her resignation for "good reason," she would continue to receive her base salary ($200,000) "for twelve (12) months after the date of termination."

34.     The Employment Agreement defined "Resignation by Employee for Good Reason" as follows:

> a.     any diminution in the employee's material responsibilities, authorities, or duties, but not merely a change;
> b.     any reduction in the employee's base salary; and/or
> c.     any breach by the company of its material obligations to the employee under the agreement.

35.     The Employment Agreement further dictated that in order to resign for "good reason," as defined above, Plaintiff was required to send notice to The Onion within sixty (60) days of the occurrence of such "good reason" event, and The Onion would then have an opportunity to cure the good reason event, *if curable*, within thirty (30) days of receipt of such notice.

36.     As stated, the terms of the Employment Agreement including the severance and good-cause resignation provisions are identical to the severance and good-cause resignation provisions in the Employment Agreements of Mueller and McAvoy.

37.     On September 25, 2018, a few months before Plaintiff's contract term was set to expire, Ms. Pontius and Univision executed an amendment to the original Employment Agreement.[2]

38.     The amendment raised Ms. Pontius's salary and extended her contract term to January 31, 2020. All other terms remained in full force and effect.

### *Univision Sells The Onion to Great Hill Partners and The Onion Becomes Part of G/O Media*

39.     In or about late October of 2018, Plaintiff and CEO McAvoy agreed that she would temporarily relocate from Chicago to New York City in order to develop and nurture relationships with New York City-based long-form content creators and buyers. Plaintiff and McAvoy further agreed that Plaintiff would fly back and forth from New York City to Chicago to handle management needs in Chicago, as needed.[3]

40.     As agreed, Plaintiff thus temporarily relocated to New York City and flew back and forth from New York City to Chicago and Los Angeles.

41.     In March 2019, there appeared to be once again an imminent change in leadership at Univision. As such, Plaintiff and McAvoy agreed that it would be prudent for Plaintiff to move back to Chicago, full-time, in order to refocus her management efforts at The Onion. McAvoy wanted Ms. Pontius, his most trusted executive, to help manage the staff through another period of major change.

---

[2] A new CEO, Sameer Dean was replacing the previous CEO and President of Fusion Media Group. Dean wanted to secure valuable leadership that was still in place within the organization and Ms. Pontius had established herself as an irreplaceable resource.

[3] The move to NYC was both personally and professionally motivated. Ms. Pontius' now-husband was living in NYC at the time but the move was also part of a growth plan and coastal strategy to expand the editorial deparment. Plaintiff had recently stepped in to oversee the Company's investment in longform content development and podcasting. As such, the Company needed to build relationships with content creators and production partners in LA and NYC. A small team of Ms. Pontius' direct reports relocated from Chicago to LA around this same time to build out The A.V. Club's video coverage and content. While they built out the operation from the west coast, Ms. Pontius tackled the East Coast.

42.     In April 2019, Univision sold The Onion to the private equity firm, Great Hill Partners. In addition to their purchase of The Onion, Great Hill Partners also purchased Gizmodo Media Group, LLC ("Gizmodo"), another Univision-owned subsidiary.

43.     Per the terms of the Employment Agreements of Plaintiff, Mueller, and McAvoy, all contractual obligations were assigned to Great Hill Partners upon purchase of The Onion.

44.     Great Hill Partners then combined Gizmodo and The Onion into one company and installed Jim Spanfeller as CEO and President of what is now G/O Media.

45.     Spanfeller is also "a significant investor" in G/O Media, according to Great Hill Partners' press release of April 8, 2019.[4]

### *Defendant Spanfeller's Purported Offer of Promotion to CTO to Plaintiff*

46.     On April 22, 2019, Plaintiff received a phone call from Spanfeller. He said, in a blasé tone that he had "heard great things." He verbally offered Plaintiff the role of Chief Talent Officer ("CTO") for G/O Media.[5]

47.     During the call, Spanfeller provided a vague overview of the CTO role: namely recruiting new employees, creating a company handbook, and longer-term goals such as succession planning and culture building. He also intimated that the CTO role would handle compliance matters, adding "all that legal mumbo jumbo, which I assume you understand?"

48.     Spanfeller also told Plaintiff that, in her proposed new role of CTO, she would be "reporting to *moi*."

---

[4] "Great Hill Partners Acquires Gizmodo Media Group", Great Hill Partners *https://www.greathillpartners.com/great-hill-partners-acquires-gizmodo-media-group-and-the-onion-from-univision-communications-inc/* (April 8, 2019).
[5] Spanfeller had only met Ms. Pontius once before when, upon assuming the position of CEO, he went to Chicago to meet with management team members. He and plaintiff had less than a 10-minute one-on-one meeting where they exclusively discussed how his day of back-to-back meetings was going. It was such a meaningless conversation that when Ms. Pontius later flew to NYC to discuss the role of CTO, Spanfeller did not recognize her or remember their meeting.

49.     Spanfeller additionally informed Plaintiff that he had hired other new corporate officers, including G/O Media's Chief Financial Officer Tom Callahan and Chief Technology Officer and Chief Operating Officer Jessie Knight. Spanfeller further stated that the former President of Onion Inc, McAvoy, would hold an executive position of some kind, which had yet to be identified.

50.     Plaintiff immediately noticed that all of these individuals were men. She would be the only woman out of five executive team members, and the only person being promoted from within the original team.

51.     Spanfeller concluded his summary of the new executive team by stating in a patronizing tone: "and then there's *you*. So, how does that feel, Madame C-Suite?"

