# EXHIBIT G

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ---------------------------------------x
     KATHERINE PONTIUS EBEL,
 4
                       Plaintiff,
 5
 6      - against -           20-CV-7483
 7
     G/O MEDIA INC, ONION, INC. and JAMES
 8   SPANFELLER, individually
 9                     Defendants.
     ---------------------------------------x
10
11                     Remote deposition
12                     October 12, 2021
13                     10:08 a.m.
14
15
16
17        VIDEOCONFERENCE DEPOSITION of MICHAEL

     MCAVOY, before Michele Moskowitz, a shorthand
18
     reporter and Notary Public of the State of New
19
     York.
20
21
22
23
24
25      Job No. CS4824523
```

1                     MCAVOY

2      Q.    Okay.  Did she report to you in that

3  capacity as an HR generalist?

4      A.    She did.

5      Q.    So would it be fair to say that

6  throughout Katie's tenure at The Onion she

7  reported directly to you?

8      A.    That is fair to say.

9      Q.    Okay.  And again, I know there was a

10  lot of testimony about the Univision acquisition

11  of The Onion, but I just want to confirm that in

12  around early 2016 Univision acquired about 40

13  percent of The Onion, Inc., correct?

14      A.    That is correct.

15      Q.    Okay.  And so in between 2011 and

16  2016, you promoted Katie a couple of times,

17  correct?

18      A.    Yeah.  A few different times.

19      Q.    Okay.  And do you recall what her

20  title was just before the Univision purchase?

21      A.    Yeah.  She was chief resource officer

22  before Univision purchased the company.

23      Q.    And when was she promoted to chief

24  resource officer?

25      A.    You know, I don't have those dates in

```
 1                        MCAVOY
 2    front of me, but I'd like to say that it was a
 3    few months prior to the acquisition.  I think I
 4    became the CEO officially in July of 2015 and I
 5    had made some personnel changes in terms of
 6    titles shortly thereafter, so sometime between --
 7    or after July but prior to the Univision
 8    acquisition.
 9         Q.    Okay.  And you promoted her, as you
10    just testified, to chief resource officer,
11    correct?
12         A.    That's correct.
13         Q.    Who came up with that title?
14         A.    It was in conversation with a couple
15    of different people.  I had done some research on
16    it as well trying to figure out what -- the right
17    role to encompass all of her kind of human
18    resources responsibilities on one side of the
19    house but also her operational role, which was
20    much more beyond someone in a traditional HR
21    role.  She was helpful in all things, you know,
22    related to the CEO, and together with Kurt
23    Mueller, the two of them kind of represented the
24    two different sides of operations within our
25    company.
```

1                    MCAVOY

2       Q.    So can you explain as best as you

3  recall what Katie's job duties were as chief

4  resource officer as of January 2016 when

5  Univision acquired the 40 percent interest in The

6  Onion?

7       A.    Katie oversaw all the HR sides of the

8  business: benefits, recruiting, you know,

9  personnel decisions.  She also oversaw the video

10 operation, which supported both the review side

11 and, you know, the audience.  She oversaw -- she

12 assisted me in overseeing the various edit teams.

13 She was a proxy to me in terms of all types of

14 sides of the business where she would help me on

15 the sale side.  She really was a -- had a

16 specific role but was also a generalist in that

17 she was helping me run the business along with

18 Kurt.

19             MS. MELLK:  Chad and Julia, for the

20       sake of expedience, we tried to use exhibits

21       that were premarked at Katie's deposition

22       where we could, so --

23             MR. SCHIEFELBEIN:  That's fine.  Just

24       tell us the title of the document you're

25       going to use and the prior exhibit number

```
 1                        MCAVOY
 2        and Bates No. so we make sure we've got the
 3        right stuff in front of us.
 4              MS. TUCCIARELLO:  This will be
 5        Pontius Exhibit 2 from plaintiff's
 6        deposition that is marked D 3 through 22.
 7              MR. SCHIEFELBEIN:  You're going to
 8        pull it up?
 9              MS. MELLK:  We're going to put it up
10        on the screen.
11        Q.    All right.  So we have up on the
12   screen as Katie -- my Katie, Tucciarello, just
13   mentioned Exhibit 2 that was marked at the
14   deposition of Katie Pontius.
15              And Mike, take whatever time you need
16   to look at it.
17        A.    Okay.
18        Q.    Do you recognize this document?
19        A.    I do.
20        Q.    This is the employment agreement that
21   Katie entered into with The Onion as of January
22   15, 2016, correct?
23        A.    That is correct.
24        Q.    And from what I understand from your
25   prior testimony, and you can please tell me if
```

Page 19

```
 1                    MCAVOY
 2   I've gotten this wrong, that Katie, along with
 3   you, Kurt Mueller, and a number of other
 4   employees entered into these agreements around
 5   the time that Univision purchased the 40 percent
 6   of The Onion, right?
 7        A.    Yeah.  These agreements were entered
 8   into as part of the sale.  They were contingent
 9   on the sale of the company.  So the reason we had
10   them is that Univision and the shareholders, but
11   mostly Univision, insisted that they had
12   employment agreements with the top people.  I
13   believe there were 13 of us in all who had this
14   agreement or a version of it.
15        Q.    So at this point you've already
16   testified Katie was already chief resource
17   officer.  And in paragraph 2, the term of this
18   agreement was for three years, correct?
19        A.    That's correct.
20        Q.    And I understand that at some point
21   the terms of Katie's agreement were extended
22   through January of 2020, correct?
23        A.    Yes.  Univision had extended the
24   agreements prior to their expiration by a year.
25        Q.    And yours was extended as well?
```

1                    MCAVOY

2  president.

3       Q.    Am I correct that at some point

4  before Kurt left the company in May of 2019 that

5  he held -- he was elevated to a senior vice

6  president title?

7       A.    Actually, Kurt was elevated to a

8  senior vice president before he was elevated to

9  chief operating officer.  So the C-level jobs

10 really removed the need for the senior vice

11 president.  Kurt kept his senior vice president

12 title as part of the -- it was really his title

13 as part of the reorganization with Univision

14 where Kurt ran the sales operation side for the

15 Gawker and Onion companies.

16      Q.    How come Kurt signed your agreement?

17      A.    Well, unfortunately, you're not able

18 to sign your own agreement so it needed to have a

19 party who -- I believe Kurt was an officer of the

20 company and so it just needed to be someone who

21 had signing authority.  And that was the advice I

22 was given by counsel not named Chad that that's

23 why I needed to do that.

24      Q.    Who were the other officers of the

25 company at that point?

Page 41

```
1                    MCAVOY

2       Q.      Are you a Notre Dame graduate?

3       A.      I am not.

4       Q.      You are a college graduate though,

5    correct?

6       A.      I am.

7       Q.      I just want to talk about what Katie

8    Pontius's job duties were in January 2016 at the

9    time that Univision acquired 40 percent of The

10   Onion.  So you've already testified that her job

11   title was chief resource officer, right?  Do you

12   know if there was a job description for the chief

13   resource officer at that time?

14      A.      I believe there was.  I'm not sure --

15   I can't recall.  I don't remember seeing a

16   document, but I remember she and I had worked on

17   one together in terms of what the

18   responsibilities were.

19      Q.      Did you work on that prior to

20   Univision's acquisition?

21      A.      Yeah.  As part of offering the job, I

22   wanted to, you know -- or in giving her a

23   promotion, we definitely defined what the

24   responsibilities were and I wanted -- and I

25   needed her to kind of manage the video operation.
```

Page 42

```
 1                    MCAVOY
 2   We had a person in that role previously who had
 3   some management challenges and Katie was a -- you
 4   know, she was a great fixer.  She could go in,
 5   diagnose problems, get input from various people
 6   on the team, and figure out the best way to kind
 7   of recalibrate the operation.
 8            So she -- that was -- a big part of
 9   the beginning of her role was hey, clean up this
10   video operation, so that was September or October
11   of 2015, as well as continue with the personnel
12   side, which I talked about earlier, the human
13   resources, and most importantly, helping me with
14   all things running the company as I saw her as,
15   you know, handling a lot of special projects, but
16   she was also just a really good sounding board
17   and always had the, you know, really good
18   insights and intel on how the company was
19   operating from the ground level.
20        Q.    So as of 2016, at the Univision
21   acquisition time, those were her job duties,
22   correct, what you testified to now and earlier
23   this morning?
24        A.    Yeah.  Combination of those two, yes,
25   that's correct.
```

1                    MCAVOY

2    profitability, its shareholders, you know, its

3    employees, and all major stakeholders.  And my

4    biggest task at hand at that point was fulfilling

5    a successful, you know, sale of the company to

6    Univision and making sure as part of the new

7    regime that we kept the operation going as best

8    we could and to make it more successful.

9              And part of the reason was there was

10   additional share incentives for the majority

11   shareholder to get increase in valuation or to

12   get, you know, his shares sold at a later date

13   through a quick call transaction.  So my job was

14   to oversee company value, and that includes

15   managing all the functions that are part of a

16   company.

17        Q.    And I have this right, around

18   September of 2016, and please correct me if my

19   dates are wrong, Univision purchased the Gawker

20   or the GMG assets, correct?

21        A.    Yes.  And I believe it was finalized

22   at that point in September.

23        Q.    Okay.  And again, I don't want to

24   duplicate testimony you've already given, but it

25   was around this time that Univision created

1                          MCAVOY

2     Fusion Media Group as sort of the umbrella parent

3     for Onion, Inc., and the GMG assets, right?

4          A.     Fusion Media Group existed the moment

5     Univision purchased us as part of a subset of

6     Univision, and The Onion and Fusion Media Group

7     were, you know, working on a plan to become, you

8     know, one umbrella company together.  That plan

9     was delayed until Univision purchased Gawker.

10    That process -- Gawker assets -- went on for

11    quite some time.  I was privy to those

12    discussions.  And so yeah, Fusion Media Group

13    existed day one prior to September.  It just

14    wasn't -- a plan for integration didn't begin

15    until Gawker was purchased.

16         Q.     The integration -- and again, I'm

17    just going to go at this as a high level so we

18    don't have to waste a lot of time on it.  That

19    integrated a number of functions at the Fusion

20    Media Group level, including marketing and PR

21    were consolidated, correct?  They weren't run out

22    of The Onion, they were run through the FMG

23    umbrella, right?

24         A.     Pieces of each of those things were,

25    yeah.  There was still some marketing that was

1                    MCAVOY

2    run through The Onion alone.

3         Q.    Okay.  But would you agree that the

4    bulk of the marketing was run through FMG?

5         A.    The bulk of the support services were

6    consolidated, but there was a piece of each

7    support services that was still within the brands

8    themselves or the companies themselves.

9         Q.    And the other areas that were

10   consolidated were technology, right?

11        A.    Technology, sales, finance, HR.

12        Q.    Anything else?

13        A.    IT.  Again HR, IT, they all had kind

14   of dual sides where there was an individual -- a

15   lot of them were consolidated, but they still had

16   individual representatives who worked for or

17   indirectly through a dotted line to the manager

18   of a subsidiary.

19        Q.    But the functions related to benefits

20   and payroll, those kinds of things were all

21   consolidated at the FMG level, right?

22        A.    To some degree.  But the truth was in

23   The Onion they had -- we had a self-insured plan

24   so it was -- there was an individual Onion, Inc.,

25   employee who was managing human resources who