52.     He seemed to find it amusing, and even cute, that Plaintiff would be the only woman on the all-male executive team.

53.     Plaintiff found this language patronizing and sexist, in that Spanfeller would never have addressed a male executive in this demeaning manner. She had difficulty imagining Spanfeller would use this tone with a male employee.

54.     Furthermore, she was certain that the five male executives Spanfeller had hired had undergone a series of thoughtfully planned in-person conversations with Spanfeller and other executive team members, as is protocol with executive-level hires at companies the size of G/O Media. In comparison, Ms. Pontius had had a 15-minute phone conversation with Spanfeller with no details whatsoever regarding her responsibilities, team or salary.

55.     Ms. Pontius then tried to ask more questions about the CTO role, but Spanfeller refused to provide more details without a commitment from plaintiff. He repeatedly stated: "I need to know if you're in, first."

56.     Plaintiff said that she was "in."

57.     As soon as she had accepted the position, Spanfeller told Ms. Pontius that her first order of business as CTO would be to terminate Gizmodo's Executive Vice President and Editorial Director, Susie Banikarim immediately. Spanfeller made it clear that Plaintiff would have to own this termination as part of her new role as CTO, as though Banikarim's firing had been her individual decision. He added that more extensive layoffs would follow.

58.     In addition to being well respected and highly successful in her dual role as EVP and Editorial Director, Banikarim was the only female, and the only person of color left on G/O Media's senior management team.

59.     When Ms. Pontius asked why Spanfeller wanted to terminate Banikarim, he retorted in a hostile tone that Banikarim was "a hindrance to making money." Ms. Pontius found this remark to be lacking in substance and context given that Spanfeller had only assumed the role of CEO approximately 10 days prior and could not possibly have assessed in that short timeframe whether Banikarim was an asset or a "hindrance."

60.     She also thought that firing Banikarim was in direct contradiction to Spanfeller's previous messaging at a recent all-staff meeting where Spanfeller told the entire Company he was not planning to lay off any staff. Given the obvious contradiction, she asked Spanfeller for further clarification.[6]

61.     Spanfeller was unable to give any concrete justification for Banikarim's termination or any examples of Banikarim's purported poor performance.

---

[6] Spanfeller also publicly declared that he would not lay off any staff a few days later in an article published in Variety, entitled "New Owner of Gizmodo Media Groups Doesn't Expect Layoffs: 'We Don't Plan to Cut Our Way To Growth.'" Todd Spangler, Variety.com, https://variety.com/2019/digital/news/gizmodo-media-onion-gomedia-jim-spanfeller-1203197897/ (April 25, 2019).

62.     As such, Plaintiff told Spanfeller that she did not think it was a good idea to fire

Banikarim, and that it was risky to terminate the only remaining person of color and the only

female on the team. She also noted that, "we should be intentionally recruiting diverse candidates

for her backfill given the lack of diversity on the new executive team."

63.     Spanfeller responded that "unfortunately the person I've brought on isn't that."[7]

64.     Spanfeller then quickly wrapped up the conversation by instructing Plaintiff to fly

to G/O Media's headquarters in New York City to meet with him in person two days later on

April 24, 2019, for further discussion of the new position.

65.     In the meantime, Spanfeller emailed his outside public relations ("PR") team to

get a press release ready to announce Ms. Pontius's new role as a CTO of G/O Media. In email

communications, Spanfeller directed the PR team to "punch up the fact that Katie is coming up

for [sic] the existing team . . . in other words we are promoting from within here."

66.     Clearly, Spanfeller anticipated backlash for his imminent plans of hiring an all-

white all-male executive leadership team from outside the Company and cleverly hoped he could

mitigate any criticism by highlighting his token female promotion "from within" – Ms. Pontius.

***Plaintiff Engages in Protected Activity***

67.     On April 23, 2019, before flying to New York to meet with Spanfeller in person,

Ms. Pontius received a barrage of emails from Spanfeller and the PR team regarding the press

release announcing her promotion to CTO. Concerned at the speed with which the transition was

moving, the fact that she knew so little about the duties and responsibilities of the role, and the

---

[7] The person Spanfeller was referring to was Paul Maidment, a white man. Maidment had previously been the editor of Forbes.com, where Spanfeller had previously been CEO. Maidment assumed the role at G/O Media in April, 2019 and resigned shortly thereafter in October, 2019 after the entire staff of Deadspin quit in mass protest to Spanfeller's and Maidment's leadership. *See* Megan Greenwell, The Adults in the Room, Deadspin, https://theconcourse.deadspin.com/the-adults-in-the-room-1837487584 (August 23, 2019).

blatant contradictions between his messaging to date and the plans discussed in their call the day

prior, Plaintiff sent the following email to Spanfeller:

> I am honored and excited to [sic] considered for this role. I
> understand you want to want to move quickly on the rollout, but
> I am concerned about the timing of the announcement. I am here to
> do the work 100% but I believe if we were to announce this next
> week - post lay off - it will be far easier for us to achieve your goals
> of 1) creating a culture where employees feel like they are being in
> invested in and have a career trajectory and 2) assuaging the fears of
> staff post-layoff and conveying the message that this is a one-time
> band aid we're ripping off. I want to be effective in this role and I
> will do the hard work, but I feel that the timing here is important and
> can be used as a moment to build trust with staff.

Ms. Pontius did not receive a response to her email that day.