```
 1                      MCAVOY
 2   worked for the head of HR for Fusion Media Group
 3   but also had a dotted line to I believe Katie and
 4   me.
 5         Q.      Do you remember who that person was?
 6         A.      Went through a few different changes.
 7   One -- I can't think of her last name, Anna.  I
 8   should know this.  It's been a while.  And then
 9   later Jesse Lively replaced Anna.  And yeah, I
10   can't recall --
11         Q.      It's okay.
12         A.      -- Anna's last name.
13         Q.      At some point Katie started referring
14   to herself as chief of staff, correct?
15         A.      Yeah.  As part of the -- as part of
16   the reorganization or the integration, you know,
17   I had worked with Felipe and Isaac, my bosses, to
18   say hey, here's how we're going to recalibrate
19   the sales engine and my role.  As part of the new
20   organization I took on an additional role where I
21   oversaw all the revenue of the group and I talked
22   about having Katie become chief of staff for me.
23   She never really forgave or, you know, gave up
24   the chief resource officer, but I primarily
25   called her my chief of staff where she was
```

Page 51

1                        MCAVOY

2    helping me with all things but primarily focused

3    on the content or Onion, Inc., like content

4    operations, video, and editorial content.

5         Q.    When you say she focused on editorial

6    content, what do you mean by that?

7         A.    Meaning she was the person there --

8    where I was focusing on the sales side with Kurt,

9    she was the one working with the various

10   managers, you know, or managing editors who were

11   really running more of the content operations for

12   the editors in chief or executive editors.

13             So she was working with those teams

14   on, you know, what they were producing, working

15   with them on, you know, figuring out how to

16   pursue long term -- long form ideas, figuring

17   them out, how to better connect with the sales

18   operations for ideas for sale.  She was really

19   handling all those types of things in conjunction

20   with myself.

21        Q.    Who came up with the chief of staff

22   title?  That was you?

23        A.    Yeah, it was me.  It was a title that

24   Univision had used, you know, and it was one

25   that -- my boss, Isaac, had a chief of staff.  It

Page 52

```
 1              MCAVOY
 2   was a -- you know, a title that was new to some
 3   forms of media, but you know, a very important
 4   role in terms of someone being involved in all
 5   things you are and being a proxy for you and
 6   being able to provide the multiple touch points
 7   to either people who worked for you or people who
 8   work for the people who worked for you.  So there
 9   was a little bit more access than you would have
10   if you were just managing it yourself.
11       Q.    And you were aware that at some point
12   Katie stopped using the chief resource officer in
13   her e-mail title and only referred to herself as
14   chief of staff, correct?
15       A.    I don't know if I thought about that,
16   but that's my understanding, that her primary job
17   was chief of staff.  That's how we referred to
18   her.  But I don't remember her ever not having
19   the chief resource title.
20       Q.    I think you said you reported
21   initially to Felipe and to Isaac Lee, and then I
22   think you testified in one or both of your prior
23   depositions that at some point Felipe left and
24   Sameer Deen came in and he became your boss,
25   right?
```

1                    MCAVOY

2        A.      He became one of my two bosses.  So I

3    worked for a woman Tonia O'Connor on the revenue

4    side of the business and then Sameer Deen for

5    kind of The Onion or edit side and then

6    eventually Tonia left and then Sameer was my sole

7    boss for a few months as the company was sold.

8        Q.      And I think you previously described

9    him as a quote/unquote placeholder boss; is that

10   correct?

11       A.      Yes.  And I stand by that testimony.

12       Q.      What do you mean by placeholder boss?

13       A.      I believe I said it last time.  He

14   was moved into that role as one of his

15   responsibilities just to provide some semblance

16   of organization as the company was being, you

17   know, sold.  Sameer didn't really want to rock

18   the boat, do any changes, do anything, he just

19   wanted to get the company sold, as that was the

20   direction that had changed when Vince Sadusky

21   took control I want to say in July of 2018 and

22   then whenever Tonia left, which I think was

23   shortly thereafter or part of that time.

24       Q.      Vince Sadusky, what was his role?

25       A.      He was the CEO of Univision.  So

1                        MCAVOY

2    Univision?

3         A.    I don't know if I would describe it

4    like that.  Katie and I had discussions all the

5    time about how to make the company better, both

6    Onion, Inc., and Fusion Media Group, and you

7    know, obviously that included managing different

8    functions different ways.

9         Q.    So I understand that in January 2017

10   Katie moved from Chicago to New York, right?

11        A.    I'm not sure of the specific dates.

12   I do recall her moving around that time frame.

13        Q.    And why did she move?

14        A.    For a couple reasons.  I mean, partly

15   at that time I was spending a lot of time in New

16   York, and having the Gawker team and having

17   someone out there wasn't -- you know, it only

18   helped in conversations.  There was definitely a

19   personal component of being out there.  We also

20   had a desire before she moved out there to get

21   more of the business in New York and Los Angeles,

22   as it was something that was really important to

23   us.

24               Particularly with comedy writers and

25   alumni where our networks were all on the coast,

Page 59

```
 1                    MCAVOY
 2   one of the things she had done as part of the
 3   move and we wanted her to work on was really
 4   solidifying the alumni network in New York.  She
 5   went to New York instead of L.A. to strengthen
 6   those relationships.
 7        Q.    So I just want to go back over this.
 8   So you said that there was a personal component
 9   to the move.  What was the personal component?
10        A.    The personal component is that I
11   believe at some point she started dating Eyal and
12   so she moved -- you know, or had an interest of
13   moving as part of that.  And for me, you know,
14   I've always -- from a location standpoint I've
15   always been fixated -- people just seem to get
16   the job done, it doesn't really matter where
17   they're located.  It's obviously great to have
18   people in one of your hubs.  And there was an
19   advantage for me to have her in New York as it
20   related to the alumni relations and building out
21   some of The Onion studio stuff that I mentioned
22   in the previous question.
23        Q.    Was it her idea to move to New York?
24        A.    It was a conversation that she and I
25   both had about New York and L.A.  And there was a
```

Page 60

```
 1                    MCAVOY
 2   time -- in that same point in time there was
 3   pretty significant conversations with my boss
 4   about me moving out to New York as well.  So it
 5   was conversations that were definitely happening
 6   at the Univision level and my level and her.  I'm
 7   not sure who suggested it or the timing of it,
 8   but it was definitely a conversation that was
 9   beyond her personal desires.
10        Q.    Who actually made the decision to
11   have her relocate to New York?
12        A.    She wanted to move to New York and I
13   was very comfortable with that idea for all the
14   reasons I just mentioned.  So I would say we both
15   made the decision, but I wasn't going to move her
16   to New York if she didn't want to move to New
17   York.
18        Q.    Did you know Eyal at that point?
19        A.    I did know Eyal, yes.
20        Q.    Were you two friendly?
21        A.    Eyal worked for me, so yes, I was
22   friendly with him.
23        Q.    And did you two socialize outside of
24   work at that time?
25        A.    We did not.  Similar to my other
```

```
 1                      MCAVOY
 2    reports, we really didn't socialize outside of
 3    work, but there was a social component to work as
 4    there's a social component any time you're
 5    spending time with people.
 6         Q.    And at some point Eyal left the
 7    company, right?
 8         A.    He did.
 9         Q.    After Eyal left the company, did you
10    two socialize?
11         A.    You asked me that previously.  I
12    believe -- I thought you did.  I believe I've
13    seen him once maybe since he left.  I don't think
14    I've seen him after I left.
15         Q.    We talked about -- you had said that
16    you had been spending time in New York, that
17    there was a personal component, which we
18    discussed, and then you also said that you
19    thought it made sense because she could get more
20    business in New York.  What does that mean?
21         A.    That phrase was referencing to The
22    Onion alumni relationships and the long form.  So
23    some of the long form -- long form meaning TV and
24    film -- you know, buyers are in New York.  A lot
25    of the talent who create those types of
```

Page 62

1                          MCAVOY

2    initiatives are based in New York.  We knew from

3    a company standpoint that our editorial writers

4    on staff may or may not have the ability at this

5    moment or the time to create really compelling

6    long-form content, but we knew that our network

7    of writers definitely had that ability, of former

8    writers.  And so that's where she was, you know,

9    working on the business in New York which was

10   long-form development and building out better

11   alumni relations as part of that.

12        Q.     Just so I'm clear, what are you

13   referring to when you refer to alumni?

14        A.     People who had been part of The Onion

15   in more of the writing or content operation and

16   had moved on to either write on different

17   television shows in New York or L.A. or people

18   who were trying to pitch shows or people who were

19   just overall in the comedy business as past

20   performers.

21              Just to footnote that, some of them

22   may have been contributing writers for us and not

23   actually full-time employees, meaning they

24   submitted some jokes or ideas, but they weren't

25   paid by us on a full-time basis.