68.     The next day, Plaintiff flew to New York City and met with Spanfeller at

headquarters, as instructed.

69.     At this one-on-one meeting in his private office, Spanfeller again told Plaintiff

that she would have to fire Banikarim that very day as part of her role as CTO.

70.     Plaintiff reiterated that she was not comfortable carrying out this termination in

the manner instructed, as it would be an exposure for the Company. Ms. Pontius was trying to

put the Company's interests first and, in her genuine attempt to assist Spanfeller in his transition

to CEO, she was hoping to persuade Spanfeller to do the same.

71.     As such, she told Spanfeller that Banikarim was not only well respected in the

Company but had successfully completed her job requirements throughout her tenure. Plaintiff

also added that, as a woman of color, Banikarim was a member of "two protected classes."

Therefore, her firing would raise an inference of unlawful discrimination, especially because the

only justification for terminating her was because she was – as Spanfeller put it – "a hindrance to

making money." There were no facts, context or examples of a legitimate performance issue to back up this statement.

72.     Plaintiff also confided in Spanfeller that his new all-male, all-white executive team had already inspired concerns of unlawful discrimination among employees of the Company, as there had been a number of recent, problematic incidents. Plaintiff gave Spanfeller an example, starting with a recent event which had occurred only one week prior.

73.     This incident involved a male Sales Executive, Steve Flannigan, installed by Spanfeller shortly after he had assumed the role of CEO. Flannigan had "tipped" a young, female Account Manager twenty dollars after she had submitted an assignment to him.[8]

74.     Naturally, the staff was angered by this and a number of other events, and complaints of sexism and discrimination were intensifying throughout the organization.

75.     When Ms. Pontius brought up this incident, Spanfeller dismissed it as irrelevant; it was clear that he did not care.

76.     Given these contentious circumstances, Plaintiff advised Spanfeller to be mindful of the potential liabilities associated with Banikarim's termination, especially since Spanfeller could not give Plaintiff any evidence or examples that Banikarim had actually done anything to warrant termination. Plaintiff also suggested that Spanfeller at the very least terminate Banikarim as part of the company-wide layoffs that were to be held later that week.

77.     Throughout the meeting, Spanfeller interrupted Ms. Pontius repeatedly to the point where she could barely finish a complete sentence.

---

[8] Ms. Pontius spoke directly with the female Account Manager after she heard about the incident. She felt humiliated by the event but did not feel comfortable bringing this forward to Spanfeller in a formal complaint given the mounting toxic environment.

78.     In response, Spanfeller became visibly angered and demanded in an exasperated manner, "*Why is this my problem?*" Ms. Pontius was speechless, as she thought she had clearly spelled out the likely inference of discrimination that would result in Banikarim's termination.

79.     In attempting to defend his decision, Spanfeller stated, "there will be no love lost for Susie."

80.     Spanfeller remained indignantly dismissive of Plaintiff's concerns regarding unlawful discrimination across the Company, stating repeatedly that these issues were "not [his] problem."

81.     The following week, the last week of April 2019, Banikarim was terminated by Spanfeller and Tom Callahan (Spanfeller's handpicked CFO) as part of the Company-wide layoffs. Indeed, despite his repeated pushback towards Ms. Pontius's suggestions, Spanfeller ultimately took her advice and fired Banikarim as part of a company-wide layoff.

***Retaliation: Spanfeller Rescinds Ms. Pontius' Offer of Promotion and Threatens Her Continued Employment***

82.     During the in-person meeting, as Plaintiff explained her objection to terminating Banikarim, Spanfeller interjected various threatening statements, including: "It sounds to me like you don't really want to work here," and "I need someone here to do the dirty work, and that really should be you."

83.     Spanfeller further accused Plaintiff of lacking a "backbone," and stated that he needed to "find someone with the backbone to do this."

84.     This was especially frustrating to Ms. Pontius, as she had proven herself to have a "backbone" over the course of her 8-year tenure with the Company and had handled many company-wide layoffs singlehandedly. She also felt that as CTO, her role was precisely to advise on talent, handle personnel issues at the highest level – *i.e.*, with Spanfeller – and mitigate

liability. Regardless of the CTO position, she *knew* that it was her current contractual duty to do all of these things in her position as CRO of the Company.

85.     Spanfeller – clearly mystified by the fact that Plaintiff could be advising him on how to do his job – then stood up and declared: "You really need to start thinking about what it is you do here, because I don't know what your job is, and I don't think it's full time."[9]

86.     Spanfeller then abruptly ended the meeting by escorting Plaintiff out of his office. Plaintiff felt sick to her stomach.

87.     Later that same day, by email dated April 24, 2019 at 2:15 p.m., Spanfeller notified Plaintiff and the PR team as follows: "Hey folks. We are going to put this on hold for now. Thanks so much for the work on this stuff. Will let you know when we are ready to move forward with something on this front."

88.     Plaintiff never again heard from Spanfeller about the CTO position.

89.     In the aftermath of Plaintiff's meeting with Spanfeller, it became clear to Plaintiff that the CTO offer was a ploy designed to put a female executive in a position to take the fall for discriminatory layoffs that the Company was planning to announce. Indeed, so transparent was the sham CTO offer, that Ms. Pontius never met with any other executives of the Company prior to receiving the purported offer. In addition, no increase in Ms. Pontius's salary or bonus was offered or discussed, and no new employment agreement was presented to her.