```
 1                      MCAVOY
 2   working for me who ran different sales functions.
 3   So I had I think five or six direct reports on
 4   that side of the house and four or five on The
 5   Onion, Inc., side of the house.
 6        Q.     And those people reported to you,
 7   right?
 8        A.     They -- yeah, they did.
 9        Q.     And we talked about the HR function
10   which -- and there was the FMG HR function and
11   then there was the person at The Onion who had
12   the dotted line, correct?
13        A.     Yes.  We did speak about that.
14        Q.     So am I correct that when you talk
15   about strategy and what Katie's role was, she was
16   just giving you her opinions on how these
17   departments should be run, right?
18        A.     How the organization as a whole
19   should be run, yes.  Just giving me her thoughts,
20   ideas, and ideas from other people, which is one
21   of the things that I thought was -- that she did
22   extremely well was get -- people who wouldn't
23   normally communicate or share, give them the
24   comfort to share their ideas.
25        Q.     So explain that to me.
```

```
 1                      MCAVOY
 2      A.     It was clearly both.  She also
 3  diagnosed our fellowship program on The Onion
 4  comedy side wasn't working.  So she figured out
 5  ways to kind of improve that in terms of, you
 6  know, diversity, equity, and inclusion, as the
 7  process was done in a way that was, you know,
 8  unintentionally not helpful for those reasons.
 9            She created those same types of
10  programs and initiatives on the other brands to
11  find better talent.  She'd work with the EICs to
12  figure out how to best organize their group or
13  get staffing and resourcing.  I remember her
14  spending a lot of time with Kevin Pang at The
15  Takeout in how they would kind of manage
16  personnel and get that operation running, whether
17  they should, you know, hire someone versus use a
18  content budget.
19            There's no shortage of examples of
20  how she would delve in or work with Mara on how
21  to set up the video operation in Los Angeles with
22  Leo.  She definitely jumped into a variety of
23  areas.
24      Q.     So you gave me a number -- diagnose
25  the fellowship program, she created the same kind
```

1                    MCAVOY

2    she would bring those to me proactively, you

3    know, saying here's what I'm hearing, other times

4    I would say hey, can you look into what this

5    issue is you know, and sometimes people would

6    bring her things, sometimes she would just figure

7    them out on her own.

8        Q.    You just said that she worked with

9    the content teams, how they can better work with

10   the sales teams and how we can best use

11   resources.  And I want to make sure I'm

12   understanding resources.  When you talk about

13   resources, you're talking about personnel, right?

14       A.    It's primarily personnel in that

15   example of saying how do we carve out someone's

16   time who wants to write 100 percent for the

17   comedy editorial operation that is, you know, you

18   can write what you want, how do we get those

19   people to spend some of their time writing

20   content that's in conjunction or for a brand

21   because the people who write the Onion content

22   are better than other writers that we have on

23   staff.

24               So figuring out clever ways to kind

25   of balance the individual employee's concerns or

1              MCAVOY

2    think is the line I keep saying and other duties

3    as signed.

4         Q.    Anything else you want to add?

5         A.    No.

6         Q.    During this time period, you were

7    speaking with her daily?

8         A.    Yes.

9         Q.    Multiple times a day?

10        A.    I would say multiple times a day.

11        Q.    And do you recall when she moved back

12   to Chicago from New York?

13        A.    I don't recall the specific date.  It

14   was before the company was sold, so maybe it was

15   March of '19.  I'm not sure.

16        Q.    And did you ask her to return?

17        A.    Yeah.  I was having conversations

18   about her as part of an impending sale, that it

19   would be better to have her in Chicago than in

20   New York just with all the personnel matters of

21   people locally.  So it was something that we had

22   talked about.  Again, she was up for it or she

23   wouldn't have moved back, but that was the

24   thought behind it.

25              MS. MELLK:  Michele, can you just

1                      MCAVOY

2        read back the answer?

3               (The record is read back by the

4        reporter.)

5        Q.      So were you having conversations

6    about her or with her or both?

7        A.      I'm not sure who -- about her to --

8        Q.      That was your testimony, you were

9    having conversations about her, that's why I

10   wanted it read back.

11       A.      Sorry.  With her.  I'm sure I also

12   communicated it to Sameer or someone else as

13   well.  Not that he would have been too in the

14   weeds on that.  But yeah, it was definitely a

15   conversation with her about the benefit of having

16   her in Chicago even though she could still work

17   in New York.

18       Q.      Do you recall if you told her that

19   she was exposed being in New York?

20       A.      I don't recall that phrase being said

21   or used.

22       Q.      Did you have any conversation with

23   her that it would be better for her -- other than

24   the personnel-related issues you just said, but

25   it would be better for her from a career

Page 86

1                    MCAVOY

2      Q.    Again, I'm not going to go through

3  this since you've testified at length, the sale

4  closed in early April 2019, correct?

5      A.    I believe it was mid April, yeah, mid

6  April 2019.

7      Q.    Upon the closing of the sale, G/O

8  Media was created correct?

9      A.    I'm not sure of the mechanics of it,

10  but the company was referred to as G/O Media

11  shortly after the sale.  I don't know when it was

12  incorporated or any of that stuff.

13      Q.    G/O Media was at that point, upon the

14  sale closing or whenever it was created -- or

15  upon the sale closing was the parent company to

16  The Onion, Inc., and to the Gawker properties,

17  right?

18      A.    That's my understanding.

19      Q.    Jim Spanfeller was the CEO of G/O

20  Media, correct?

21      A.    Yes.

22      Q.    And I think you had testified in one

23  of your prior depositions that you were aware

24  that Great Hill had an exclusivity agreement with

25  Univision regarding the purchase in early 2019;

1              MCAVOY

2    the potential purchaser was with your employees?

3         A.     Not that I'm aware of.  I'm not privy

4    to the -- I was not privy to the agreement

5    between Great Hill Partners and Univision.

6         Q.     During this time frame, right, the

7    period of the exclusivity agreement or the couple

8    of months prior to the actual sale closing, did

9    you have any discussions with either Katie or

10   Kurt Mueller or both of them about options that

11   you might have under your employment agreement in

12   the event you were unhappy under new management?

13        A.     I don't believe so.

14        Q.     So you testified you think the sale

15   closed in mid April.  And upon the sale closing,

16   Jim Spanfeller came to the Chicago office,

17   correct?

18        A.     He did.  He came that week.  I'm not

19   sure which day.  Maybe Wednesday night, Thursday.

20        Q.     Do you know if Jim met directly with

21   Katie while she was there?

22        A.     I do.  Jim met with probably 13

23   people or so.  I think he met with Katie as the

24   last person he had met with as part of his -- I

25   think he called them speed dating -- or somebody

```
 1                      MCAVOY
 2   called them speed dating interviews where he
 3   probably spent 15 to 30 minutes with a variety of
 4   people.
 5        Q.    There was a dinner that night with
 6   Jim Spanfeller, right?
 7        A.    Not correct.  There was a dinner the
 8   night before.
 9        Q.    The night before.  And Katie Pontius
10   went to that dinner, correct?
11        A.    Katie along with about 12 others went
12   to that dinner.
13        Q.    Okay.  And I believe you testified --
14   again, I'm not sure which deposition -- that you
15   met with Jim one on one during his visit to
16   Chicago, right?
17        A.    I did.  Jim and I -- Jim was a little
18   late to dinner the night before I think because
19   he had a busy day in New York.  I'm not sure if
20   his flight was delayed.  I can't recall that.
21   But the next morning following the dinner Jim and
22   I spent some time together in the morning as well
23   as Jim, Kurt, and I, and then again Jim and I.
24        Q.    And if I recall correctly, I think
25   this was during your testimony in the Jerard
```

1                        MCAVOY

2    matter, you testified that it was during this

3    conversation when Jim asked you how come you

4    didn't fire Katie because she was in New York and

5    you were based in Chicago, right?

6         A.    That's correct.

7         Q.    During your conversations with Jim on

8    that day in question, did you discuss anything

9    else about Katie other than, you know --

10        A.    Yeah.  Jim wanted to know what I

11   thought of her, what her job was.  I explained

12   those things to Jim, said I was a big fan of

13   Katie and he met with her later in the day.

14        Q.    When you explained to him what her

15   job was, was it similar to the explanation you

16   just gave me in this deposition?

17        A.    It was similar to that and it was

18   also more emphasis on her strengths with various

19   personnel matters in particular and strategy.  So

20   instead of the more -- I think we focused a lot

21   on the mechanics of video or long form.  It was

22   more general with more of the personnel or the

23   strategy side.

24        Q.    And I understand from your prior

25   testimony that you had met Jim before these

Page 93

```
 1               MCAVOY
 2   were running as an independent from a major media
 3   company.
 4        Q.    Do you recall if you had any
 5   one-on-one conversations with Katie about Jim's
 6   visit?
 7        A.    I don't recall.
 8        Q.    Are you aware about whether Katie
 9   reached out to Jim right after his visit?
10        A.    I'm aware that she and Jim connected
11   as a follow-up to their meeting, you know, and
12   then they began discussions about a human
13   resources role G/O.
14        Q.    Did you suggest that she reach out to
15   him about anything?
16        A.    I didn't suggest that.  I definitely
17   suggested to Jim as part of her description of
18   responsibilities that this was a very talented
19   person here, and I believe my recommendation to
20   him -- and I believe I've seen some
21   correspondence since then where he relied on my
22   view of her, you know, as well as her desire and
23   initiative to try to help someone, you know, lead
24   an integration process is how they got to that
25   responsibility, that new job.
```

1                    MCAVOY

2      Q.     What new job are you talking about?

3      A.     It was the chief talent officer.  I'm

4  not sure what Jim called her -- what Jim was

5  planning on having.

6      Q.     I'll just give you the date as far as

7  I understand it, on April 22nd Jim offered Katie

8  this chief talent officer role.  Does that make

9  sense?

10     A.     Sometime in the -- call it the middle

11 end of April, that makes sense to me, but before

12 the very end of April where we began the layoffs.

13     Q.     Okay.  And I think you said you

14 understood the CTO role to be the chief talent

15 officer role, right?

16     A.     I believe that's what it was called.

17     Q.     And that was going to be a chief

18 talent officer role with G/O Media, correct?

19     A.     Yes.

20     Q.     Did Jim tell you that he was going to

21 offer Katie this role before April 22nd?

22     A.     Yeah, Jim did.  Jim and I talked.  We

23 had a walk and talk where he talked about that

24 role, that he wanted to offer her that job, and

25 that, you know, it was something he hoped she

1           MCAVOY

2    would consider or she could keep doing what she

3    was doing today.

4         Q.    What's a walk and talk?

5         A.    It's where we walked around the city

6    of New York because Jim wanted to have a

7    conversation but not be in the office.  And so we

8    walked and we talked about various things,

9    including Katie Pontius.  So that is the formal

10   definition of a walk and talk.

11        Q.    Got it.  Okay.  So I take it at some

12   point between Jim's visit to Chicago and the time

13   he offered her the CTO role, you went to New

14   York, right?

15        A.    That is correct.

16        Q.    Got it.  And other than -- you know,

17   in this walk and talk you just referred to, other

18   than talking about the role and hoping she would

19   take it and if she wouldn't, she could, you know,

20   go back to The Onion, did you talk about anything

21   else relating to Katie Pontius with Jim?

22        A.    Just -- I don't believe so.  I think

23   it was more or less just that I thought she was

24   impressive, that he, you know, liked my

25   recommendation and my view of her, and that he

Page 96