90.     Later on, in an exposé published on August 2, 2019 in Deadspin, for which Spanfeller was interviewed, the following comment regarding the promotion decision was included without Ms. Pontius' approval:

> Spanfeller did offer to promote one female employee, former chief of staff for The Onion Katie Pontius, and make her the company's head of talent, but the position fell through after he demanded that

---

[9] Spanfeller's "confusion" regarding Ms. Pontius' role became a repeated trope throughout the next few months.

she fire newsroom editorial director Susie Banikarim as her first management move, which Pontius refused, according to sources who spoke to Deadspin. Spanfeller says Pontius accepted the job, but he decided she was "not a good fit for this position" after Pontius "refused to join me in communicating our plans" to fire Banikarim.[10]

91. A few days after Spanfeller's meeting with Plaintiff, on May 1, 2019, upon information and belief, Spanfeller told McAvoy in an in-person meeting that he wanted to fire Plaintiff because she did not have the "spine" for the job.

92. After rescinding the offer of promotion, Spanfeller stopped communicating with Plaintiff.[11]

93. Further, after Ms. Pontius's protected complaints and after rescinding the CTO offer, Spanfeller excluded Plaintiff from weekly leadership meetings as well as a June 2019 leadership excursion to Martha's Vineyard, despite the fact that her Gizmodo counterparts (the C-suite, all senior VPs, and VPs) were invited to attend both the leadership meetings and the leadership excursion.

94. In a union meeting that Plaintiff was not at during the last week of July 2019, Spanfeller cast aspersions upon Plaintiff's role at the Company to a group of approximately a dozen people – including The Onion's union bargaining committee, Writers Guild of America East representatives. By way of example only, Spanfeller asked probing questions regarding what "Katie had done in HR" and tried to discredit her role or cling to an assumption that Ms. Pontius was not doing her job.[12]

---

[10] Caleb Ecarma, "5 Revelations From Deadspin's Exposé on Their Parent Company CEO Jim Spanfeller", Media ITE, *https://www.mediaite.com/online/5-revelations-from-deadspins-expose-on-their-parent-companys-ceo-jim-spanfeller/* (August 2, 2019).

[11] The next time Plaintiff heard from Spanfeller was on July 10, 2019, when he sent a company-wide email announcing that he had hired a new Head of Talent, Angela Persaud.

[12] Ms. Pontius had not been the Head of Human Resources for a long time but – as the team player that she was – during her tenure with the Company and its previous iterations, she had filled gaps and helped on personnel issues frequently.

**_Pattern of Sex-Based Adverse Employment Decisions by G/O Media and Spanfeller_**

95.     In June 2019, in addition to Callahan, McAvoy, and Knight, Spanfeller hand-picked and hired a number of other new white, male G/O Media executives:

96.     As stated, Spanfeller hired Editorial Director Paul Maidment to replace Banikarim, the woman of color whose termination Plaintiff had opposed as discriminatory.

97.     Spanfeller hired new Senior Vice President of Marketing Bruce Rogers, who had also previously worked with Spanfeller at Forbes. Rogers took over the majority of a woman named Lindsay Eckert's responsibilities, effectively demoting her.

98.     Spanfeller also hired new Vice President of West, South and Midwest Advertising Sales Steve Thompson, his former colleague at _Playboy_. Spanfeller gave Thompson half of former Vice President of West Coast Sales Nadine Jarrard's sales territory after demoting Ms. Jarrard to make way for Thompson. Once again, Spanfeller passed over another woman in favor of a white man for a leadership role.

99.     Spanfeller hired new Vice President to East Sales Sean Flanagan ("Flanagan"), who had previously worked at Tronc, the company which had purchased Spanfeller Media Group from Spanfeller in December, 2016. Flanagan took over the majority of Ms. Oona Mayo's responsibilities.

100.     Upon information and belief, none of these positions were publicly posted, either internally or externally, prior to Spanfeller's installation of the aforementioned white men into these roles.

101.     Further, according to an article published on August 2, 2019:

> Two G/O Media employees Deadspin spoke to, who are women who have an experienced track record with the company, say Spanfeller promised to give them a chance to interview for upper-level roles. But before a formal interview process could take place,

Spanfeller filled the jobs with his ex-colleagues. This has led to some protest among employees, as one staffer told Deadspin, "It definitely feels like it's the old boys club." A second employee told the site, "This guy just seems like he doesn't like women."[13]

### *Incurable Material Diminution of Plaintiff's Job Duties and Scope of Authority*

102.    Following Great Hill Partner's acquisition of The Onion and Gizmodo under the new name of G/O Media, the Company underwent a strategic shift that was colloquially termed the "one company" approach, in which Spanfeller centralized control of G/O Media with his new, all-white, all-male management team in his New York City office.

103.    Thus, The Onion lost the pre-acquisition autonomy it had enjoyed as an independent subsidiary, and the authority of The Onion's executive team was transferred to the new G/O Media executive team in New York City.

104.    As a result of the new "one company" approach, Plaintiff's job duties, responsibilities, and scope of authority as CRO and Chief of Staff were substantially and materially diminished.

105.    This strategic shift centralized control of all G/O Media subsidiaries in New York City and removed Plaintiff's and McAvoy's ability to hire their own teams and make compensation decisions at The Onion. This change also greatly diluted their ability to manage their own teams at The Onion.