```
 1                    MCAVOY
 2   was planning on offering her that role.  That was
 3   the substance of it.
 4        Q.    And looking at this time frame, again
 5   between the Chicago visit and your visit to New
 6   York where you had the walk and talk with Jim,
 7   were there any conversations with Jim between
 8   that time about Katie Pontius?
 9        A.    I'm not sure.  I believe we probably
10   talked about it as part of other matters.  I
11   remember -- I don't remember all the specifics of
12   that.  I remember being part off part of the next
13   week in Florida for a spring break with my kids.
14   I remember talking to Jim on the Friday after the
15   town hall and asking him whether he was -- had
16   planned to terminate me, as he was talking about
17   hiring someone new in a role.
18             And I don't remember specifically
19   talking about Katie, but I do remember talking
20   about just general what his thoughts were on
21   structure of the company going forward.
22   Especially since he and I had a separate
23   conversation of how are you going to cut
24   multimillion dollars out of the budget, which he
25   said he wanted to also reorganize the company as
```

1                           MCAVOY

2        A.      I don't believe I was aware that she

3    accepted the job.  It's my understanding that

4    they were both considering each other for the

5    job.  So I don't -- that was my understanding.

6        Q.      After you sent this e-mail, Katie, as

7    far as you know, and Jim had a meeting, correct?

8        A.      Yeah.  I believe they had a meeting

9    the next day.  They had an interview.  Or maybe

10   it was two days later.  I don't recall the

11   specific date.

12       Q.      Did Katie speak with you after that

13   meeting?

14       A.      She did, yes.

15       Q.      What did she say to you after that

16   meeting?

17       A.      She told me she was fired in the

18   meeting and that the meeting had gone really

19   terribly and lasted a short amount of time.  I

20   remember seeing her leave -- it was in a glass

21   conference room -- and seeing her, you know, out

22   of the meeting with him probably 15 or 20 minutes

23   or whatever it was, because I was in my own

24   meeting, and I didn't catch up with her till

25   after I closed my meeting, but she was

1                    MCAVOY

2    to --

3         Q.     That she shared with you.

4         A.     At that time I think that's what I

5    remember.  I don't recall any other details.

6         Q.     And you said that you would speak

7    with Jim and Tom, and by Tom you mean Tom

8    Callahan, correct?

9         A.     Tom Callahan, yup.

10        Q.     And you reported directly to Jim,

11   right?

12        A.     I did.  I reported directly to Jim,

13   but Tom was my business liaison.  The way Jim had

14   set it up was Tom was the guy who worked on all

15   the financial business side, as Jim didn't want

16   to deal with all those specifics, so I would work

17   through Tom on all that and then eventually the

18   two of us would kind of come together with Jim on

19   certain matters.

20        Q.     So Tom was the finance guy, and you

21   just testified what you do with him, but you

22   directly reported to Jim, who was the CEO of G/O,

23   right?

24        A.     Yes.  Jim was my boss.  Former boss.

25        Q.     So as you testified, you told Katie

1              MCAVOY

2    you would speak with Jim and/or Tom.  Did you

3    speak with Jim after you had this call with

4    Katie?

5         A.     Yeah.  I spoke with Jim and I also

6    spoke with Tom.  I did both things I said I would

7    do.

8         Q.     Was that the same day you had the

9    call with Katie that you spoke with Jim?

10        A.     It was.  It was -- Jim and I had time

11   set up later, we had talked through, you know,

12   the stuff.  Oh, the other thing I do recall from

13   that meeting, I remember, you know, Katie talking

14   to Jim about -- we had this -- an incident where

15   one of the new hires, new consultants, that Jim

16   had hired to work on my team had tipped a young

17   woman.  I remember Katie talking to Jim about

18   that, Jim getting, you know, agitated about that.

19             Jim and I also talked about that in

20   our conversation as well as the Katie thing, as I

21   had sat the gentleman he had hired, Sean

22   Flanagan, down that morning and said that that

23   kind of behavior's unacceptable.  So I just

24   wanted to -- that -- by thinking of my meeting

25   with Jim, I recalled that Katie also mentioned

1                        MCAVOY

2    just talking about Katie Pontius.  You don't have

3    to share everything else you talked about.

4    Subsequent to her calling you upset.

5        A.     Yeah.  Jim had said that the meeting

6    had not gone well at all and that he thought my

7    assessment of her was wrong, that she didn't have

8    the spine for the job.  I said I had the complete

9    opposite experience with her.  I asked him, you

10   know, what he heard and he was trying to

11   articulate it saying she's not comfortable

12   hiring -- firing Susie.  I said my understanding

13   is the exact opposite, is that it doesn't make

14   any sense to single out one individual to fire

15   them.  You know, when you're going to do a layoff

16   of 25 or 30 people, why not do it all together.

17             Jim's argument for doing it was that

18   he wanted to kind of send a message to the

19   organization, which is the reason why he wanted

20   to fire Susie in advance, but he did in the

21   end -- you know, he and I talked about that and

22   how that didn't make sense, which is the same

23   thing that Katie had suggested to him, and that

24   by grouping it together he made it, you know, a

25   layoff instead of an individual thing of him not

1              MCAVOY

2   I later confirmed with Katie that she exactly

3   said what I had said to him, but at the time I

4   talked to Jim about the piece, my goal in that

5   meeting was to understand if she were in fact

6   fired.  Because she felt like she was fired.

7            My conversation with Tom Callahan

8   before my meeting with Jim was Jim thought she

9   was fired, that he thought that he had fired her

10  when -- you know, when he escorted her out of the

11  office and so that was my -- my point -- my goal

12  in the -- I didn't want -- I wanted to know if my

13  employee got fired.  I care a lot about Katie,

14  she's a great employee, and I wanted to

15  understand what actually had happened between the

16  two.

17      Q.    Well, did Jim tell you he had fired

18  her?

19      A.    Jim -- he said no.  And we talked

20  about it the following day, about the no, but he

21  was unsure of how it left because he didn't

22  actually say, "You're fired," but he said, "I

23  don't know what you do here."

24            And he told me, he's like, "I don't

25  know what she does here."

Page 121

```
1                        MCAVOY
2         A.    I would say it would look bad, but
3    even worse, there's nothing worse than letting --
4    like, giving one piece of bad news and then
5    people feeling like another, you know, piece is
6    coming without having conclusions.  You're better
7    off ripping a Band-Aid off versus doing the death
8    of 10,000 cuts.
9              So the advice was optically for sure,
10   but even beyond the optics, it just doesn't make
11   sense to do the death of 10,000 cuts.  Rip the
12   Band-Aid off once and then you can build trust
13   with your people.  The last thing you want to do
14   is tell people no, no, no, this is it, and then
15   make cuts the next day.  You're not being
16   truthful.
17        Q.    So at some point you determined that
18   Katie had not been fired, correct?
19        A.    Yeah.  My conversation with Jim the
20   following day, my conversation -- you know, Katie
21   didn't have clarity that she was fired.  I talked
22   to Jim and he said he didn't fire her and I said,
23   you know, "Are you still considering her for the
24   role"?
25              He's like, "I would consider it if
```

Page 122

1                           MCAVOY
2     she still wanted to do it."
3                 I said, "Can you reach out to her?"
4                 This is the following day on the
5     phone, I believe, because I flew out.
6                 And he said, "Well you can tell her
7     as well and she can reach out to me?"
8                 I'm like, "I think it's best if you
9     reach out to her, as you're the one who ended the
10    conversation."
11                And then he never communicated to her
12    and she, you know, never reached out to him.  And
13    she told me that, you know, she wasn't planning
14    on it because he was the one who kind of ended
15    the conversation and she felt like it was weird
16    to then reopen that discussion on her own.  I
17    told Jim all that stuff in our conversation and I
18    told Tom the same thing as well.  That all
19    happened in that two-day period.
20          Q.    So have you told me -- I know you had
21    multiple conversations with Jim and multiple with
22    Tom, a couple with -- have you told me everything
23    that you remember from those whole series of
24    conversations during those two or so days?
25          A.    I think with respect to those two for

1                    MCAVOY

2    time.

3         A.    Okay.

4         Q.    So the first thread of this e-mail is

5    from May 22nd and it's from you, right?  Mmcavoy

6    @fmg.com, that was one of your e-mail addresses,

7    correct?

8         A.    Yes.

9         Q.    And when you say "gents," are you

10   addressing Jim and Tom?

11        A.    I believe so.

12        Q.    And you say, "Caught up with each of

13   you on our Kurt dilemma."  And can you tell me

14   what dilemma refers to?

15        A.    It's my understanding that it refers

16   to the decision that Kurt's -- that we're either

17   looking at moving Kurt into a role that he may

18   have a claim about diminishment, as he'd lose

19   some responsibilities, or we're trying to work

20   out a severance agreement with him instead of

21   going down the good reason path.

22        Q.    And before you sent this particular

23   e-mail, had you spoken -- strike that.

24             You say in the second role, [sic] "It

25   looks like the role we're proposing for Kurt

1                    MCAVOY

2    isn't what Kurt is interested in doing, as he

3    feels it's a step back in his career and worried

4    about his market value, et cetera," and then you

5    go on to say, "So I think we're at the point

6    where we should just move to an amicable

7    separation.  Working around his employment

8    agreement will be bad for everyone."

9             Had you spoken with Kurt about moving

10   to an amicable separation before you sent this

11   e-mail?

12        A.    Yes.  I had a conversation with

13   the -- with Katie and Kurt in the middle of April

14   as part of the cuts where everyone had said

15   they'd prefer to work at The Onion or G/O Media,

16   but in the event we couldn't figure out a role

17   that was commensurate with what they had done in

18   the past, as they knew we were reorging and we

19   needed their savings in their salary to help meet

20   the cuts, that they were willing to take a

21   modified version of their severance agreement in

22   exchange for an amicable and more friendly

23   parting.

24             MS. MELLK:  Michele, can you read

25        that back to me just so I make sure I've

1                         MCAVOY

2       gotten everything?

3                 (The record is read back by the

4       reporter.)

5       Q.      So what prompted you having this

6  conversation with Katie and Kurt?

7       A.      Tom Callahan and Jim asked me to cut

8  multimillion dollars from The Onion, Inc., and

9  cut the sales budget in mid April of 2019.  As

10  part of that conversation with Tom, one of the

11  items -- one of the questions I asked and one of

12  the items he raised was whether it was more

13  important to make cuts as it was geared to EBITDA

14  or for cash, two different accounting reasons to

15  make cuts.

16             He said both but that EBITDA was

17  really important and that I should look at

18  executive or employment agreements which he

19  referred to as EA, a term I had not heard at the

20  time.  I told him I would talk to the people on

21  employment agreements and see if there's any

22  interest from them on taking a lesser version of

23  what was contractually laid out in the agreement

24  in exchange for a voluntary, you know, amicable

25  termination.  That was a conversation Tom and I

1                    MCAVOY

2    with Tom at that point about changing Katie

3    Pontius's job duties?

4         A.    The point of the conversation was

5    before either party -- even before Katie I

6    believe had met with Jim, it was a conversation

7    about determining cuts and figuring out if we

8    wanted to tackle the employment agreements as

9    part of it, which he said we should look at it,

10   if people were willing to take a lesser amount of

11   money than was contractually owed to them if they

12   would prevail on a good reason claim.

13        Q.    So you spoke with Katie and Kurt.

14   And what was their -- what did they say during

15   this meeting?

16        A.    They both said that they wanted, as I

17   said earlier, to be part of G/O Media and that

18   they -- they wanted to see things out, but if

19   they were going to do something and we needed to

20   save -- if we could save other jobs or we

21   couldn't get to our number, you know, a certain

22   way, they would both be willing to have a

23   conversation about it where they took less

24   severance, you know, in exchange for no

25   noncompete and no strings attached, you know,

1                    MCAVOY

2    from a solicitation standpoint or anything else.

3        Q.    So those specifics that you just

4    talked about were discussed in this meeting with

5    Katie and Kurt?

6        A.    Yeah.  In mid April right after

7    the -- whenever the first conversation Tom and I

8    had about cuts, Jim and I had a conversation

9    about cuts where Tom raised the fact that we

10   should look at employment agreements, or EAs.

11       Q.    And in between that conversation and

12   May 22nd, did you have any conversations with

13   Katie and Kurt together about this issue, about

14   their employment agreements and leaving with

15   reduced severance?

16       A.    We had the one conversation to kick

17   things off in the beginning -- when the beginning

18   of it came up, then we had conversations -- a lot

19   of conversations individually with Kurt,

20   occasionally with Katie, where we were

21   reorganizing the sales team and we were deciding

22   which organization we would go with, which

23   ultimately was a decision from Jim.

24             And Kurt along that way said, "Hey,

25   I'm not looking to move into a diminished role,