106.    By way of example only, Ms. Pontius was no longer : (i) overseeing west coast video operation (this had been redistributed to McAvoy), (ii) in charge of The Onion Studios expansion into television and film long term projects (i.e., developing content for cable networks

---

[13] Caleb Ecarma, "5 Revelations From Deadspin's Exposé on Their Parent Company CEO Jim Spanfeller", Media ITE, *https://www.mediaite.com/online/5-revelations-from-deadspins-expose-on-their-companys-ceo-jim-spanfeller/* (August 2, 2019).

and streaming services), (iii) assisting in setting strategy, (iv) determining tactics to implement strategy, (v) had authority to implement strategies and tactics, and (vi) managing the LA operations. Plaintiff also lost her responsibilities regarding studio development, day-to-day budget, payroll and strategy decisions.

107.    Plaintiff tried to communicate with executive leadership regarding these issues, but she was repeatedly ignored by Spanfeller and Callahan.[14]

### *Plaintiff Gives Notice of Material Diminution*

108.    As such, by email dated June 13, 2019, Plaintiff provided notice to Onion CEO McAvoy that her job duties and scope of authority had been materially diminished, triggering the "good reason" resignation position in her Employment Agreement.

109.    By email dated June 17, 2019, General Counsel Lynne Oberlander[15] asked McAvoy how Plaintiff's role had been diminished.

110.    By reply email also dated June 17, 2019, McAvoy stated:

> Truth is that we don't have the job that she had before as we move to one company approach rather than two.
> The job of Chief Of Staff & Chief Resource Office is naturally more amorphous than that of others, but we've definitely had a general diminishment of responsibilities, and a clear reduction of authority. Not to mention, she's been taking punches from below and above to [sic] it's been a rough job.
> After everything that Katie [Pontius] has done to help us as a company, and prevented so many more issues from transpiring [16] I want to handle this as dignified as possible. I don't want to "rope dope" with her as I want to make sure she is treated at least the same way as Kurt [Mueller], as she was equally authoritative and more

---

[14] After her meeting in April with Spanfeller, Callahan also all but ignored Plaintiff. He had one phone call with Ms. Pontius a few weeks later, where he asked her to put together a strategy for HR. Ms. Pontius diligently laid out the plan to implement urgent needs for the company's lack of HR in a deck and sent it to him, along with several follow-up emails. She never heard back.

[15] As EVP and General Counsel of Gizmodo, Oberlander was at the time one of the few women left on the executive leadership team. She left the Company at the end of July, 2019.

[16] McAvoy was likely talking about the way in which Ms. Pontius had helped to advance the company throughout the course of the past eight years, *i.e.*, in that she had stayed with the Company through multiple transitions and helped to ensure its continued growth and success.

valuable and had served here longer. She's also been my most trusted partner and has handled so many personnel issues. I want to treat her as well as everyone else who has had this happen before, regardless of the ownership change, and definitely don't want to treat her worse. My concern is we're treating her worse already.

Personally, I don't see how we just don't settle this cleanly. But Jim [Spanfeller] appears to have changed his tune on Katie [Pontius] since she declined to terminate Susie [Banikarim] as her first order or business in a CTO role. AS [sic] it seemed [sic] to [sic] personal if not handled with everything else in the company. She advised us properly and somehow that has been used against her."

111.    Upon information and belief, around the same time, in mid-June, 2019 Spanfeller told McAvoy that he wanted to terminate Plaintiff. He added that he did not want to pay Plaintiff her contractual severance because he was angry with her for opposing the discriminatory termination of Banikarim, and therefore preferred to have her stay out her contract (albeit in a diminished role) rather than pay her any "dead money."

112.    Indeed, Spanfeller had previously told McAvoy that he should have fired Ms. Pontius because she lived in New York. After he met her, Spanfeller changed course but when Ms. Pontius declined to terminate Banikarim, he reverted back to his original position and told McAvoy that she did not have the "spine for the job." At that time, McAvoy vehemently disagreed with this, and told Spanfeller that Ms. Pontius had been a long-time employee of the Company, who was hardworking, loyal and had been part of making and implementing many difficult decisions over her eight years at the Company.[17]

113.    By email dated June 18, 2019, Oberlander informed Plaintiff that her notice of diminution was insufficient to trigger a "good reason" resignation.  Oberlander told Ms. Pontius that under the Employment Agreement, the Company "has an opportunity to cure" and

---

[17] Other details regarding McAvoy's advocacy of Ms. Pontius and Spanfeller's ensuing retaliation towards McAvoy are laid out in McAvoy's lawsuit against G/O Media, The Onion and Spanfeller. *See Michael McAvoy v. G/O Media Inc., et al.* Index No. 2019L012149 (Cook County, IL Nov. 1, 2019).

"therefore it is necessary for it to receive specifics so that they can be addressed and if needed, cured." Moreover, Oberlander told Plaintiff that her notice needed to be sent to the Chief Human Resources Officer and the Office of General Counsel in order to be accepted as an official notice of diminution.[18]

114.    Plaintiff therefore provided such notice the next day, as instructed, by fax dated June 19, 2019.  Plaintiff stated in her letter the following:

> My responsibilities as Chief Resource Officer have been materially and significantly diminished. I am no longer assisting in setting strategy for the Company and or charged with implementing (after determining) tactics. I no longer have a role or the authority to implement the strategy or manage personnel or assist in the hiring of new people. As another example, I am no longer responsible for managing the LA operation or running Onion Studios (podcasting and long-form). All of these actions demonstrate a substantial diminishment of my material responsibilities. Clearly, the responsibilities, which are outlined in the job description of Chief Resource Officer, and more importantly, the responsibilities that I historically had have been significantly diminished. Validating the foregoing, I have been told my job as Chief Resource Officer is no longer necessary. *Finally, and very much disheartening and disappointing, the diminishment of my responsibilities has been reinforced by the harassment and lack of respect shown to me by Jim Spanfeller.*

(emphasis added). As per the Employment Agreement, the Company had 30 days – until July 18, 2019 – to cure this diminution or else to allow Ms. Pontius to leave and pay her at her base salary rate for 12 months.