```
1                    MCAVOY
2   it was really everything was being restructured
3   and there was -- as there was a belief people who
4   were managed -- in management before weren't very
5   good.
6        Q.    And the Susie and Paul Mabin, that
7   had nothing to do with Katie's role, right?
8   Those were Gawker properties.  Susie was the
9   editor-in-chief, right?
10       A.    It didn't have to do anything with
11  Katie's, you know, diminishment claim.  It was
12  the general philosophy that connected the dots in
13  these conversations which we're going with a
14  different -- a new management team to run the
15  company, therefore we want to get rid of the old
16  management team in as least expensive way
17  possible.
18       Q.    Everything you just talked about,
19  those were restructuring at the parent level,
20  right?
21       A.    It's both.
22       Q.    You talked about the CFO, which was
23  Tom; HR, legal, sales, and then you talked about
24  Susie and Paul Mabin, but Jim wasn't suggesting
25  that you replace Chad Nackers as editor-in-chief,
```

Page 154

1           MCAVOY

2    direct reports from the A.V. Club?

3         A.    Yeah.  It was Mara and Cameron and I

4    believe Leo when he moved away from running video

5    to focus on that, those were her direct reports

6    over there.

7         Q.    So as of the end of May 2019 when

8    you're having this conversation with Katie about

9    what her job is, was she still overseeing Mara,

10   Cameron, Leo, and whoever else from the A.V.

11   Club?

12        A.    She was -- I think at that point we

13   had maybe made a change.  She was overseeing them

14   and she was still helping with it, but we had an

15   EEOC complaint from Laura Browning, who was

16   Mara's equivalent.  You know, there was the

17   editorial side and then the video side of

18   editorial, there were two different people

19   running that brand, and there was a belief from

20   Laura and Mara -- Laura, not Mara, that by the

21   nature of Katie managing Mara and not having me

22   manage her directly, that she was treated in a

23   lesser capacity than her counterparts at The

24   Onion.

25        Q.    So you made the decision that Mara

1                        MCAVOY

2     would report to you rather than Katie, correct?

3          A.    Yeah.  I made the decision.  And to

4     address that I communicated that, what we were

5     doing there as well as it related to the EEOC

6     matter as part of that overall thing.  I believe

7     that was all communicated with Jim and Tom as

8     well.

9          Q.    And just so my record's clear Laura

10    Browning filed an EEOC charge before G/O Media

11    came in, correct?

12         A.    Yeah.  Laura Browning filed an EEOC

13    charge and I want to say along with her managing

14    editor once the union agreement was finalized and

15    the A.V. Club was paid at lesser rates for

16    similar titles because the jobs were different

17    than their counterparts at The Onion.  That was

18    the triggering event for her charge, which I

19    think was in March of 2019.

20         Q.    All right.

21              MS. MELLK:  So for Julia and for

22         Chad, I have, I don't know, an hour and a

23         half, two hours left, do you want to take --

24         Julia, here in New York I know it's 2:00.  I

25         don't know if you guys want to take a lunch

Page 158

1                    MCAVOY

2    decision.  Ultimately, you know, her job made

3    sense in Chicago or in New York."

4              And you go on, "It would have made

5    sense in Los Angeles.  We also relocated people

6    there prior to the Great Hill acquisition.  So

7    one of the goals I have is to try to build up the

8    coasts a little bit better, but we also needed to

9    have people back in Chicago depending upon what

10   the job was.  So it was one of those jobs that

11   you could have done either way."

12             Then you continue on and you say,

13   "But as we kind of backed off the long-form side

14   in New York and were no longer able to have our

15   own office that could, you know, manage that, --

16   it she didn't need to be there or did not need to

17   be there."

18             So your testimony in the Girard case

19   was that you backed off long form around the time

20   that Katie moved back to Chicago; is that

21   accurate?

22        A.    No longer -- it's both.  We no longer

23   had an office in New York, but the full backing

24   off was part of the cuts that were done in the

25   end of April.

Page 159

1                        MCAVOY

2        Q.     Here you testified that one of the

3    reasons why she moved back to New York was

4    because we backed off the long-form content, and

5    so I just want to understand that at the time she

6    came back to New York --

7                 MR. SCHIEFELBEIN:  Chicago.

8        Q.     I mean Chicago from New York, you had

9    backed off the long-form content at that point,

10   correct?

11       A.     We had evaluated some of the

12   long-form content.  We had not backed off

13   completely so we could -- we were backing backing

14   up, but as part of the cut conversation, we

15   finalized the --

16       Q.     I'm not talking about the cut

17   conversation.  I'm just focused on this time

18   period in March.  And so you know, I just want to

19   make sure your testimony in Girard was accurate

20   or -- I'm just trying to figure out --

21       A.     As I just said, we were backing --

22   you can read my words again, but we were backing

23   up on long form and we, fully you know, proceeded

24   with this part of the cuts.

25       Q.     So just so we're clear, the decision

1                      MCAVOY
2   had already been made to move off of it and then
3   that was solidified with the cuts as well, right?
4        A.    The idea was made that we were going
5   to pull off of it as part of the various
6   discussions we had through the company's sale
7   process, you know, and getting to profitability,
8   which was a priority of not just G/O Media, but
9   the other suitors.  So yes, all that was
10  conversations that were had, but they weren't
11  finalized or full implemented until the cuts were
12  in place.
13       Q.    Okay.  At any point -- and in April
14  of 2019 had you reached out to John Tamisiea at
15  McDermott?
16       A.    I don't believe so.  I'm not sure of
17  the dates I talked to John.  I know John did the
18  revised employment agreements for us in maybe
19  September, October the year before.
20       Q.    Okay.
21       A.    I do recall -- no, I do recall
22  because one of the things that I had to -- there
23  was some documentation I needed to sign and one
24  of the documents inadvertently had me -- if I
25  would have signed, it would have resigned my job,

1                          MCAVOY

2    for people.  It's also a pretty hectic time in

3    terms of all the ins and outs that were going on.

4    This was not out of the blue to say let's have

5    a -- you know, a more serious or formal

6    conversation so...

7         Q.    She says in the second sentence, "I

8    know this won't come as a surprise to you, but

9    the last few weeks have been particularly

10   frustrating - after quite a few months/years of a

11   different type of frustration before that."

12             So let's focus on the second part of

13   that sentence.  She says, "...after quite a few

14   months/years of a different type of frustration."

15   Did you know what she was talking about?

16        A.    Yeah.  I had testified to this

17   previously, you know, in a previous deposition,

18   but yeah, there was always, as I mentioned

19   earlier, lots of ins and outs with respect to how

20   Univision was run and the changes that were made

21   on a corporate level there and how it would --

22   you know, it was a roller coaster in terms of

23   what we were doing or not doing so I -- you know,

24   and when you're in a position like she is and

25   you're dealing with people on the front lines who