### *Disparate Treatment*

115.    In the meantime, Mueller had experienced a similar diminution in his job duties and scope of authority following Great Hill Partners' acquisition of The Onion and centralization of control under G/O Media in New York City.

---

[18]  Kurt Mueller on the other hand did not submit any formal notification stating his Good Reason diminishment.

116.    Mueller complained informally of diminution which the Company accepted as valid; unlike Plaintiff, he was not required to submit official notification of diminution to the Chief Human Resources Officer and the Office of General Counsel.

117.    The Company did not deny that Mueller's role had been materially diminished.

118.    Instead, the Company offered Mueller the role of Senior Vice President ("SVP") of Sales Operations and Marketing at G/O Media in order to cure his diminution.

119.    Mueller declined to accept this SVP role, and requested that the Company terminate his employment and provide him with nine (9) months of severance and release him from the three-month non-compete clause of his Employment Agreement, in lieu of 12 months of severance.

120.    The Company adhered to Mueller's demands.

121.    In fact, by email dated May 23, 2019, Spanfeller enthusiastically agreed: "All for making this [Mueller's departure] easy for everyone."

122.    Spanfeller added: "Communication will be important here for Kurt [Mueller] and for us. Let's discuss with him how he would like to mention this."

123.    In stark contrast to Spanfeller's statements about Mueller's diminishment and severance, Spanfeller apparently did not wish to make Plaintiff's departure "easy for everyone," in that he refused to acknowledge the diminution of her role or offer her any severance per the terms of her Employment Agreement.

124.    Also in stark contrast to his treatment of Mueller, Spanfeller refused to communicate with Plaintiff about how she would like the Company to "message" her departure.

125.    As stated, on June 18, 2019, G/O Media's former General Counsel Oberlander emailed Plaintiff rejecting her resignation for good reason notification. This alone was disparate,

and worse, treatment of Mueller, who did not submit any formal notification stating his Good Reason diminishment.

**_Breach of Contract_**

126.    Upon information and belief, when Spanfeller learned of Plaintiff's notice of material diminution, he told McAvoy that he wanted to terminate her employment, but that he did not want to pay her the severance provided in her Employment Agreement, and thus he preferred to have her work until her contract expired in January 2020, albeit in a diminished role.

127.    Upon information and belief, Spanfeller therefore tasked McAvoy with the job of devising a cure for Plaintiff's diminution.

128.    By email dated June 26, 2019, McAvoy explained to Spanfeller that the diminution was incurable, given the centralization of control in New York City, and proposed that Spanfeller offer her a new role. McAvoy stated the following:

> To the question of how best to reinstate Katie's authority, I am not sure I have the answer given the one-company management approach and the emphasis on profitability. One possible solution is to operate Onion, Inc. as a separate company with the management team of Onion, Inc. has the requisite authority and responsibilities she previously had. Alternatively, maybe there is a position at GMG or G/O which would provide her with the requisite authority and responsibilities. I am open to any suggestions, as I value Katie's talent and the contributions Katie has made over the years as a key management team member of Onion, Inc.

129.    Unsurprisingly, Spanfeller did not heed McAvoy's suggestions.

130.    On July 5, 2019, Oberlander emailed Plaintiff stating G/O Media did not "agree" that there had been a diminution in her role, but refused to address any of the allegations set forth in her notice, or that had been communicated to the Company for a number of weeks before the notice, stating that addressing such allegations would not be "fruitful." Oberlander then offered three proposals to cure the diminution that the Company refused to recognize.

131.    Through counsel, by letter dated July 11, 2019, Plaintiff again engaged in protected activity by detailing the demeaning and threatening treatment she had been subjected to by Spanfeller, outlined the numerous and continuous diminishment of her role, and stated that the proffered "cures" offered by Oberlander were insufficient as they offered no material positive change in Plaintiff's duties, responsibilities, or authority.

132.    That same day, Spanfeller fired McAvoy partly due to his consistent advocacy of Ms. Pontius's position at the Company.

133.    Plaintiff was not offered a new role as suggested by McAvoy, but rather, after McAvoy's termination, was forced to report directly to Spanfeller. In fact, on July 11th, a few hours after McAvoy had been terminated, Spanfeller wrote to Ms. Pontius: "I assume you are now aware of Mike's exit. I just wanted to reach out and state the obvious, you will now report to me." This was the first time Plaintiff had heard directly from Spanfeller since their April in-person meeting.

134.    On July 15, Spanfeller and Ms. Pontius had a follow-up call. Knowing that Ms. Pontius had already given her notice of material diminution and had retained legal counsel, Spanfeller – in a purported attempt to collaborate and play nice – asked that Ms. Pontius send over her thoughts on The A.V. Club team.[19]

135.    As such, and in the hopes of offering a workable solution to the diminution of her role, in an email dated July 16, 2019, Plaintiff attempted to outline a plan for The A.V. Club. In response Spanfeller stated the following:

> Given everything that is happening right now at the company, while I see great merit in a lot of what you have laid out here, I am not sure how fast we might enact some or all of this. Let's continue to talk about it though. In the meantime please continue to oversee these

---

[19] He asked for Ms. Pontius's advice in lieu of the sites Editor in Chief, Laura Browning, and Managing Editor, Caitlyn Penzymoog, who had both left the Company the week before.

operations. Perhaps we can work towards some of the objectives laid out here over the next couple of months.