```
1                    MCAVOY
2   are asking questions and you don't have the
3   crystal ball or you're not -- you don't have
4   access to all the information to know why certain
5   decisions are made at Univision corporate, it can
6   become particularly frustrating.
7            On top of that when you make -- there
8   was a lot of operational mistakes within
9   Univision and also within, you know, the
10  transition to G/O, that I think was all mentioned
11  below, that are all part of the frustration.
12       Q.    Then she goes on to talk about, "My
13  lack of authority is an issue" in the second
14  paragraph.  And then she talks about in the third
15  paragraph she's offered to help on the HR cleanup
16  and that she had sent Tom a plan and hadn't heard
17  back for a discussion about it since.
18            Was that news to you at this point or
19  had you talked about this?
20       A.    I think I knew that she had met with
21  Tom and sent him a plan on stuff.  I didn't know
22  the degree of his lack of communication with her.
23       Q.    So she had not raised this to you
24  previously, correct?
25       A.    I don't believe so.  I mean, I'm
```

1                      MCAVOY

2    amicable ending to this.  Do you know where she

3    got that phrase, amicable ending?

4        A.    It's a phrase that's used and very,

5    very common in business.  It's one that's been

6    used I would say a hundred times by me, a hundred

7    times by her and everyone else on the team in

8    terms of when you're dealing with people and

9    trying to figure out the right end of a chapter

10   or right transition to the next chapter.

11       Q.    And this was the phrase that you used

12   in the e-mails to Jim and Tom about -- or a

13   similar phrase about Kurt Mueller leaving,

14   correct?

15       A.    I believe so, yeah.  Amicable

16   parting, amicable separation, amicable

17   transition, amicable change, all those were

18   frequent phrases that were used by me and others.

19       Q.    And before Monday, June 3rd, at 12:39

20   a.m. of 2019, did you know or had she told you

21   that she wanted to work out an amicable ending?

22       A.    Yeah, no, I mean, I think Katie

23   always told me the same thing over and over

24   again, same thing that Kurt told me and everyone

25   had, which is they wanted to work in a job that

1                     MCAVOY

2    testified about, correct?

3        A.     That is.

4        Q.     Then you say, "Jim brought up again

5    last week," which conversation was this?

6        A.     That is a conversation that I had

7    with Jim when I was in Los Angeles.

8        Q.     Okay.  "Will let you know what Jim

9    says but would like to figure out the easiest

10   solve here."  So did you have a conversation --

11   actually, did you send Katie's June 3rd e-mail to

12   Jim?

13       A.     I don't know if I sent this to Jim or

14   not.  I wouldn't have access to that e-mail.  G/O

15   would have access to it.  I did talk to Jim about

16   this.  This is the conversation I cited earlier

17   when I was in my office in Chicago.  And Tom and

18   I also talked about it in addition to this note

19   and Tom said that he would do the heavy lifting

20   with Jim to help resolve the matter.

21       Q.     So we talked about a lot of

22   conversations.  So the one -- you said you spoke

23   with Jim about this when you were in the Chicago

24   office.  Which conversation -- just refresh my

25   recollection, which conversation was that?

Page 189

1                          MCAVOY

2       Q.    Okay.  So did you ever go to Katie

3   and say Tom suggested the role with benefits?

4       A.    Yeah.  It was -- yeah, I said -- I

5   suggested -- I said hey, Tom mentioned instead of

6   this, would you be interested in just doing a

7   benefit piece where you enroll benefits and then

8   you get paid through the end of January instead

9   of, you know, a nine-month severance agreement

10  and she said, no that doesn't sound -- that

11  doesn't make sense to me, it's also less of a job

12  and less severance and pay than it would be if I

13  had the other arrangement that I had with Kurt.

14            I relayed that exact sentiment to

15  Tom, saying why would someone take less months'

16  pay and have to do a job for it when the other

17  person got nine months' pay and didn't have to do

18  anything.  He agreed.  He said let me work on Jim

19  again.  And as Jim and I -- or Tom and I had

20  worked is that a lot of times with Jim it took

21  multiple conversations with Jim in order for Jim

22  to become comfortable with something.

23            We had a similar severance agreement

24  with this woman Christine Murphy where it started

25  at six weeks and it ended up at 20 or 26 because

1                        MCAVOY

2    Tom had multiple conversations with them and we

3    were able to actually solve the issue at hand.

4         Q.     What was that employee's name?

5         A.     Christine Murphy.  She was the one

6    who was in charge of the branded content side of

7    long-form content.

8         Q.     Let's pull up Exhibit 18.  Let me

9    know after you've had a chance to review that.

10        A.     I have, yes.

11        Q.     So at the bottom of this e-mail

12   there's an e-mail -- this is an e-mail to you

13   from Katie Pontius, correct, from June 13, 2019,

14   at 7:04?

15        A.     That's correct.

16        Q.     And Katie is asking you to accept

17   this written notice of material diminution of my

18   authority, duties, and responsibilities in my

19   role, correct?

20        A.     That's correct.

21        Q.     She writes that -- she makes

22   reference to grounds for good reason as defined

23   in my employment agreement, correct?

24        A.     Correct.

25        Q.     We reviewed the employment agreement

1                          MCAVOY

2    June 13th, your June 13th response, and then you

3    forward this to Tom Callahan on June 13th, right?

4    Does that sound good?

5         A.    It does, except it does not include

6    the e-mail I previously had sent to Tom as part

7    of the full chain.

8         Q.    Okay.  We already talked about that,

9    that was marked as McAvoy 1, correct?

10        A.    Sure.

11        Q.    Okay.  So you forwarded Katie's June

12   13th e-mail to Tom Callahan, correct?  That's the

13   top e-mail piece at the very top of the exhibit,

14   right?

15        A.    That's correct.

16        Q.    How come you didn't forward this to

17   Jim?

18        A.    Tom was the person I dealt with on

19   all these matters and also Tom was the person who

20   was handling the personnel matters or HR for --

21   at the end of the TSA with Univision, he had sent

22   out a note previously saying he was the contact

23   for all this stuff, and Tom and I had been

24   talking about this, that's why he and I started

25   there, and he also believed that it was easier

Page 202

```
 1              MCAVOY
 2   and settle it together.
 3          MS. MELLK:  Michele, can you read me
 4      the answer?  I want to make sure I got that?
 5          (The record is read back by the
 6      reporter.)
 7      Q.    Let's look at 19.
 8          Ms. TUCCIARELLO:  This has been
 9      previously marked Plaintiff's Exhibit 19, P
10      38.
11      Q.    Let me know after you've had a chance
12   to look at it.
13      A.    It's not up on the screen.
14          MR. SCHIEFELBEIN:  It's here.
15      Q.    Should be up on the screen.  It's up
16   on our screen.
17      A.    Okay.
18      Q.    Take whatever time you need to read
19   it.
20          MR. SCHIEFELBEIN:  Go ahead and use
21      that one.
22      A.    Okay.
23      Q.    The top portion of this e-mail, that
24   was an e-mail that you sent to Katie Pontius on
25   June 17th, correct?
```

1                          MCAVOY

2          Q.      What were you on Monday, the 17th?

3          A.      I started off the day in Chicago, I

4    ended the day in New York, I believe.  I

5    believe -- yeah, I think maybe Monday -- yeah,

6    Monday I think I went out to New York and I came

7    back maybe Tuesday night.  I can't recall.  Or

8    Tuesday, Wednesday.

9          Q.      That was your decision to have her

10   take the week off, right?

11         A.      It was my decision.

12         Q.      And you also say to her, "In

13   particular I don't want you to attend the union

14   meeting this Thursday."  That was your decision

15   as well, right, to have her not attend the union

16   meeting?

17         A.      Yeah.  I didn't want her to be stuck

18   in the situation that she was in with the climate

19   assessment, and I think Jim was also at that

20   meeting and I didn't want to have any undue

21   frustration or stress for her in the midst of the

22   conversations.

23              MS. MELLK:  I'm just going to take a

24         quick one-minute break.  Just give me a

25         minute.

1                      MCAVOY

2              MR. SCHIEFELBEIN:  Can we take three

3         and use the wash rooms?

4              MS. MELLK:  Sure.

5              MR. SCHIEFELBEIN:  Thanks.

6              (A brief recess was taken.)

7         Q.    In between -- well, we don't have

8    to -- in between June 13th and June 17th when you

9    wrote back to Katie about taking the week off,

10   did you have any discussion with Jim about your

11   e-mail where you say you're taking this as a

12   formal recognition of diminishment?

13        A.    I don't recall having -- I'm not sure

14   if I had a meeting with him that Friday or if it

15   was the following week.  I know we were spending

16   time together as part of our sales summit, but I

17   don't recall that specific.  Primarily I was

18   working everything through with Tom at this

19   point.

20        Q.    So did anybody speak with you about

21   your --

22             MR. MELLK:  And you can put up

23        Exhibit 19 so he has it in front of him.

24        A.    I have it in front of me.

25        Q.    Okay.  So did anybody, Jim or Tom or

```
 1                     MCAVOY
 2   anybody else, speak with you about your choice of
 3   words that you are taking this as a formal
 4   recognition of diminishment?
 5       A.    Is there a time frame here?  I
 6   received a note from Lynn on behalf of Katie
 7   maybe a couple of days later, but I hadn't -- I
 8   don't believe I heard anything from anyone saying
 9   don't do that at this point.
10       Q.    At some point did anybody tell you --
11       A.    I remember -- yeah.  I remember Jim
12   not wanting me to write that.  When we talked
13   maybe -- maybe when we were in the cab together
14   the following week or lunch in Chicago, I can't
15   recall, but I remember him saying, you know, I
16   don't want -- I don't, you know, want that in
17   writing.  I can't remember what the phrase he
18   used was.
19       Q.    So going back to the timeline, I
20   think you testified that you told Katie not to be
21   in the office because -- I mean, I think you said
22   she -- you know, you knew she was frustrated and
23   Jim was going to be in the office that week,
24   right?
25       A.    Yes.
```

Page 209

1                        MCAVOY

2     putting a wedge between you, me, and her and

3     ultimately you need to, you know, pick sides and

4     overcome her diminishment claim or, you know --

5     or I don't know what's going to happen to you.

6     It was a weird conversation.

7          Q.     Did he say anything else about Katie?

8          A.     We had subsequent conversations.

9     There was a Monday conversation, there was an

10    additional one Tuesday in the cab ride after

11    there was a formal diminishment report or claim

12    that was faxed over to Lynn.  There was multiple

13    conversations with Jim during this period from

14    the Monday through I would say the Wednesday or

15    Thursday or until I received my first formal note

16    from a legal person that Jim signed his name to,

17    which I think was June 22nd or something like

18    that.  Or June 24th.

19         Q.     But I'm just focusing on this first

20    week.  So all of these conversations that you had

21    with Jim, were they all about, you know, what you

22    just testified to about putting a wedge between

23    you?  Was that the substance of each of those

24    conversations?

25         A.     No.  I mean, it was, Hey, you did an