Also I neglected to bring up The Take Out. I am thinking that you should oversee that for the moment as well. Make sense? At this point Paul is still getting his arms around the New York sites so I am reluctant to put too much on his plate and you do have a lot of the history around all of the Chicago based businesses . . . Anyway, let's keep talking about all this. Lots to think about here. Thanks again for the thoughts.

136.    Evidently, Spanfeller not only dismissed all of Ms. Pontius's ideas but then also asked her to take on overseeing The Take Out because Maidment – the individual Spanfeller had hired to replace Banikarim – had "too much on his plate." The Take Out was a spin-off food site of The A.V. Club with a small staff of three people.

137.    Ms. Pontius knew that Spanfeller was only offering her The Take Out because she had retained legal counsel after repeatedly being stonewalled in attempts to cure diminution. Nor was supervising The Take Out team a meaningful cure to the diminution of her role. It only meant that she would have to essentially monitor a team of three staff members which did not call for any particular leadership or management skills, especially as Ms. Pontius had not been given any guidance or organizational direction.

138.    Therefore, in late July 2019, Ms. Pontius's role remained diminished despite her best efforts to draw up legitimate, working plans for her position and other roles. As described further below, she sought to leave her role in the same amicable manner that Onion COO Kurt Mueller had.

139.    Counsel for Ms. Pontius sought to confer with counsel for the Company in order to reach a mutually agreeable resolution for the parties but the Company was resolute in its position that Ms. Pontius's role was not diminished and refused to negotiate her exit in good faith, like it had done with Mueller.

140.    On July 17, 2019 at 8:02 p.m. – the eve of the 30-day cure deadline – Spanfeller wrote to Ms. Pontius imploring her to stay at G/O Media, citing more false and vague promises of "additional key responsibilities." Unsurprisingly, Spanfeller did not propose or lay out any tangible plan of action, let alone any formal designation of responsibilities in his email.

141.    Ms. Pontius responded the following morning stating the following:

> I feel strongly that the Company's very recent words and promises – including your message on the eve of the cure deadline – are not sincere. I have been raising issues about my role and authority with the Company for months, and provided a formal Good Reason notice under my employment contract back on June 19. Yet, for months the Company has ignored my concerns and continued to take actions that diminish my role and authority. After eight years of pouring my heart into The Onion, it saddens me to have reached this point. I feel it best to allow our attorneys to address the issues I have raised under my contract and otherwise. I remain hopeful that we can reach an amicable and mutually-beneficial resolution.

142.    Unfortunately, unlike with Mueller's departure, an amicable resolution for Ms. Pontius was out of the question in Spanfeller's view, especially given Ms. Pontius's complaint of discrimination regarding Banikarim and Spanfeller's sexist hiring practices.

### *Plaintiff Leaves the Company*

143.    Throughout the 30-day cure period following Plaintiff's notice, G/O Media was unwilling to honor its contractual obligations to her or treat her equitably despite having done so with her similarly situated male peer, Mueller.

144.    On July 19, 2019, Plaintiff resigned from her position by operation of her Employment Agreement.

145.    After Plaintiff's resignation, Spanfeller issued written responses to a reporter from Deadspin.com with full knowledge that they would be published. In the article, titled "This Is

How Things Work Now At G/O Media," Spanfeller falsely described the details of the CTO role

offer and his decision not to hire Ms. Pontius:

> "I hired Katie who accepted the job," . . . "The next day she refused
> to join me in communicating our plans to Susie. I found this
> troubling but was okay with it given the circumstances. Katie then
> refused to assume the HR lead role around other wider layoffs at the
> company. It became clear that she was not a good fit for this position
> and we both agreed on this. I was disappointed. I thought she was
> going to be great, and it didn't work out by her own assessment."

146.    All of these statements are untrue other than the fact that Ms. Pontius had

accepted the job of CTO. Spanfeller also wrote to the Deadspin reporter that he "did not ask

Katie to fire Susie, only to be in the room while I had the conversation about Susie's future with

the company." This is also untrue.

### *The Effect on Plaintiff*

147.    Ms. Pontius's untimely resignation from G/O Media was a devastating decision

for her. Not only had she spent the better part of a decade building up her career and working

hard to become one of the only women on the executive team, but The Onion had essentially

become her home.

148.    After she realized that the Company was going to honor Mueller's Employment

Agreement but not hers, she felt worthless and began to question her own value to G/O Media

and The Onion.

149.    Her disappointment and stress continued to grow exponentially as she realized she

would be forced to resign. While her lawyers attempted to negotiate a mutual resolution in good

faith, Plaintiff suffered from sleepless nights, panic attacks and constant anxiety. Unfortunately,

these symptoms were only exacerbated when it became clear that G/O Media and Spanfeller

were not interested in allowing Ms. Pontius to leave the Company in an amicable manner.

150.     Ultimately, Ms. Pontius had to spend a significant sum of money on legal counsel in order to resign from a Company she had poured her heart and soul into for the past eight years.