```
 1                        MCAVOY
 2   awesome job at the sales summit, thanks for
 3   leading that; Hey, you're doing great here.  I
 4   mean, there was a bunch of stuff going on at
 5   once.  I --
 6        Q.     With regard to Katie.
 7               MR. SCHIEFELBEIN:  You have to let
 8        him finish.
 9        A.     I had a lot of responsibilities.  So
10   I was running this big sales summit that Jim was
11   super excited about.  I had done that, I had done
12   a really good job on that.  He was really proud
13   of me.  You know, he said he was.  So we had that
14   going on, then he had given me advice on the
15   Katie issue of saying it's going to put a wedge
16   between us, almost like a father to son or mentor
17   to mentee, but it was also very bizarre and
18   peculiar so I was very -- you know, a little --
19   it was a little off-putting.
20               And then that was -- you know, then
21   we had multiple conversations about it once there
22   was a formal or more formal diminishment letter
23   that was sent.  But that's kind of how it began
24   in that week or continued that week.
25        Q.     Did you, you know, ask him to
```

Page 211

1                     MCAVOY

2    elaborate or explain what he meant about putting

3    a wedge between you?

4         A.    I mean, the first time we had a

5    conversation was at a happy hour with like 30

6    people, you know, and he said it to me and I was

7    confused by it, but it was also not the place to

8    have a -- you know, when you're welcoming

9    everyone to town, they've been there less than

10   three months, to have that conversation.

11              And then we talked about it again the

12   following day after the summit where he was,

13   again, very happy with me from the summit.  But

14   yeah, it was -- and then the next day we talked

15   about it in Chicago.  We went to this restaurant

16   called the Left Coast I believe and then we

17   talked about it in more detail.

18        Q.    So other than what you've already

19   told me, did he relay anything else to you about

20   how he felt about Katie's e-mail to you of June

21   13th?

22        A.    He didn't say anything on the June

23   13th, just we don't want to communicate anything

24   in writing.

25        Q.    I'm sorry.  About her e-mail to you,

1              MCAVOY

2    between me, him, her and that, you know, I needed

3    to pick sides and help resolve.

4         Q.    And was anything else said during

5    that conversation with Jim about Lynn's letter to

6    Katie?

7         A.    I believe that was it.  It was a very

8    short conversation in the sense that we were at a

9    cocktail hour with about 30 people, and I don't

10   think that letter was sent till later at night so

11   it was pretty brief.

12        Q.    So let's move on to Exhibit 32.  I'm

13   going to show you a document marked Exhibit 32.

14   It is our position this is a confidential and

15   privileged e-mail, but it has been disclosed in

16   many of the prior litigations and in

17   Ms. Pontius's Complaint, so it has been marked.

18        A.    Okay.

19        Q.    Have you had a chance to review it?

20        A.    Yup.

21        Q.    So this is -- there's a couple of

22   parts to this e-mail so I'm going to focus in the

23   beginning in the middle of the page where it

24   says, "Begin forwarded message."  So let's go

25   down to the first e-mail on Monday, June 17th.

Page 217

1                       MCAVOY

2    It's an e-mail from Lynn to you, correct?

3        A.    Yes.

4        Q.    And when you read this, did you

5    recognize that it said "privileged and

6    confidential attorney/client communication"?

7                MR. SCHIEFELBEIN:  Object to the form

8            of the question to the extent it calls for a

9            legal conclusion.

10       Q.    You can answer.

11       A.    Yeah, I don't recall.

12       Q.    But you knew Lynn Oberlander was the

13   EVP and general counsel, right?

14       A.    Yeah, I knew Lynn to be the EVP,

15   general counsel, and handled a lot of the call

16   them GMG centric issues.

17       Q.    And Lynn is reaching out to you to

18   speak to you about what Katie's job entails and

19   how it was diminished, correct?

20               MS. CRUMILLER:  Objection.  This is

21           what's taking so long.  This isn't a

22           question.

23               MS. MELLK:  Susan, I heard your

24           objection.  You put it on the record.

25       Q.    That's why Lynn was reaching out to

Page 219

1                           MCAVOY

2     on her job and how we handled everything."

3                 And so what did you mean by "I've

4     been spending my day compiling information on her

5     job?"

6          A.    I was just running through, you know,

7     the list of her responsibilities and prior job

8     descriptions that we had created for her.  So I

9     just was making sure I had everything that she

10    had done kind of laid out.

11         Q.    And then you also say, "The job of a

12    chief of staff and chief resource officer is

13    naturally more amorphous than that of others."

14                What did you mean by that?

15         A.    Yeah.  Anyone who's that closely

16    connected to the CEO and has a lot of duties that

17    are assigned, it's a little less clear as to what

18    they're doing versus an accounts payable clerk or

19    someone like that who's doing a very specific set

20    of tasks.  So the higher-level jobs are naturally

21    more amorphous, particularly one that works

22    closely with the CEO.

23         Q.    And then in the next paragraph you

24    say, "I don't want to 'rope dope' with her."

25                What did you mean by that?

Page 229

1                    MCAVOY

2        Q.     Now we can look at 23.  Tell me if

3    you've had a chance to look at this.

4        A.     I have.

5        Q.     This was an e-mail that you sent to

6    Katie Pontius from your Gmail account correct?

7        A.     Correct.

8        Q.     That's your personal -- michaeljames

9    mcavoy@gmail.com, is that your personal e-mail

10   account?

11       A.     It is.

12       Q.     And you sent it to katiepontius

13   @gmail.com, and did you understand that to be her

14   personal e-mail account?

15       A.     I do.

16       Q.     You say at the top, "First two

17   accounts."  What did that mean?

18       A.     Yeah, this e-mail was a recap of the

19   kind of events and the conversations that had

20   happened.  Katie had, you know, wanted to have

21   clarity on how I was handling things, how things

22   were represented to her, as it was very confusing

23   as to why new steps were put in place in this

24   process.  She was trying to figure out, you know,

25   either how to have an amicable parting or how to

```
 1                    MCAVOY
 2      but I'm asking the question.
 3             Michele, can you reread the question,
 4      please?
 5                (The record is read back by the
 6      reporter.)
 7             MR. SCHIEFELBEIN:  Same objections as
 8      to form, calls for a legal conclusion, and
 9      argumentative.
10      Q.    As far as you understand it,
11 Mr. McAvoy, please answer the question.
12      A.    My understanding was that I was
13 acting in the best interests of the company, and
14 for that reason is the reason why I was -- made
15 sure I was honest with an employee that we valued
16 and wasn't going to rope a dope or lie or not be
17 transparent as to what had happened.  And it also
18 to me is the best way to mitigate any legal
19 issues at all, being a really clear, consistent,
20 and truthful communicator.
21      Q.    So going back to Exhibit 23, you have
22 in bold, "Simplest version, no secondhand, just
23 Mike and Katie."  And then there are a couple of
24 bullet points under that.  Then you have in bold,
25 "Longer version, 99 percent firsthand of Mike and
```

Page 235

1                        MCAVOY

2    Katie."

3              So what did you mean by, "Simplest

4    version, no secondhand, just Mike and Katie"?

5        A.    This is just again a recapping of the

6    knowledge that she and I had and the other

7    knowledge that was secondhand, conversations

8    about the facts as they related to her issues and

9    my inability to manage this thing through.

10             So the longer version accounted for

11   just additional pieces that came out of, you

12   know, conversations I would hear where I wasn't

13   part of the conversation between Tom and Jim, but

14   Tom was representing those, you know, facts to me

15   that he had with Jim.  So that was really the

16   addition.

17       Q.    And under the simplest version -- I'm

18   not going to go through every bullet point since

19   people are raising issues about time, but I want

20   to ask about a couple of them.  So the third

21   bullet point from the bottom of the simplest

22   version says, "Mike will not cure claims as is

23   it's not curable and inappropriate to treat

24   someone of Katie's stature and company value."

25             So were you telling Katie that you

1                       MCAVOY

2    were not going to cure the claims?

3         A.    I was telling her I'm not going to do

4    something that was disingenuous.  I was obviously

5    going to make actions that were appropriate and

6    as evidenced by the fact that I did provide

7    guidance to G/O on how to handle the claims, but

8    I definitely didn't want to rope a dope her or do

9    something that was dishonest or act in bad faith

10   just to cure a claim.  And that was the intent of

11   that line and I believe that was understood by

12   her.

13        Q.    So at this point in time on June

14   20th, had you shared with Jim all of these things

15   that you're sharing with Katie, that Jim changed

16   his tune, Jim doesn't want to honor good reason

17   claim, that you're not going to cure the claims?

18   Had you spoken to Jim about your feelings about

19   this?

20        A.    Absolutely.  Jim and I had gone

21   through all this stuff in the cab ride the day

22   before and again on the lunch this day, and once

23   Jim -- you know, so Jim and I talked about every

24   single thing on here.  These weren't new data

25   points to Jim.  You know, so yeah, this is all

1                         MCAVOY

2     operate in bad faith and cure a claim just to

3     cure a claim, that I -- and I was willing to do

4     whatever we needed to do to make things right,

5     but I wasn't going to operate in bad faith and

6     all of a sudden pretend that either he liked

7     Katie Pontius, number one; two, that there was a

8     job that made sense for her that he actually, you

9     know, believed made sense.  I didn't want to

10    operate in a place where we were disingenuous,

11    and I had told him as such multiple times.

12         Q.    Moving up to towards the beginning of

13    this e-mail, you say, "I'm also sending you a

14    recap of [sic] e-mail of union too," right?

15         A.    Yes.

16               MS. MELLK:  Let's bring up 24.

17         Q.    Have you had a chance to review this?

18         A.    I have.

19         Q.    So this was an e-mail that you sent

20    to Katie on Thursday, June 20, 2019, at 11:19

21    p.m., right?

22         A.    Yes.

23         Q.    And this was sent on your business

24    e-mail right?  Mmcavoy@fmg.com, that was your

25    business e-mail, correct?

1                    MCAVOY

2        A.    Yes.

3        Q.    And it was sent to Katie's business

4    e-mail, correct?

5        A.    Yes.  I can't tell actually.

6              MS. MELLK:  Let's pull up 25.

7        Q.    This was previously marked at Katie

8    Pontius's deposition as Exhibit 25.  Let me know

9    when you're ready.

10       A.    Okay.

11       Q.    So at the top of this e-mail entitled

12   "Revised" -- that was sent from your personal

13   e-mail account to Katie's personal e-mail

14   account, correct?

15       A.    Yeah.  I believe it's the same e-mail

16   account.

17       Q.    Can you tell me when you sent that?

18       A.    Looks like it was 6:53 in the morning

19   on Friday June 21st.

20       Q.    So can you explain to me -- I want to

21   just have you have 23, 24, and 25 in front of

22   you.  You sent her an e-mail, which is Exhibit

23   23, from your personal e-mail account on June 20,

24   2019, 9:59 p.m., you then switch to your business

25   account to send her an e-mail on that same date

1              MCAVOY
2    didn't you use your personal Gmail account to
3    send this?
4        A.    I can't speak to the specifics of why
5    each account was used, but I can tell you I was
6    drafting the e-mail from -- the recap in -- while
7    I was in the business meeting to write down
8    digital points in the meeting with the union.  So
9    maybe I had an open-ended e-mail browser at that
10   time.  I don't know.  I'm not putting a lot of
11   thought into why one was sent in one e-mail
12   versus the other e-mail.
13       Q.    In between April 2019 and when you
14   left the company in July 2019, did you use your
15   personal account to communicate with Katie
16   Pontius about anything other than these two
17   e-mails?
18            MR. SCHIEFELBEIN:  Objection, asked
19        and answered.  Also object to the form of
20        the question.  Mr. McAvoy didn't leave the
21        company.  He was fired.
22       Q.    When you were fired.  That's fine.
23       A.    The only e-mails I recall sending to
24   her and that I have, you guys are in possession
25   of.  So I don't believe there's any other ones,

Page 242