151.     To add insult to injury, she had to comply with the terms of her Employment Agreement and was prohibited from working during a three-month "cooling-off" period after her resignation. After this three-month period, she diligently looked for employment but, largely due to the derogatory statements made about her by Spanfeller in the press, she was unsuccessful.

152.     Ms. Pontius remained unemployed for more than a year.

**FIRST CAUSE OF ACTION:**
**Discrimination in Violation of Title VII**
*Against G/O Media*

153.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

154.     G/O Media improperly discriminated against Plaintiff in the terms and conditions of her employment by treating her disparately and worse than her similarly situated male counterpart on the basis of her gender, in violation of Title VII.

155.     G/O Media's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

156.     G/O Media acted willfully, with malice and/or reckless indifference to Plaintiff's rights, therefore entitling Plaintiff to an award of punitive damages.

157.     Therefore, G/O Media is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of Title VII
#### *Against G/O Media*

158.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

159.    G/O Media unlawfully retaliated against Plaintiff by, *inter alia*, rescinding its offer of promote, diminishing Plaintiff's employment, and refusing to honor Plaintiff's resignation for good reason, on the basis of her protected activities, in violation of Title VII.

160.    G/O Media acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive wages.

161.    G/O Media's discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

162.    Therefore, G/O Media is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## THIRD CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL
#### *Against all Defendants*

163.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

164.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by treating her disparately and worse than her similarly situated male counterpart on the basis of her gender, in violation of the NYSHRL.

165.     As described herein, Defendant Spanfeller is personally and directly liable in that he aided and abetted G/O Media in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296(6).

166.     Alternatively, in terms of the economic realities of the workplace, Defendant Spanfeller is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296(1).

167.     Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

168.     Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

169.     Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

### FOURTH CAUSE OF ACTION:
**Retaliation in Violation of NYSHRL**
***Against all Defendants***

170.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

171.     Defendants unlawfully retaliated against Plaintiff by, *inter alia*, rescinding their offer to promote, diminishing Plaintiff's employment, and refusing to honor Plaintiff's resignation for good reason. on the basis of her protected activities, in violation of the NYSHRL.

172.     As described herein, Defendant Spanfeller is personally and directly liable in that he aided and abetted G/O Media in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296 (6).

173.    Alternatively, in terms of the economic realities of the workplace, Defendant Spanfeller is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296 (1).

174.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive wages.

175.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

176.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### FIFTH CAUSE OF ACTION:
**Discrimination in Violation of the NYCHRL**
***Against all Defendants***

177.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

178.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment by treating her disparately and worse than her similarly situated male counterpart on the basis of her gender, in violation of the NYSHRL.

179.    As described herein, Defendant Spanfeller is personally and directly liable in that he aided and abetted G/O Media in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296(6).

180.    Alternatively, in terms of the economic realities of the workplace, Defendant Spanfeller is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296(1).

181.    Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

182.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

183.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

**SIXTH CAUSE OF ACTION:**
**Retaliation in Violation of NYCHRL**
***Against all Defendants***

184.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

185.    Defendants unlawfully retaliated against Plaintiff by, *inter alia*, rescinding their offer to promote, diminishing Plaintiff's employment, and refusing to honor Plaintiff's resignation for good reason. on the basis of her protected activities, in violation of the NYCHRL.

186.    As described herein, Defendant Spanfeller is personally and directly liable in that he aided and abetted G/O Media in its unlawful discriminatory acts against Plaintiff, in violation of NYCHRL § 8-107(6).

187.    Alternatively, in terms of the economic realities of the workplace, Defendant Spanfeller is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 8-107(1)(a).

188.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive wages.

189.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

190.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**SEVENTH CAUSE OF ACTION:**
**Breach of Contract**
***Against G/O Media***

191.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

192.    The Employment Agreement constituted a legally binding and enforceable contract between Plaintiff and the G/O Media.

193.    Plaintiff dutifully followed all her obligations and responsibilities under the Employment Agreement throughout the course of her employment.

194.    Pursuant to the Employment Agreement, upon the diminution in Plaintiff's material responsibilities, authorities, and duties, Plaintiff gave G/O Media notice of her resignation for good cause.

195.    Despite timely notice and due demand, G/O Media defaulted under the Employment Agreement by failing to pay Plaintiff her base salary for a period of twelve months following her resignation for good cause, in breach of their obligations under the Employment Agreement.

196.    Due to Defendant's breach, Plaintiff is entitled to an award of damages against G/O Media as well as pre-judgment interest from the date of the breach.

## DEMAND FOR RELIEF

WHEREFORE, Pontius respectfully requests that this Court enter judgment that:

a)  Declares that the discriminatory actions, practices, and policies of Defendants as set forth above violated Title VII, the NYSHRL and the NYCHRL;

b)  Declares that the retaliatory actions, practices and policies of Defendants set forth above violated Title VII, the NYSHRL and the NYCHRL;

c)  Declares the breach of contract by Defendants as set forth above;

d)  awards monetary damages to Plaintiff to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress;

e)  awards Plaintiff punitive damages pursuant to Title VII;

f)  awards Plaintiff reasonable attorneys' fees and costs; and

g)  grants such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.


Dated: Brooklyn, New York
      September 11, 2020

                Respectfully submitted,

                Crumiller P.C.


                By:   *Julia Elmaleh-Sachs*
                      Julia Elmaleh-Sachs
                      Susan Crumiller
                      16 Court Street, Suite 2500
                      Brooklyn, NY 11241
                      (212) 390-8480
                      jes@crumiller.com
                      *Attorneys for Plaintiff*