```
 1                        MCAVOY
 2   but that's my understanding.
 3        Q.    Well, going back to the subpoena, we
 4   had asked for all e-mail communications between
 5   you and Ms. Pontius and you did not produce
 6   these, and so do you have these e-mails?
 7             MR. SCHIEFELBEIN:  Objection.  We did
 8        produce them.  We produced them from G/O
 9        Media.  They came to Katie Pontius.  We gave
10        them the whole production.
11             MS. MELLK:  Okay.  They came from G/O
12        Media.
13        Q.    Mr. McAvoy, did you have these
14   e-mails on your personal e-mail account?
15        A.    I do not.
16        Q.    Did you delete these e-mails?
17        A.    As I said in my prior testimonies, I
18   purge my e-mail all the time on my personal
19   e-mail and I don't have recollection of any -- or
20   I don't have the documents -- of any of those
21   things anything.  Anything that needed I sent to
22   John Tamisiea to make sure that I had.  Anything
23   else that I had, personal, either I delete things
24   in general or I made sure I didn't have any
25   documents.
```

1          MCAVOY

2    I'm sure in the e-mail request there's probably

3    an e-mail that says things that speak to facts as

4    it relates to Jim.  It might even be to Jim

5    directly.  There's many times it's like, Jim, you

6    have a different recollection of the facts, this

7    didn't actually happen, here's the mail I sent

8    you before that you said I didn't write, you

9    know, and I'd copy and paste.

10               So there was not an issue with not

11   being transparent with respect to Jim regarding

12   this issue.

13        Q.    So looking at Exhibit 25, it says,

14   "Also, still working on a full deposition

15   cleanup."  What did that mean?

16        A.    It was more I would say tongue in

17   cheek than anything, but one of the things that

18   Katie was really clear to me about was be serious

19   about this in all the communications, and making

20   sure that I was accurate about what had happened

21   and what hadn't and it was my reference to I'm

22   taking this whole thing serious as to what this

23   is because it's important to actually relay the

24   facts correctly.

25        Q.    Well, what did the phrase "full

Page 246

1                          MCAVOY

2      A.      No.   These e-mails were a recap of

3   the events that had transpired between Katie,

4   myself, and the company vis-a-vis the changing

5   story as to how Katie's role was handled.

6      Q.      Did you tell Jim that you were

7   sending these e-mails to Katie?

8      A.      I don't believe -- Jim and I talked

9   through all the information on these e-mails.

10  Jim knew that Katie knew all the information.

11  But I don't recall saying, Hey, Jim, here's this

12  e-mail.  I don't recall even -- I didn't recall

13  this e-mail when I last testified.  I had

14  forgotten that I had written out the facts.  So

15  to me it was helpful that I did because it was

16  clear as to everything that had transpired, but

17  it was -- yeah, that was the intent of it and

18  there was nothing beyond that.

19     Q.      And was all of this information in

20  both 25 and 23 -- was this information that you

21  had firsthand or was this -- any of this

22  information information that you had received

23  secondhand?

24     A.      I mean, there's a couple of things

25  that were secondhand in the sense that Tom would

Page 263

1                     MCAVOY

2    e-mail to come up with suggestions to help cure

3    the claims of diminishment, correct?

4        A.    Yes.  That's part of the e-mail.

5        Q.    Okay.  So let's move on.  Let's look

6    at McAvoy 5.

7              (E-mail was marked McAvoy Exhibit 5

8        for identification, as of this date.)

9        Q.    Tell me when you're ready.

10       A.    Yup.

11       Q.    So you respond to Jim's e-mail of

12   July 2nd in this July 3rd e-mail, correct?

13       A.    That is correct.

14       Q.    And did you write this?

15       A.    Again, I wrote this e-mail and I also

16   had a conversation with my counsel.

17       Q.    And did Katie review this e-mail?

18       A.    Again, she did not.

19       Q.    Was she aware that you were sending

20   this e-mail?

21       A.    I don't believe so.

22       Q.    Did you tell her you were

23   communicating with Jim about how to try and cure

24   the diminishment claim?

25       A.    I don't believe so.  I remember

1                    MCAVOY

2    talking to her saying at some point that, you

3    know, we both were doing our own things to try to

4    resolve everything, but I don't remember -- I

5    definitely didn't share this with her or write

6    these with her.

7         Q.     Did you run the ideas that you put

8    forth to Jim by Katie?

9         A.     No.  These are my thoughts, my ideas.

10        Q.     So in the paragraph starting

11   "Alternatively," you write, "We could consider

12   giving Katie direct oversight of all the

13   editorial personnel at Onion, Inc."  Was one of

14   your ideas to give Katie direct oversight of all

15   the editorial personnel at The Onion, Inc.?

16        A.     Yes, that's correct.

17        Q.     And what did you mean by "direct

18   oversight of all the editorial personnel"?

19        A.     I meant create a matching structure

20   to what was in place on the Gawker side of the

21   business where there was a person underneath Paul

22   Mabin, I think Joyce -- I don't remember what

23   Joyce's last name was -- who oversaw the

24   editors-in-chief and I believe the video team, so

25   saying let's create that role for her.

1                    MCAVOY

2        Q.    Just so I'm clear, Katie had never

3    held the title of chief operating officer or

4    president of Onion, Inc., correct?

5        A.    She had not.

6        Q.    Okay.

7              MR. SCHIEFELBEIN:  I have Theo in the

8        room, he tells me we just have to reconnect

9        real quick so we can see the exhibit that we

10       didn't get premarked.

11             MS. MELLK:  Then I'm almost done.

12       Once we do that, I'll have a couple more

13       questions, and then Julia can go.

14             MR. SCHIEFELBEIN:  Can we do that

15       real quick?

16             MS. ELMALEH-SACHS:  I have a

17       question.  Is there a reason you can't

18       use -- if it's just the e-mail contact that

19       you want, Wendy, I --

20             MS. MELLK:  Not the content.  I want

21       him to look at the actual e-mail.

22             MS. ELMALEH-SACHS:  Fine.

23             MS. MELLK:  It's important.

24             MR. SCHIEFELBEIN:  Give us a few

25       seconds.  We're going to reboot.  He tells

Page 272

1                          MCAVOY

2        Q.     Let's move on.  I just want to go

3   back to Exhibit 20 and then I'll be done.

4               MS. MELLK:  And then, Julia, you can

5        take over.

6               MS. ELMALEH-SACHS:  Great.

7        Q.     So we had already discussed the

8   content of this e-mail, which was marked Exhibit

9   32 actually.  We talked about the content, I just

10  want to talk about -- when were you -- was your

11  employment terminated?  What date?

12       A.     July 11th.

13       Q.     So you forwarded this e-mail to Katie

14  Pontius on Saturday, July 13, 2019, correct?

15       A.     At 7:27 a.m., yes.

16       Q.     At 7:27 a.m.  You were no longer an

17  employee of the company when you did this,

18  correct?

19       A.     That's correct.

20       Q.     Just give me a minute.  I think I

21  might be done.

22               MS. MELLK:  Just give me a minute.

23       Go off the record.

24               (A discussion was held off the

25       record.)

1                    MCAVOY

2    forward.

3        Q.    Was it confusing to you that he now

4    no longer seemed to know what she did there after

5    he had just offered her a C suite position?

6        A.    Yes.  It was very confusing that

7    someone would offer someone a job, not know what

8    they did, take my word that they were really

9    valuable, but yet then later go back and say they

10   had no idea what they did after they offered them

11   this job.  It didn't seem very sincere or

12   truthful.

13       Q.    You also testified that Katie was,

14   quote, a hot button topic for Jim.  Can you

15   elaborate what you meant by that?

16       A.    Any time you brought up Katie, he had

17   a -- you know, his reaction was the what does she

18   do here, what is she doing.  He was I think -- I

19   don't want to say shocked, but he was very

20   confused that she wouldn't want to accept a job

21   to work for him at any cost or, you know, in any

22   way, and it was something where Tom and I talked

23   about quite a bit that any time we talked about

24   Katie, it was something that Jim would get

25   agitated by.

Page 289

1                      MCAVOY

2   next one is Exhibit 9, which is your next e-mail

3   to Jim with ideas of how to cure Katie's

4   diminution of her role, and I think as we

5   discussed previously, you suggested three

6   possible ideas for Jim to put Katie in a role

7   that would cure her diminution; is that correct?

8        A.    I believe that's how many ideas I

9   had, yes.

10       Q.    So other than these suggestions, as

11  well as the broader ideas that you had kind of

12  suggested in your previous e-mail of June 26, in

13  your opinion was there any other way that G/O

14  Media could cure Katie's diminution of her role

15  at that time?

16       A.    No.  My view is that it had to be

17  something that was in the same scope as what I

18  had outlined.  Maybe there was another

19  permutation on that, a different twist, but it

20  needed to be something that was significant and

21  real.

22            (E-mail was marked Exhibit MM 10 for

23       identification, as of this date.)

24       Q.    Let's go to Exhibit 10.  This is the

25  letter that Lynn sent to Katie, and you're copied

Page 301

```
1              C E R T I F I C A T I O N
2    STATE OF NEW YORK  )
                        )
3    COUNTY OF NEW YORK )
4
5
6       I, MICHELE MOSKOWITZ, a Shorthand Reporter
7    and Notary Public within and for the State of New
8    York, do hereby certify:
9       That MICHAEL MCAVOY, the witness whose
10   examination is hereinbefore set forth, was duly
11   sworn/affirmed by me and that this transcript of
12   such examination is a true record of the
13   testimony given by such witness.
14      I further certify that I am not related to
15   any of the parties to this action by blood or
16   marriage and that I am in no way interested in
17   the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set my
19   hand this 26th day of October, 2021.
20
21
22
23
              MICHELE MOSKOWITZ
24
25
```