UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

KATHERINE PONTIUS EBEL,

                              Plaintiff,

            -v-

G/O MEDIA, INC, ONION, INC., *and* JAMES
SPANFELLER,

                              Defendants.

———————————————————————————

G/O MEDIA, INC, ONION, INC., *and* JAMES
SPANFELLER,

                              Counter-Claimants,

            -v-

KATHERINE PONTIUS EBEL,

                              Counter-Defendant.

———————————————————————————

20 Civ. 7483 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

        Plaintiff Katherine Pontius Ebel ("Pontius") worked for G/O Media, Inc. ("G/O" or "the

Company"), Onion, Inc., and James Spanfeller ("Spanfeller") (together, "defendants") from July

2011 until July 2019.  She brings claims against them under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963, 29 U.S.C. § 206, *et

seq.* ("EPA"), the New York State Human Rights Law, New York Exec. Law § 290 *et seq.*

("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*

("NYCHRL"), and the New York Labor Law § 190 *et seq.* ("NYLL"), and for breach of

contract.  Defendants have counterclaimed for breach of contract and breach of fiduciary duty.

Pending now are the parties' cross-motions for summary judgment.  Defendants move on Pontius's claims of gender discrimination and retaliation under federal, state, and local law; of violations of the NYLL; and of breach of contract.  Pontius moves on her breach of contract claim and defendants' counterclaims for breach of contract and fiduciary duty.

For the following reasons, the Court grants defendants' motion for summary judgment as to Pontius's Title VII and Equal Pay Act claims—her two federal claims.  The Court declines to exercise supplemental jurisdiction over Pontius's remaining claims and defendants' remaining counterclaim.[1]

## I.    Background

### A.    Factual Background[2]

#### 1.    Introduction

The Court sets out here facts relevant to the central dispute in this case—whether the circumstances of Pontius's ultimate departure from the Onion after G/O succeeded Univision as

---

[1] After Pontius cross-moved for summary judgment, defendants withdrew their counterclaims for breach of contract and of fiduciary duty, as based on Pontius's purportedly wrongful retention of certain documents after her resignation.  *See* Dkt. 98 ("Def. Oppo. Memo") at 1 n.2, 21–22.  Defendants' only remaining counterclaim is for breach of contract, based on Pontius's alleged lack of good faith and fair dealing in refusing to assist G/O in finding a cure for her purported diminishment.

[2] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motions—specifically, the parties' joint statement of undisputed facts, Dkt. 76 ("JSF"); Defendants' Local Rule 56.1 statement of material facts, Dkt. 81 ("Def. 56.1"); the declaration of Wendy J. Mellk, Esq., in support of defendants' motion for summary judgment, Dkts. 82, 83 ("Mellk Decl."), and exhibits attached thereto; Pontius's Local Rule 56.1 counter-statement, Dkt. 89 ("Pl. Reply 56.1"); Pontius's Local Rule 56.1 statement of material facts, Dkt. 90 ("Pl. 56.1"); the declaration of Julia Elmaleh-Sachs, Esq., in support of Pontius's cross-motion for summary judgment, Dkt. 91 ("Elmaleh-Sachs Decl."), and the exhibits attached thereto; defendants' Local Rule 56.1 counter-statement, Dkt. 96 ("Def. Reply 56.1"); and the declaration of Wendy J. Mellk, Esq. in opposition to Pontius's cross-motion for summary judgment, Dkt. 97, 99 ("Mellk Oppo. Decl.").

the owner of the Onion breached her statutory or common law rights.  As described below, Pontius's employment at the Onion can be separated into three periods: (1) her initial employment, from 2011 to 2016; (2) her employment at the Onion while it was owned by Univision, which operated the Onion under the umbrella company Fusion Media Group ("FMG"), from 2016 to 2019; and (3) and Pontius's employment after Great Hill Partners ("GHP") acquired the Onion and other companies from Univision, and operated them under a new company, G/O Media, Inc. ("G/O"), from April to July 2019.  The Court's account of the factual record largely focuses on the events between April and July 2019, after GHP's acquisition, when Pontius asserts that G/O diminished her responsibilities, unlawfully denied her severance pay accorded to at least one ostensible comparator, retaliated against her for speaking out against the termination of a woman of color, and subjected her to a hostile work environment.

### 2.    Parties

Pontius is a citizen of the state of Illinois.  JSF ¶ 1.

G/O is a media company that publishes 11 individual destination websites.  Def. 56.1 ¶ 1. It is a Delaware corporation with its principal place of business/headquarters in New York.  Dkt. 31 ¶ 7.

---

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

G/O owns the Onion, Inc., which publishes *The Onion*, a Wisconsin satirical digital media company with its principal place of business/headquarters in Chicago, Illinois.  JSF ¶ 2.

James Spanfeller is G/O's chief executive officer ("CEO").  Def. 56.1. ¶ 3.  Spanfeller is a New York resident.  Dkt. 31 ¶ 9.

### 3. 2011–2016: Pontius's Employment at the Onion

On July 13, 2011, Pontius joined the Onion as a human resources ("HR") generalist.  JSF ¶ 3.  Her starting salary was $35,000.  *Id.* ¶ 4.  When she joined, Pontius reported to Michael McAvoy ("McAvoy"), who, at that time, was the Onion's chief operating officer ("COO").  *Id.* ¶ 5.  As an HR generalist, Pontius's job duties included: (1) consolidating HR functions; (2) leading the relocation efforts of the Onion's writing staff from New York City to Chicago; and (3) supporting 60–70 full-time employees.  *Id.* ¶ 6.

In 2013, Pontius was promoted to the Onion's director of human resources.  *Id.* ¶ 7.  In that role, Pontius continued to report to McAvoy.  *Id.* ¶ 8.  Her job duties included: (1) overhauling the new-hire onboarding by creating an electronic system to make onboarding a smoother experience; and (2) managing all of HR at the Onion.  *Id.* ¶ 9.

In 2014, Pontius was promoted to vice president of talent for the Onion.  Pontius continued to report to McAvoy.  *Id.* ¶ 10.  In that role, Pontius had responsibility, *inter alia*, for recruiting and onboarding the Onion's first executive management team.  *Id.* ¶ 11.

In July 2015, McAvoy became the Onion's chief executive officer.  *Id.* ¶ 12.

### 4. January 2016: Univision Purchases the Onion

In early January 2016, Univision Communications ("Univision") purchased the Onion, which included *The Onion* satirical publication, as well as other digital platforms operating under the Onion umbrella of brands: the A.V. Club, Clickhole and the TakeOut.  *Id.* ¶ 14; Def. 56.1 ¶ 22.  Shortly thereafter, McAvoy promoted Pontius to chief resource officer ("CRO").  JSF ¶ 15;

Def. 56.1 ¶ 23.  On January 14, 2016, Pontius entered into an employment agreement with the Onion ("Employment Agreement").  JSF ¶ 18.  The agreement provided, among other things, that Pontius would be paid a base salary of $200,000 per year.[3]  *Id.* ¶ 19.

McAvoy also promoted Kurt Mueller ("Mueller") from senior vice president of operations to COO.  *Id.* ¶ 16.  Univision offered employment agreements to Pontius as well as 12 other Onion employees, including Mueller and McAvoy.  *Id.* ¶ 17.

### 5.    Structure of the Onion after the Univision Acquisition

In 2016, after it purchased the Onion, Univision also acquired Gizmodo Media Brands ("GMG brands").  *Id.* ¶ 27.  Univision operated the Onion and GMG brands under the umbrella Fusion Media Group division ("FMG").  *Id.* ¶ 28.

McAvoy, as the CEO of the Onion, and Raju Narisetti, the CEO of the GMG brands, reported directly to the CEO of FMG (Isaac Lee), with a "dotted" reporting line to the president of FMG, Felipe Holguin.  Holguin reported directly to Lee.  Lee, in turn, reported to the CEO of Univision.  In or around March 2018, Sameer Deen succeeded Lee.  *Id.* ¶ 29.  According to McAvoy, after Deen became CEO, Deen's role was primarily to prepare FMG for sale.  Def. 56.1 ¶ 42.  In addition to his role as the Onion's CEO, McAvoy also held the title of FMG's executive vice president of sales and was responsible for revenue and finance at the FMG level. JSF ¶ 34.  The following illustrates the reporting structure:

---

[3] On September 25, 2018, a few months before her contract term was set to expire, Pontius and Univision executed an amendment to the original Employment Agreement.  It raised Pontius's salary to $240,000 and extended her contract term to January 31, 2020.  All other terms remained in effect.  JSF ¶ 19, n.2.



The Onion and the GMG brands continued to operate independently of each other with respect to content creation and editorial independence, and each maintained its own editors and writers. *Id.* ¶ 31. However, certain functions that previously had been brand-specific began to be consolidated at the FMG level, including: technology; marketing; sales; revenue and finance; and, relevant to Pontius, HR. Each such function still had personnel specific to that subsidiary. *Id.* ¶ 32.

At the Onion, an individual employee—an HR director—managed human resources, and worked for the head of HR of FMG, while also having a dotted line reporting structure to Pontius and McAvoy. *Id.* ¶ 33. Pontius did not have other HR direct reports. *See* Def. 56.1 ¶ 50; Pl. Reply 56.1 ¶ 50. In addition to overseeing the HR director representing the Onion's employees in Chicago, Pontius testified that her job duties after the Univision acquisition consisted of (1) resolving and mitigating personnel risks; (2) furthering growth initiatives for the Onion; (3) acting as McAvoy's proxy for Onion employees; and (4) focusing on the Onion's content operations, including video and editorial content. Def. 56.1 ¶ 53. Soon after the acquisition,

McAvoy gave Pontius the title of chief of staff ("COS"), which she held in conjunction with her chief resources officer title.  JSF ¶ 35.

### 6.    October 2017–March 2019: Pontius Moves to New York City

In October 2017, for personal and professional reasons, Pontius moved to New York City.  *Id.* ¶ 36.  Pontius explained that her "soon-to-be husband at the time lived in New York and we had just got engaged, but the move worked well for our company because we were expanding into Onion Studios, which was our film and television expansion [*i.e.*, long form content]."  *Id.* ¶ 37 (quoting Mellk Decl., Ex. D ("Pontius Dep.") at 116).

While in New York, Pontius was tasked with building relationships with content creators and buyers.  *Id.*  She had a number of direct reports located in Los Angeles, but none in New York.  *Id.* ¶ 38; Def. 56.1 ¶ 58.  Pontius also managed the art and video production departments based in Chicago.  Pl. Reply 56.1 ¶ 58.  While in New York, responsibilities related to Onion Studios comprised 80% of Pontius's job duties.  These included securing, establishing and managing third-party vendor partnerships with production companies, management companies and talent agencies.  The remaining 20% was spent problem solving and managing day-to-day "fires."  JSF ¶ 39.

In March 2019, Pontius returned to Chicago at McAvoy's request.  *Id.* ¶ 40.  As of April 1, 2019, Pontius's job duties included running Onion Studios; managing day-to-day "fires" and problem solving for content creation teams; supporting growth initiatives, *i.e.*, securing talent for the Onion; and engaging in union negotiations.  Def. 56.1 ¶ 64.

### 7.    April 2019: G/O Media Purchases the Onion

On April 9, 2019, Univision sold Gizmodo Media Group and the Onion to Great Hill Partners ("GHP"), a private equity group.  JSF ¶ 41.  Upon the sale, GHP created G/O Media

Inc., headed by Spanfeller as chief executive officer ("CEO"). *Id.* ¶ 42. McAvoy began reporting directly to Spanfeller; Pontius continued reporting directly to McAvoy. Def. 56.1 ¶ 69.

Before the GHP purchase, Spanfeller had a number of meetings with the FMG management team as part of the due diligence purchase process. McAvoy and Mueller were involved in these meetings. The parties dispute whether Pontius attended any, but agree that Spanfeller and Pontius did not meet until after the acquisition. *Id.* ¶¶ 71, 73; Pl. Reply 56.1 ¶¶ 71, 73.

Soon after his appointment to CEO, Spanfeller hired Tom Callahan ("Callahan"), Jesse Knight, and Sean Flanagan to work at G/O as chief financial officer, chief compliance officer, and sales manager, respectively. Pl. 56.1 ¶ 33. Each is a white man with previous experience either working directly with Spanfeller or working at organizations at which Spanfeller had previously worked. *See id.* ¶¶ 33, 34; Def. Reply 56.1 ¶ 34.

Sometime in mid-April 2019, before Pontius and Spanfeller had met, Pontius and McAvoy discussed the potential diminishment of their roles after the acquisition, including whether such diminishment would trigger a "Good Reason" resignation.[4] Def. 56.1 ¶ 74. McAvoy recalled discussing "what it means if our jobs are diminished, what our options are and what would be ideal, what would be an ideal scenario, like whether that was working out, you know, taking less severance for an amicable parting or something along those lines." *See* Elmaleh-Sachs Decl., Ex. 6 ("McAvoy Dep.") at 130–31.

These conversations were prompted by McAvoy's and Pontius's belief that the new management would diminish the old guard. McAvoy viewed the new guard's approach thusly:

---

[4] A resignation for "Good Reason" under Pontius's and McAvoy's respective contracts would entitle them to a year's worth of salary in severance pay. *See* JSF ¶ 23.

"[W]e're going with a different—a new management team to run the company, therefore we want to get rid of the old management team in as least expensive [a] way possible." *Id.* at 134. Mueller recalled: "everybody was having those conversations.  We had just gotten bought out by an entity, and I don't think there was one person I knew from the acquired entity that wasn't trying to figure out what the fuck was going on." *See* Elmaleh-Sachs Decl., Ex. 11 ("Mueller Dep.") at 21.

Around this time, Mueller, McAvoy, and Pontius also discussed G/O's "one company" vision, which Pontius understood at the time to mean that the Onion and GMG would no longer operate independently of each other.  *See* Pontius Dep. at 213–14.  In fact, G/O planned to implement, with respect to its new acquisition, a number of functions that had already been consolidated to some extent at the FMG level, including technology; marketing; sales; revenue and finance; and HR.  Def. 56.1 ¶ 76.  Spanfeller testified that the "one company" approach did not require a restructuring of the way the Onion was managed and operated.  *See* Elmaleh-Sachs Decl., Ex. 8 ("Spanfeller Dep.") at 22.  The structure of the individual properties—each having its own operating group and leadership—remains in place today.  *Id*. at 23.

### 8.    April 11–April 21, 2019: Spanfeller and Pontius Meet and Hold Initial Meeting

On April 11, 2019, Spanfeller visited the Onion's Chicago office to meet the Onion's leadership team.  JSF ¶ 44.

Throughout the day, Spanfeller had one-on-one meetings with members of that team, including Pontius.  At some point, Spanfeller and Pontius met briefly to introduce themselves and agreed to discuss human resources initiatives at a later date.  *Id.* ¶ 45.  After the meetings, Spanfeller had dinner with the leadership team, although he and Pontius did not speak one-on-one at that dinner.  *Id.* ¶ 46.

9

At 6:34 p.m. that day, Pontius emailed Spanfeller apologizing that they didn't "have a chance to get down to biz today."  Pontius wrote that she "admir[ed] the work [Spanfeller] put in that day" and that the Onion was "excited and lucky to have him."  Pontius offered to help Spanfeller with the transition, offering to be a "sounding board, errand runner, hit man, plumber, etc."  Pontius requested some time to discuss "looming HR needs" and wrote that she had "some slight (and cheap) suggestions that'll help [Spanfeller] build trust, boost morale and improve on some super basic (but painfully bureaucratic) ways of doing things around here."  *Id.* ¶ 47.

At 6:38 p.m., Spanfeller replied that he would "love to hear [Pontius's] thoughts" on HR and asked to speak the next week.  *Id.* ¶ 48.

The following day, April 12, 2019, Spanfeller held an "all-hands" meeting at GMG's NYC offices.  *Id.* ¶ 49.  After the meeting, Pontius, who attended virtually, emailed Spanfeller stating, "[n]icely done this morning at GMG.  That's a tough room to say the least, but you stayed composed and answered them thoroughly and authentically.  Well done!"[5]  *Id.* ¶ 50.

Thereafter, Spanfeller and Pontius set up a time to discuss HR needs.  *Id.* ¶ 51.  On April 18, 2019, Pontius and Spanfeller had a call to discuss the need to fill the HR role at G/O, and Pontius also gave Spanfeller high-level thoughts about HR needs at G/O.  *Id.* ¶ 52.  Pontius recalled that Spanfeller's demeanor during this call was pleasant and that he was open to talking to her.  Def. 56.1 ¶ 86.

Around this same time, McAvoy was speaking with Spanfeller about Pontius.  He told Spanfeller he was a "big fan" and emphasized Pontius's strengths and capabilities in handling

---

[5] Pontius later testified that this was not her honest assessment of Spanfeller's performance: "[T]o be honest, it did not go well, but I wanted to give him some positive reinforcement because it is a tough room."  Pontius Dep. at 146–47.

personnel matters and managing different projects.  JSF ¶ 87.  Spanfeller was receptive to McAvoy's comments and "liked his view" of Pontius.  *Id.* ¶ 88.

> ### 9.     April 22 and 23, 2019: Spanfeller Offers Pontius the Role of CTO for G/O Media

On April 22, 2019, Spanfeller and Pontius spoke by phone.  JSF ¶ 53.  Spanfeller offered Pontius the role of chief talent officer ("CTO") for G/O Media, which Pontius accepted.  *Id.* ¶¶ 53, 55.  Spanfeller explained that the CTO role would involve hiring new employees, preparing a handbook and human resources-type responsibilities, as well as culture building and succession planning.  Def. 56.1 ¶ 91.  Before this call, Spanfeller had spoken with McAvoy about offering Pontius the CTO role.  McAvoy hoped that Pontius would consider the role or she could "keep on doing what she was doing."  *Id.* ¶ 90.

Pontius recalled that after she accepted, Spanfeller told her that his first order of business would be to terminate Susie Banikarim ("Banikarim"), GMG's then-executive vice president and editorial director.  *See* Pontius Dep. at 155.  Banikarim, at the time, was the only woman of color on the management team.  *Id.* at 158.  Pontius asked Spanfeller why he wanted to terminate Banikarim, whom Pontius regarded as "well respected."  *Id.*  Spanfeller responded that Banikarim was a "hindrance to making money."  *Id.*  Pontius advised Spanfeller that he should recruit a woman—ideally a woman of color—to fill the position, because "diversity was a hot button issue at the moment."  *Id.* at 155–56.  Spanfeller generally agreed, but informed Pontius that the person he had lined up to replace Banikarim was neither a woman nor a person of color.  *Id.* at 156.

In his deposition, Spanfeller testified as to his reasons for terminating Banikarim.  *See* Spanfeller Dep. at 174.  He stated that he had heard from Raju Narasetti ("Narasetti"), Banikarim's direct manager—and based on his own observations and conversations with a

number of people he had spoken to during the diligence process—that Banikarim was "not very good at her job." *Id.* Narasetti, in particular, told Spanfeller that Banikarim was "the worst hire [Narasetti] ever made"; she was abusive toward her staff, not well liked, and was generally hard to work with. *Id.* at 175. McAvoy had conveyed similarly negative sentiments about Banikarim to Spanfeller. *Id.*

Pontius claims that Spanfeller did not tell her his reasons for terminating Banikarim, apart from the fact that she was "a hindrance to us making money." Pontius Dep. at 169. Pontius also disagrees with Spanfeller's negative assessment of Banikarim, opining that language Spanfeller used to describe her was "coded" including terming her "aggressive," "abusive," "condescending," "contrarian," and "domineering." *See* Mellk Decl. Ex. QQ. However, Pontius knew Banikarim only by reputation, and had never worked with her or supervised her, and had not had responsibility for managing the GMG team. Def. 56.1 ¶ 95.

Pontius recalled that Spanfeller also made comments on the April 22 call that she viewed as "degrading" and "demeaning." Pl. 56.1 ¶ 47. For example, when Pontius asked to whom she would be reporting, Spanfeller responded, "moi." *Id.* When Pontius asked who else would be on the management team, Spanfeller responded by listing his then-executive team members and concluded by remarking "And then there's you. So, how does that feel, Madam C-Suite?" *Id.* Pontius recalled that she found Spanfeller's comments "gross," but chose not to dwell on them. *Id.*

On the April 22 call, Spanfeller also informed Pontius that over the following week, G/O would need to execute company-wide layoffs. JSF ¶ 54; Def. 56.1 ¶ 92.

After the call, at Spanfeller's direction, G/O engaged a third-party public relations company to draft a press release announcing Pontius's promotion to CTO.  JSF ¶ 56.  The draft press release was sent to Pontius for review.  *Id.* ¶ 57.

On April 23, 2019, Pontius emailed Spanfeller that she was concerned about the timing of the announcement of her promotion given the upcoming layoffs.  Pontius suggested delaying the announcement until the following week, "post lay off" so as to garner goodwill with the remaining employees and use her promotion "as a moment to build trust with staff."  *Id.* ¶ 58.

Thereafter, Pontius and Spanfeller spoke on the phone.  Spanfeller did not object to Pontius's request to delay issuing the press release at that time.  *Id.* ¶ 59.

### 10.    April 24, 2019: Pontius and Spanfeller Meet in New York City

On April 24, 2019, Pontius and Spanfeller met in person at G/O's offices in New York City to further discuss the CTO role.  *Id.* ¶ 60.  According to Pontius, she began the meeting by reiterating her reasons to delay the announcement of her promotion.  Pontius Dep. at 189.  Pontius then described the state of morale in the office.  *Id.* at 189–90.  Pontius told Spanfeller that there were signs in the bathroom quoting certain comments Spanfeller had made regarding meritocracy during the April 12 "all-hands" meeting, and Pontius had heard that employees were organizing after-work meet-ups to discuss it.  *Id.* at 190.  Pontius also shared a "disturbing" incident in which a sales hire Spanfeller had installed tipped a manager $20 for completing her job.  *Id.*

According to Pontius, she also shared her concerns about the timing of Banikarim's termination in light of these "culture" issues.  Pontius advised Spanfeller of "the potential liabilities" and "bad optics" that "terminating a protected class" could entail.  *Id.* at 190, 196.  Pontius did so because she "felt like [Spanfeller] should know that there were some risks associated with [firing Banikarim] and there could be some backlash or outburst as a result."  *Id.*

13

Pontius "tried to connect those dots" in describing the "toxic work environment" and the timing of Banikarim's termination, and advised Spanfeller to wait to terminate Banikarim until the larger layoff planned for the following week or week after. *Id.* at 190–91, 194. Pontius explained: "I wanted him to know something that was on everybody's mind so that we went to terminate the only female manager of color, we could be mindful of . . . the optics and also mitigate any potential liability that could have resulted from terminat[ing] a protected class employee." *Id.* at 196. Pontius claims that Spanfeller met this advice with "anger" that Pontius would weigh in on his strategy. *Id.* at 191. According to Pontius, Spanfeller told her that "he needed somebody with a backbone to do the job." *Id.*

Pontius estimated that the entire meeting lasted approximately 10 minutes and that "[b]efore [she] knew it, [Spanfeller] was escorting [her] out of his office. And the parting words that he said to [her] were, 'I don't know what it is you do here, but I don't think it's a full-time job.'" *Id.* at 191. After the meeting, Pontius was unsure whether she was still employed. *Id.* at 204.

Spanfeller recalled that during this meeting, he formed the impression that Pontius did not want to participate in the layoffs, which he viewed as a "basic ten[et] of being an HR lead." Spanfeller Dep. at 36. He recalled telling Pontius that if that was so, then perhaps the CTO role was a poor fit. *Id.* According to Spanfeller, Pontius agreed with him. *Id.*

After the meeting, Spanfeller emailed Pontius that they were putting the announcement of her CTO appointment "on hold for now." JSF at 61. Spanfeller testified that he never told Pontius he was formally withdrawing the offer of the CTO position, or told McAvoy or Pontius that he wanted to fire her, or ever did so. Def. 56.1 ¶¶ 113–14.

14

On April 25, McAvoy and Spanfeller spoke by phone regarding Pontius. McAvoy Dep. at 121. Spanfeller assured McAvoy that he had not fired Pontius, and that he would still consider Pontius for the CTO role if she still wanted to do it. *Id.* at 121–22. Spanfeller told McAvoy to have Pontius follow up with him if she was still interested. *Id.* According to Pontius, she never did so because (1) she felt it was inappropriate after the conversation on April 24; and (2) she was respecting the "chain of command" and working only through McAvoy. Pontius Dep. at 237–38. Pontius and Spanfeller did not have any more in-person meetings during Pontius's tenure at G/O. Def. 56.1 ¶ 119.

**11.    April–May 2019: Spanfeller's Updates About Pontius**

In April 2019, Spanfeller began sending weekly updates to Christopher Gaffney and Eric Alhgren of GHP. JSF ¶ 62.

On May 11, 2019, Spanfeller wrote in his weekly update to Gaffney and Alhgren

I do need to sort out the three folks at the top of the heap in Chicago. We are going to try to get [Pontius] to take a 6 month severance package vs. 12 months in return for reducing or eliminating her non-compete clause.

*Id.* ¶ 63.

On May 25, 2019, Spanfeller wrote in his weekly update to Gaffney and Alhgren:

We are also working hard on finding at least two heads in the programmatic space to handle both external communications as well as the internal yield operations. Finally on this front, we will soon focus on separating [Pontius] from the company, hopefully in a similar package to [COO Kurt Mueller's]. Together these two represented ~$1 million in headcount costs.

*Id.* ¶ 64.

Eventually, Spanfeller did not pay Pontius the same exit package offered to departing COO Mueller. He explained that McAvoy had championed Pontius's abilities, and he had felt that G/O could "do a lot with [Pontius]," Def. 56.1 ¶ 145, but that it later no longer made business sense to pay her such a generous exit package because, "if you have got a talented smart

15

individual and you are going to pay them you might as well get value as opposed to simply say we will pay you to go away. We [didn't] want her to go away," Spanfeller Dep. at 141; Mellk Decl., Ex. AA.

**12.    Late May 2019: Mueller Severs Ties with the Onion**

After the GHP purchase, G/O was exploring a reorganization of the sales team which could lead to a restructure of COO Mueller's role and responsibilities. Def. 56.1 ¶ 120.

On May 22, 2019, McAvoy emailed Spanfeller and Callahan, about Mueller, telling them:

> It looks like the role that we're proposing for Kurt ("SVP, sales ops / marketing") isn't what Kurt is interested in doing as he feels it is a step back in his career . . .
>
> So I think we're at the point where we should just move to an amicable separation as working around his employment agreement will be bad for everyone. To th[at] end, if we terminated Kurt's employment through the employment agreement he would get 12 months severance and a 3 month non-compete. I suggest we apply a 9 month severance no non-compete . . .

JSF ¶ 65.

The next day, Spanfeller replied that the proposed new position role would "not be [a] step back for Mueller, but as they say beauty is in the eye of the beholder." *Id.* ¶ 66.

Later on May 23, 2019, McAvoy emailed Spanfeller and Callahan that he had spoken to Mueller about "what he's looking for based on an amicable separation in the event his job changed to that we've proposed (remove sales team and have him focus on sales support/marketing)." *Id.* ¶ 67.

On or about May 31, 2019, Mueller severed ties with the Onion pursuant to a severance and general release agreement ("Mueller Agreement"). *Id.* ¶ 68.

### 13.    June 3–17, 2019: Pontius Raises "Diminishment"; McAvoy Responds

On June 3, 2019, Pontius emailed McAvoy asking to "set up some time to chat to talk through my future here.  I know this won't come as a surprise to you, but the last few weeks have been particularly frustrating—after quite a few months/years of a different type of frustration before that [when the Company was owned by Univision, G/O's predecessor]."  Pontius stated that she wanted to work out an "amicable ending."  *Id.* ¶ 69; Def. 56.1 ¶ 128.  The parties dispute whether McAvoy forwarded the email to Spanfeller, *see* Def. 56.1 ¶ 130; Pl. Reply 56.1 ¶ 130, but McAvoy testified that he discussed Pontius's email with Spanfeller, McAvoy Dep. at 184.

On June 13, 2019, at 7:04 p.m., Pontius emailed McAvoy: "Following up on my previous note from 6/3, please accept this written notice of the material diminution of my authority, duties and responsibilities of my role."  Pontius wrote that she hoped to work out an "amicable parting," and "would like to part ways with the company in accordance with the provisions of my agreement."  JSF ¶ 70.

That day, at 8:40 p.m., McAvoy responded by email that he was "taking this as a formal recognition of diminishment."  *Id.* ¶ 71.  McAvoy did not run this response by Spanfeller.  Def. 56.1 ¶ 134.  The parties contest whether Spanfeller needed to have been made aware, or whether he was in fact aware, of McAvoy's response.  *See id.*; Pl. Reply 56.1 ¶ 134.

After responding to Pontius, McAvoy forwarded Pontius's email to Callahan, G/O's CFO, stating that he would "personally" rather settle this now for the "Kurt deal" and that he did not see any "reasonable way to reinstate [Pontius's] authority of role given what they are trying to achieve and knowing that she is already taken a few more shots than she deserves or is fair."  Def 56.1 ¶ 135.

On June 17, 2019, McAvoy emailed Pontius apologizing for his "inability to get back to you on Friday as I said I would" and directing her "to take off this week.  In particular, I don't want you to attend the union meeting this Thursday."  JSF ¶ 72.

> **14.     June 15, 2019: Spanfeller Informs GHP of Pontius's Diminishment Claim**

On June 15, 2019, Spanfeller emailed Gaffney and Ahlgren of GHP with an update on matters at G/O.  *Id.* ¶ 78; Def. 56.1 ¶ 138.  Summarizing the situation with Pontius, Spanfeller wrote the following:

> On another front, McAvoy is now having issues with Katie [Pontius], his Chief of Staff.  As you may recall I had offered her the HR lead job, which she accepted and then turned down because she did not want to have to deal with the [Banikarim] issue nor the staff layoffs.  I said fine, and we put her back in her old job.  Now when I say that, we actually have very little understanding of what her job actually is despite asking McAvoy on several occasions what her exact job description was.  Also key here is the fact that she has a contract that promises her a year of severance if she is terminated before the end of next January.

> My plan was to simply have her continue on in her present role and figure out what was what as we got to the end of the year.  She is smart and appears very competent so rather then [sic] pay her to go away my thinking was to continue to use her talents and look for additional more structured ways to employ her.

> Now we find out (or rather Tom [Callahan] has found out, as McAvoy has not told me any of this) that Katie feels like McAvoy has diminished her responsibilities and as such is constructively terminating her.  What McAvoy has been communicating is his desire to do a deal with her similar to what we did with Kurt, take away the non-compete and pay out 9 months of severance.  In this case that makes no sense.

> The most recent news on this front (yesterday late afternoon) is that Katie has told McAvoy that she was going to get a lawyer and notify the company of her position.  Assuming this does happen we have 35 days to cure the issue, which we will do.  This is causing McAvoy some high level of stress according to Tom.  Tom believes that McAvoy is worried that Katie will unearth some troublesome issue around him or The Onion in general.  I really have no sense of what is what here.  I plan to get into it with McAvoy on Monday or Tuesday when he is in NYC.  At this point this is just a potential issue but we will stay on top of it.

Mellk Decl., Ex. TT.  According to his testimony, Spanfeller's view of Pontius's potential at the company stood in contrast to his view of Mueller's.  *See* Spanfeller Dep. at 142.  Spanfeller felt that there were "plenty of things we could have [Pontius] do."  But: "There were not plenty of things other than marketing job that we could have [Mueller] do."  *Id.*

### 15.    June 18–July 10, 2019: G/O Responds to Pontius's Claim of Diminishment

On June 18, 2019, Lynn Oberlander ("Oberlander"), G/O's then-general counsel, formally responded to Pontius's June 13 letter to McAvoy.  Oberlander advised Pontius that her "purported notice of Good Reason under the Employment Agreement was not compliant with or sufficient under the Employment Agreement" and asked Pontius to provide "specific facts and circumstances regarding [her] assertion that there has been a diminution in [her] 'material responsibilities authorities, or duties'" as G/O has "an opportunity to cure under the Employment Agreement."[6]  JSF ¶ 73.

On June 19, 2019, Pontius—via counsel—faxed Oberlander a formal "notice of resignation for Good Reason."  *Id.* ¶ 76.  In it, Pontius stated that her position had been diminished because she: (1) was no longer assisting in setting strategy for the Onion or charged with implementing (after determining) tactics; (2) no longer had a role or the authority to implement the strategy or manage personnel or assist in the hiring of new people; (3) was no longer responsible for managing the Los Angeles operation or running Onion Studios

---

[6] Oberlander also reminded Pontius that per her Employment Agreement, notice of Good Reason was required to be sent to the chief human resources office and the office of general counsel. JSF ¶ 74.  Finally, Oberlander stated that "with respect to Mr. McAvoy's response to you on June 13, 2019 stating that he was 'taking [your email] as a formal recognition of diminishment,' that statement was merely an acknowledgement of your email to him and is not in any way a statement by the Company that you have Good Reason to resign under the Employment Agreement."  *Id.* ¶ 75.

(podcasting and long-form); and (4) had been told her position as chief resource officer was no longer necessary.  Def 56.1 ¶ 153.  Pontius also claimed, for the first time, "harassment and lack of respect shown to me by Jim Spanfeller," but did not provide any details about this claim.  *Id.* ¶ 154.

Around this time, McAvoy sent to Pontius, via their private g-mail accounts, emails reciting facts supporting her diminishment claims.[7]  According to Pontius, she had asked McAvoy to put together a summary of his advocacy attempts on her behalf.  Pontius Dep. at 273.  McAvoy did so, he testified, attempting to "be[] a really clear, consistent and truthful communicator."  McAvoy Dep. at 234.  He explained that "these e-mails were a recap of the events that had transpired between Katie, myself, and the company vis-à-vis the changing story as to how Katie's role was handled."  *Id.* at 246.

McAvoy's first email, sent on June 20, 2019 at 9:59 p.m., was entitled, "First Two Accounts," and documented the ways in which Pontius's job had been diminished.  McAvoy's email set out a "simplest version – no second hand just Mike and Katie" and a "longer version (99% First Hand of Mike and Katie)."  Pontius Dep. at 269–74; McAvoy Dep. at 234–35; Mellk Decl., Ex. UU.  Each category contained examples of Pontius's diminishment.  Mellk Decl., Ex. UU.

The next morning, June 21, 2019, at 6:53 a.m., McAvoy sent another email (via his personal g-mail) to Pontius's personal email with a revised version of his previous "First Two Accounts" email.  Def 56.1 ¶ 158; Mellk Decl. Ex. WW.

---

[7] Pontius testified, for context, that it was standard for FMG leadership to communicate through personal email accounts.  Pontius Dep. at 270.

On June 24, 2019, Spanfeller emailed McAvoy to inform him that Pontius had given notice on June 19, 2019, contending that there was "Good Reason" under her Employment Agreement.  Spanfeller's email stated that G/O valued Pontius's role and contributions, and did not want her to resign.  Def. 56.1 ¶ 162.  Spanfeller asked McAvoy for suggestions as to how G/O could address Pontius's assertions to ensure that her job was not diminished.  *Id.* ¶ 163.

On June 26, 2019, McAvoy responded to Spanfeller's email.  McAvoy stated that he was confused about Spanfeller's newfound focus on Pontius's value, given his previous negative statements to McAvoy about her, including that he believed the CTO job was beyond Pontius's skillset.  Mellk Decl., Ex. XX.  McAvoy added that he did not believe it was possible to cure Pontius's claim of diminishment, given the "one company" approach.  *Id.*  McAvoy explained that, under the reorganization, his role as CEO had been diminished, such diminishment had "trickled down" to Pontius, as his chief of staff, resulting in her current position occupying "significantly less authority and responsibility than she previously had."  *Id.*  McAvoy also noted the company's new focus on higher margin business and improved profitability, which had resulted in the elimination of management positions that Pontius had overseen.  *Id.*  McAvoy suggested that Spanfeller offer Pontius a new role instead.  *Id.*

On July 2, 2019, Spanfeller responded to McAvoy's June 26, 2019 email.  He claimed that Spanfeller had never said that the CTO job offered was beyond Pontius's skillset, that her current position was not full time, or that Pontius should be fired.  Mellk Decl., Ex. YY.  Rather, Spanfeller wrote, he had "stated repeatedly that [Pontius] is a valued member of the Company and that we should do what we can to make sure that we are best utilizing her skills and abilities."  *Id.*  Spanfeller explained that he had only questioned what Pontius was doing when she was working in New York for months but not coming into the office.  *Id.*  Spanfeller also

noted that Pontius had initially accepted the CTO role, only to reject the job after she realized she would be involved in employee terminations, which raised concerns for Spanfeller. *Id.* Spanfeller suggested reinstating some of Pontius's management authority. He reiterated his request that McAvoy find ways to address Pontius's claim of diminution, as "[p]aying [Pontius] instead of trying to utilize her in a meaningful role is not in the Company's interest[.]" *Id.*

On July 3, 2019, McAvoy responded. Def. 56.1 ¶ 169. First, McAvoy addressed a suggestion raised by Spanfeller to have Pontius directly manage both A.V. Club Editorial and A.V. Club Video, rather than having these units report to McAvoy. *Id.* McAvoy reminded Spanfeller that there was an "EEOC" matter regarding treating employees at the Onion differently than at the A.V. Club, and suggested Spanfeller run this suggestion by "legal."[8] *Id.* Second, McAvoy suggested giving Pontius direct oversight of all editorial personnel at the Onion, perhaps with the title of chief operating officer or president of the Onion. *Id.* ¶ 171.[9] Third, McAvoy suggested making Pontius head of G/O's content studios, with a commensurate budget to pursue long-form, and a plan to build out video in Los Angeles. *Id.* ¶ 172. He suggested a title of SVP of content for G/O studios. *Id.*

On July 5, 2019, Oberlander emailed Pontius a formal response to her June 19, 2019 "Good Reason" resignation notice letter. JSF ¶ 77. The letter proposed cures for Pontius's

---

[8] The "EEOC" matter referred to claims of gender discrimination asserted by two A.V. Club employees against at least McAvoy and the Onion arising before the GHP purchase. These did not involve Spanfeller. It is disputed whether these claims were also asserted against Pontius. Def. 56.1 ¶ 170; Pl. Reply 56.1 ¶ 170.

[9] It is disputed whether Pontius was qualified for the posts McAvoy identified. Defendants note that she did not have expertise beyond HR and recruitment, and had never been involved in the revenue or sales operations of the Onion. Pontius Dep. at 105, 293, 317; McAvoy Dep. at 265. Pontius, however, maintains that she was qualified, citing a declaration from McAvoy so stating. Pl. Reply 56.1 ¶ 171. She does not contend that she had expertise or experience in revenue or sales. *Id.*

claimed diminishment.  These included: (1) expanding existing managerial responsibilities so that A.V. editorial and A.V.video would both report directly to her; (2) giving Pontius a role implementing strategy and managing personnel and assisting in hiring of new people; (3) giving Pontius a role assisting in setting strategy for the company and/or implementing tactics; and (4) having Pontius attend weekly leadership meetings.  Def. 56.1 ¶ 173.  Oberlander also addressed Pontius's comment regarding alleged "harassment and lack of respect" by Spanfeller, stating that it was unclear to what conduct Pontius was referring.  *Id.* ¶ 174.  Oberlander asked that Pontius bring any specific conduct to her attention immediately so that he could address it.  *Id.* ¶ 175.

Pontius disputes that these cures were sufficient.  Pl. Reply 56.1 ¶ 173.  And, she claims, she already had effective oversight of A.V. editorial and A.V. video, such that the first proposed cure would not have materially restored her responsibilities.  *Id.*

On July 9, 2019, Spanfeller emailed McAvoy asking, "are you and Katie joining the leadership meeting?"  Mellk Decl., Ex. AAA.  Typically, only Spanfeller's direct reports were invited to such meetings—which in this instance was telephonic—and Pontius did not directly report to Spanfeller.  Def. 56.1 ¶ 178.  Defendants contend that this was an effort by Spanfeller to immediately address Pontius's concern of diminishment; Pontius contests that this email, without more, was insufficient to cure her diminishment.  McAvoy did not respond.  *Id.* ¶ 179.

Later that night, Spanfeller emailed McAvoy asking if he had invited Pontius to the leadership call that morning, and if so, if there was a reason she did not attend.  *Id.* ¶ 180.  Spanfeller also asked McAvoy to invite Pontius to the next week's meeting, because, he stated, he wished to make sure Pontius knew she could attend, while going through McAvoy to respect the "chain in command."  *Id.* ¶ 181.

The next day, July 10, 2019, Spanfeller followed up with McAvoy, seeking an update on Pontius and noting that McAvoy had not responded to Spanfeller's query about Pontius's absence from the leadership meeting.  *Id.* ¶ 182. Spanfeller asked McAvoy whether Pontius would be at the next week's leadership meeting, whether Pontius was coming to the office on a daily basis, and whether he had gotten any feedback from Pontius after Oberlander's email.  *Id.* ¶ 183.

Later that day, McAvoy replied to Spanfeller that Pontius was coming into the office daily.  He added that Spanfeller's cure proposal was not what he proposed, but acknowledged that it addressed some issues he had identified.  *Id.* ¶ 184.  McAvoy added that he had not asked Pontius to join the leadership meeting on July 9.  *Id.* ¶ 185.

Also on July 10, Pontius learned that G/O had hired Angela Persaud as SVP of talent.  Pl. 56.1 ¶ 136.  Pontius had not been interviewed for this position.  *Id.* ¶ 137.

### 16.    July 11–13, 2019: McAvoy's Employment is Terminated; He Forwards Emails to Pontius's Personal Email

On July 11, 2019, G/O terminated McAvoy's employment.  JSF ¶ 82.  McAvoy was not paid severance upon his exit.  Def. 56.1 ¶ 187.

On July 13, 2019, McAvoy forwarded two emails from his personal email account to Pontius's personal email account.  JSF ¶ 83.

The first was an email exchange from May 22–23, 2019 between McAvoy and Spanfeller regarding Mueller's severance agreement.  Pontius had been aware of this exchange, and the fact that Mueller had resigned pursuant to a separation agreement, since May 2019, around the time Mueller leaving the company.  *Id.* ¶ 84.  The email attached a copy of Mueller's severance agreement.  Mellk Decl., Ex. CC.

The second was an email exchange from June 17, 2019, between McAvoy and

Oberlander, in which Oberlander asked McAvoy how Pontius's job had been diminished.  JSF ¶

85.  In response, McAvoy stated that Pontius's job had been diminished and suggested that

Pontius be treated in same way as Mueller, referring to his severance package.  Mellk Decl., Ex.

NN ("[p]ersonally, I don't see how we just don't settle this cleanly").

### 17.    July 11–19, 2019: G/O and Pontius are Unable to Resolve Their Differences

Almost immediately after McAvoy's employment was terminated, Spanfeller reached out

to Pontius directly.  Def 56.1 ¶ 193.  On July 11, 2019, Spanfeller wrote:

> I just wanted to reach out and state what I assume is the obvious.  You will now be
> reporting to me.  Also, as I think you know you are now invited to join the weekly
> leadership calls that occur on Tuesdays at 9 Central time.  I have asked my EA,
> Emily, to make sure you have all the details for the next meeting.  If you don't get
> these please do let me know.  I was hoping to have you join our meeting this week
> but apparently Mike [McAvoy] did not invite you.  A communication breakdown
> for which I apologize.
>
> I am looking forward to working together.  We should find some time over the next
> few days to schedule a catch up call.  I am very much looking forward to your ideas
> and suggestions on all fronts.

*Id.* ¶ 194.

The following week, Pontius and Spanfeller communicated via email.  On July 16, 2019,

Pontius emailed Spanfeller with suggestions for managing the A.V. Club.  *Id.* ¶ 195.  Spanfeller

responded, noting that her suggestions had merit, but that he was unsure how quickly they could

be implemented.  *Id.* ¶ 196.  Spanfeller also asked Pontius to oversee operations in the meantime,

and to take on oversight of the TakeOut, a food and pop culture website.  Mellk Decl., Ex. GGG.

On July 17, 2019, Oberlander emailed Pontius's counsel what she termed a settlement

offer.  Oberlander wrote:

> While the Company maintains its position that Ms. Pontius's circumstances do not
> amount to Good Reason under the terms of her Employment Agreement and thus

25

> the severance provisions are not triggered, in order to amicably resolve the situation, the Company is willing to offer Ms. Pontius six weeks of base salary in exchange for executing a full and comprehensive release.

Elmaleh-Sachs Decl., Ex. 50.  Pontius's counsel, Shane W. Blackstone, rejected this offer and counter-offered Pontius's "final offer": nine months of base salary and a full waiver of her non-compete.  *Id.*  Blackstone wrote that without such an agreement, Pontius intended to pursue all claims and remedies available to her.  *Id.*  Defendants did not respond to or counter this offer.  Pl. 56.1 ¶ 128.

Also on July 17, 2019, Spanfeller emailed Pontius, stating that G/O would like her to take on an expanded leadership role as well as additional key responsibilities, and that G/O was willing to consider any other reasonable proposals to expand Pontius's role or authority.  Mellk Decl., Ex. HHH.  Referring to information he had learned from a discussion between Pontius's attorney and G/O's outside counsel, Spanfeller wrote that he was disappointed to learn that Pontius felt her concerns could not be cured by any action and that she planned to resign.  *Id.*  Spanfeller stated that G/O disagreed.  He asked Pontius to reconsider and to work with G/O to make her role one in which she was content.  *Id.*  Spanfeller concluded by informing Pontius that he remained "very interested in working collaboratively with [Pontius] to resolve [her] concerns and hope[d] that [Pontius] [would] view this as an opportunity to play a significant role in the future of the company."  *Id.*

On July 19, 2019, Pontius voluntarily resigned her employment with the Onion, invoking the "Good Reason" provision of the Employment.  JSF ¶ 100; Def. 56.1 ¶ 200.  Pontius did not sign any release of claims.  Def. 56.1 ¶ 201.

### 18.    September 11, 2020: Pontius Commences This Lawsuit

On September 11, 2020, after receiving a notice of a right to sue from the Equal Employment Opportunity Commission, Pontius brought this lawsuit.  Def. 56.1 ¶ 202.

19.     **Mueller's and Pontius's Roles**

Because Pontius's disparate treatment claims turn on a comparison to Mueller, the parties have marshalled facts relevant to this comparison.

Pontius emphasizes that before the G/O's acquisition, she and Mueller occupied similar rank and were held in similar regard at the Onion, despite their different titles and roles. *See* Pl. 56.1 ¶ 22. McAvoy called Pontius and Mueller "two different sides of operations," and "equal in terms of value" at the Onion. McAvoy Dep. at 15, 284–85. Pontius and Mueller had joined the Onion at about the same time.

Defendants note differences in how Mueller and Pontius were situated before the acquisition. Mueller, they note, held a title and responsibilities with both the Onion (COO) and with FMG/G/O (SVP of operations and sales), whereas Pontius held a title only with the Onion (CRO/COS), and did not have any FMG or GMG direct reports. Def. 56.1 ¶ 210; Def. Reply 56.1 ¶ 19. Consistent with that, Mueller had responsibilities outside the Onion, including building the sales operations, overseeing branded content and managing sales representatives at the FMG (and then G/O) level for *both* the Onion and GMG brands. *Id.* ¶ 211. McAvoy also described Pontius's role as "less clear" and "naturally more amorphous than that of others." McAvoy Dep. at 219. McAvoy attributed this to the fact that Pontius worked closely with him as his chief of staff, and therefore was assigned duties as various needs arose. *Id.*

Defendants also emphasize that after G/O's acquisition, Pontius and Mueller were in different positions with respect to their futures at the company. After the acquisition, Spanfeller repeatedly indicated his belief that Pontius could be "utilized," but that Mueller could not. *See* Spanfeller Dep. at 142 (there were "plenty of things we could have [Pontius] do. There were not plenty of things other than marketing job that we could have [Mueller] do."). Pontius counters that Spanfeller had been more welcoming and easygoing toward Mueller, and other male

employees, than to her.  McAvoy Decl. ¶ 19.  Defendants counter that Pontius had initially

perceived Spanfeller as pleasant and open to speaking with her, Pontius Dep. at 147, 152–53,

until their disastrous New York meeting.  Defendants also note that even after that meeting, in

contemporaneous emails, Spanfeller described Pontius as "smart" and "competent."  Def. 56.1 ¶

144.

Defendants also note that a former female executive for FMG was provided severance

after McAvoy eliminated her role.  McAvoy Dep. at 189–90.  Conversely, McAvoy, a male, was

not provided severance upon his termination.  Spanfeller Dep. at 141.

Finally, defendants emphasize that the circumstances of Mueller's and Pontius's

resignations differed.  In resigning, Mueller, unlike Pontius, did not rely on the Good Reason

clause of his Employment Agreement or make a formal claim of diminishment.  Def 56.1 ¶ 212.

### 20.    Spanfeller's Attitude Toward Women, Generally

Insofar as Pontius' gender discrimination claims center on Spanfeller, Pontius contends,

largely via a declaration by McAvoy, that Spanfeller was less receptive toward women generally.

McAvoy observed that "Spanfeller treated female employees noticeably differently, and worse,

than male employees."  Pl. 56.1 ¶ 36.  McAvoy perceived that Spanfeller took "disproportionate

negative actions against female employees."  *Id.* ¶ 37.

In response, defendants note that Spanfeller offered Pontius a C-Suite job, and had hired

multiple women into C-Suite positions including as general counsel, chief financial officer, and

SVP/head of people, Def. 56.1 ¶ 221, and Spanfeller fired male employees, like McAvoy, *id.* ¶

186.

Neither McAvoy nor Pontius attested to specific episodes of gendered behavior by

Spanfeller, apart from Pontius's account above.  However, McAvoy stated he observed that

"Spanfeller was critical and dismissive of the women on the Onion team, such as [Pontius], Julie

28

Scott, Lindsay Eckert, Kelly Bishop and Liz Ellis by either not interviewing them for opportunities, not understanding what their roles were, or being aggressive and critical to their points during meetings." *See* Elmaleh-Sachs Decl., Ex. 2 ("McAvoy Decl.") ¶ 9.  McAvoy also observed Spanfeller engage in "uncomfortable and inappropriate teasing towards female reports that neither he nor any of his male colleagues ever experienced." *Id.* ¶ 11.  McAvoy did not provide any specific accounts of such teasing.

### B.    Procedural History

The Court's May 21, 2021 decision on the parties' motions to dismiss set out in detail the procedural history of this case to that point.  *See* Dkt. 48 at 7. The Court incorporates that history here by reference.  The following is a brief summary.

On September 11, 2020, Pontius commenced this action.  Dkt. 1.  On November 20, 2020, defendants answered, Dkt. 19, and on December 9, 2020, filed an amended answer with counterclaims, Dkt. 29.  On December 11, 2020, Pontius filed the FAC.  Dkt. 31.  On December 28, 2020, defendants filed an amended answer.  Dkt. 33.  On December 30, 2020, Pontius moved to dismiss defendants' counterclaims.  Dkts. 34–35.  On May 21, 2021, the Court granted that motion.  *See* Dkt. 48.  It held that defendants had not plausibly alleged that Pontius and McAvoy colluded to engineer a Good Reason resignation, and even if they had—and even if Pontius had improperly received and used confidential information in doing so—such would not constitute a breach of Pontius's duty of loyalty, the premise of defendants' breach of fiduciary duty claim. *Id.* at 8–13.  Because defendants' other counterclaims, for breach of contract and breach of the duty of care, turned on the same premise—that Pontius had acted disloyally—it dismissed those counterclaims as well.  *Id.* at 14–16.

On June 4, 2021, defendants moved for reconsideration or, in the alternative, leave to amend.  Dkt. 51.  On July 7, 2021, the Court denied the motion for reconsideration, but granted

defendants' motion for leave to file an amended counterclaim, for breach of contract and breach of fiduciary duty.  On July 15, 2021, defendants filed an amended counterclaim.  Dkt. 64.  On August 3, 2021, Pontius filed an answer.  Dkt. 65.

As to the instant motions, on December 15, 2021, the parties filed their JSF.  Dkt. 76.  On January 12, 2022, defendants filed their motion for summary judgment; a Local Rule 56.1 Statement; the declaration of Wendy J. Mellk, with exhibits attached thereto; and a memorandum of law in support.  Dkts. 80–84.  On February 2, 2022, Pontius filed her cross-motion for summary judgment, a Local Rule 56.1 counter-statement, a Local Rule 56.1 statement; the declaration of Julia Elmaleh-Sachs, with exhibits attached thereto; and a memorandum of law in support.  Dkts. 88–91, 93.  On February 23, 2022, defendants filed a reply memorandum; a Local Rule 56.1 counter-statement; the declaration of Wendy J. Mellk, with exhibits attached thereto; and a memorandum of law in opposition to Pontius's cross-motion for summary judgment.  Dkts. 95–98.  On March 9, 2022, Pontius filed a reply in support of her cross-motion for summary judgment.  Dkt. 100.

## II.    Applicable Legal Standards

### A.    Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed, R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

The Court considers first defendants' motion for summary judgment directed to Pontius's federal claims, brought under Title VII and the Equal Pay Act.

Under Title VII, Pontius alleges that (1) she was discriminated against based on the more favorable treatment a male colleague, Kurt Mueller, received when he exited G/O, and based on her role's having been diminished; (2) she was retaliated against based on comments Pontius made about Banikarim's termination; (3) she experienced a hostile work environment.

Under the Equal Pay Act, Pontius alleges equal pay violations.

The Court addresses each claim in that sequence.

A.       **Discrimination**

1.       **Applicable Legal Standards**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Discrimination claims under Title VII are analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Holcomb*, 521 F.3d at 138. To do so, the plaintiff must show that (1) she "belonged to a protected class"; (2) she "was qualified for the position [s]he held"; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138). The burden of establishing a *prima facie* case in an employment-discrimination case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

Where the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981)). The burden of production then shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer's burden is "one of production, not

persuasion").  However, a plaintiff cannot establish a *prima facie* case based on "purely

conclusory allegations of discrimination, absent any concrete particulars."  *Benzinger v. Lukoil*

*Pan Ams., LLC*, 447 F. Supp. 3d 99, 117 (S.D.N.Y. 2020) (citing *Meiri v. Dacon*, 759 F.2d 989,

998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985)).

        If the employer satisfies that burden, the presumption of discriminatory intent "drops out

of the analysis," and "the plaintiff must establish, by a preponderance of the evidence, that the

employer's justification is a pretext for discrimination."  *Lenzi*, 944 F.3d at 108 (quotation and

citation omitted); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).  The

plaintiff, however, is "not required to show that the employer's proffered reasons were false or

played no role in the employment decision, but only that they were not the only reasons and that

a prohibited factor was at least one of the 'motivating' factors" for the decision.  *Holcomb*, 521

F.3d at 138 (citation omitted); *see also* 42 U.S.C. § 2000e–2(m) (race, color, or sex must be "a

motivating factor" for employment decision).  However, "a plaintiff must provide more than

conclusory allegations of discrimination to defeat a motion for summary judgment."  *Schwapp v.*

*Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  A plaintiff cannot defeat a summary judgment

motion by "offering purely conclusory allegations of discrimination, absent any concrete

particulars."  *Meiri*, 759 F.2d at 998.

        **2.**     **Application**

        *a.*  Prima facie *case*

        Defendants do not dispute that the evidence can establish the first two elements of a

*prima facie* case: that Pontius (1) as a woman, is a member of a protected class; and (2) was

qualified for her positions of chief of staff and chief resource officer.  Defendants instead argue

that Pontius has not demonstrated the last two elements because she has failed to show either that

(3) she suffered an adverse employment action, or (4) the circumstances gave rise to an inference

of discrimination.

i.      Adverse employment action

An adverse employment action is a "materially adverse change in the terms and

conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.

2004) (citation omitted).  "To be materially adverse, a change in working conditions must be

more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders*, 361 F.3d at 755).

"Examples of such a change include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation." *Id.*

(quoting *Sanders*, 361 F.3d at 755).

Here, although Pontius's briefing is somewhat elusive on this point, she appears to raise

two theories as to how she experienced an adverse employment action: that her job role was

diminished and that she was denied severance pay to which she was entitled.[10]

*Job diminution*:  Under Title VII, Pontius need show "significantly diminished material

responsibilities" to demonstrate an adverse employment action.  *See Smith v. City of New York*,

_____

[10] Pontius's memorandum of law does not identify with specificity the adverse employment
actions she claims.  It states instead, generally, that "the facts are clear that Plaintiff suffered
multiple adverse actions under conditions giving rise to an inference of discrimination."  Pl.
Memo at 34.  Nor does her Amended Complaint articulate a theory of discrimination beyond that
she experienced disparate treatment relative to the terminated Mueller with respect to severance
pay.  *See* Dkt. 31 ¶ 162.  Defendants' distillation that Pontius pursues job-diminution and
severance-pay theories of adverse action appears to fairly identify the colorable theories of
adverse action.  The Court does not, however, construe the offer and loss of the CTO job to form
the basis of Pontius's discrimination claim.  (It is central to her retaliation claim, in which, as
clearly stated in both Pontius's complaint and memorandum, she claims she lost the CTO job
after protesting Spanfeller's decision to terminate Banikarim.)

385 F. Supp. 3d 323, 333 (S.D.N.Y. 2019).  But Pontius has not adduced sufficient evidence to establish either that her authority had been significantly limited or, assuming *arguendo* that it had been thus diminished in the wake of G/O's acquisition, that the cures defendants proposed would not have restored her level of responsibility.

Pontius claims that her role was diminished in the following ways.  First, by early May 2019, defendants had shuttered Onion Studios, and were divesting from the type of long form content Onion Studios produced.  Pl. 56.1 ¶ 75.  Oversight of the Onion Studios had comprised 80% of Pontius's job duties while she was in New York.  JSF ¶ 39.  Second, Pontius claims that after G/O's acquisition, she was "no longer assisting in setting strategy or charged with implementing corporate strategy."  Pl. 56.1 ¶ 77.  More specifically, she claims that, as a result of the change of ownership, which reduced the authority of the person (McAvoy) to whom she directly reported, she no longer had the same level of access to strategic decision-makers.  In other words, Pontius claims, she lost her ability to work directly with the first in command.  Third, Pontius claims, she no longer had the authority to manage personnel or assist in the hiring of new employees.  *Id.* ¶ 84.  Prior to the purchase, Pontius claims to have been "McAvoy's trusted partner and had handled a broad range of personnel issues, including making tough decisions and being a good counsel to McAvoy and the Onion."  *Id.* ¶ 85.  She also had direct access to all decisionmakers such that she could give authoritative answers to employees and exercise discretion in resolving problems.  *Id.* ¶ 86.  After the acquisition, however, Pontius claims, she no longer had practical sway over hiring or compensation decisions, nor direct or ready access to the decisionmakers—Spanfeller and Callahan.  *Id.* ¶ 87.  In essence, Pontius' diminution argument—setting aside, for the moment, the wind down of Onion Studios—is this: Upon G/O's acquisition of the FMG companies, which included the Onion, G/O began to take a

more centralized approach to management, and, as a result, McAvoy (the Onion's president and

CEO, and Pontius's direct boss), had less authority to make strategic and personnel decisions,

which in turn meant that Pontius, as his chief of staff and chief resource officer, had less

authority.

Defendants forcefully dispute Pontius's dramatic framing of the consequences for her of

G/O's takeover.  Before G/O's acquisition, defendants note, FMG had already operated the

Onion and GMG on a centralized basis.  Def. Reply 56.1 ¶ 8.  And, as is undisputed, HR,

Pontius's domain, was among the functions that—on Univision's watch—had already been

consolidated at the FMG level.  *See* JSF ¶ 32.  As to the reporting hierarchy, defendants note that

after the G/O acquisition, Onion president and CEO McAvoy merely reported to a different

management team; albeit one that more tightly supervised the Onion's operations than had its

predecessor.  Before the acquisition, McAvoy reported to FMG president Felipe Holguin and to

FMG CEO Isaac Lee (later Sameer Deen).  *Id.* ¶ 30.  That McAvoy reported to a different CEO

after the acquisition—Spanfeller—does not, defendants argue, on its own, suggest that

McAvoy's role or authority changed, or that his diminished authority resulted in a diminution of

Pontius's.  Following the acquisition by G/O, defendants note, McAvoy retained his position of

president and CEO of the Onion, and Pontius retained her post as CRO and chief of staff at the

Onion level, continuing to report directly to McAvoy.  Further, defendants note, Pontius had

never had an FMG title, and therefore had never had a direct reporting relationship to anyone

above McAvoy.  Pontius Dep. at 85–86.

Defendants' argument on this point carries the day.  Given the absence of evidence that

her job title or formal responsibilities or immediate reporting hierarchy changed at all, Pontius's

generalized complaint that she had reduced influence within the overall corporate structure as a

result of G/O acquisition of the Onion from Univision is insufficient to establish an adverse employment action. She offers conclusory assertions, such as, that she "was no longer assisting in setting strategy or charged with implementing corporate strategy," Pl. 56.1 ¶ 77; and "no longer had authority to manage personnel or assist in the hiring of new employees," *id.* ¶ 84. But she has not adduced evidence of any concrete situation in which her authority was newly limited, or that anyone told her that her authority in these spheres had been circumscribed, or indeed, of any job action, following G/O's acquisition, that was particular to her. *See Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 297 (E.D.N.Y. 2016) (finding plaintiff's allegations that defendants had stripped her of supervisory responsibilities after acquisition insufficient to form adverse employment action where plaintiff alleged no specifics regarding how much of her job was dedicated to such supervisory responsibility); *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (plaintiff must proffer objective indicia of material disadvantage; subjective disappointment not enough); *Jean-Pierre v. Citizen Watch Co. of Am., Inc.*, No. 18 Civ. 0507 (VEC), 2019 WL 5887479, at *7 (S.D.N.Y. Nov. 12, 2019) (finding no adverse employment action where plaintiff proffered no objective indicia of being materially disadvantaged after role was restructured).

As to the loss of Onion Studios—which comprised 80% of Pontius's job responsibilities before G/O's takeover—Pontius has not adduced evidence that defendants' proposed additions to her repertoire to fill this void were insufficient. It is undisputed that defendants offered Pontius oversight over A.V. Club Editorial and Video, and the TakeOut, *see* Mellk Decl., Ex. II, and invited Pontius to propose additional areas of authority if she found these proposals wanting. *See* Mellk Decl., Ex. HHH. As is undisputed, Pontius did not avail herself of this invitation. In these circumstances, while Pontius was at liberty to resign, she cannot claim that G/O's actions

constituted an adverse employment action sounding in constructive discharge. *Cf. Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (citing *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000) ("An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge."); *Forman v. New York City Dep't of Educ.*, No. 19 Civ. 8156 (JPC), 2022 WL 912130, at *11 (S.D.N.Y. Mar. 29, 2022). And Pontius has not adduced evidence that—or explained why—defendants' proposal that she oversee the TakeOut—even assuming she already had "effective oversight" of the A.V. Club, Pl. 56.1 ¶ 173—would not have filled the void left in her oversight authority by the closure of Onion Studios. She has not, for example, pointed to evidence as to the size of this project, or the number of people she would have overseen, or the time oversight of this project would have taken, relative to overseeing Onion Studios. *See Markovic v. New York City Sch. Constr. Auth.*, No. 99 Civ. 10339 (AGS), 2002 WL 22043, at *7 (S.D.N.Y. Jan. 8, 2002) (finding no adverse employment action where "[t]here is no evidence that plaintiff's salary, benefits, or title changed . . . [or] that his new assignment . . . was less prestigious than his former assignment").

In asserting diminished responsibilities constituting an adverse employment action under Title VII, Pontius also complains generally that after her April 24 meeting with Spanfeller in New York, both Spanfeller and Callahan stopped directly communicating with her. *See* Dkt. 93 ("Pl. Memo") at 39. But Pontius was not a direct report of either executive. She has not adduced evidence that either was organizationally expected to communicate directly with her or shut her out of conversations or meetings in which she otherwise would have taken part. And there is concrete evidence to the contrary. On learning of Pontius's concerns, Spanfeller invited her to a

weekly leadership meeting, Mellk Decl., Ex. FFF, to which Spanfeller typically invited only his direct reports, Def. 56.1 ¶ 178. Furthermore, Spanfeller told McAvoy to have Pontius reach out to him directly if she remained interested in the CTO job, but Pontius did not do so. *Id.* ¶ 236. And finally, after McAvoy's employment was terminated, Spanfeller reached out to Pontius directly, and the two remained in direct contact up through her resignation. Mellk Decl., Ex. FFF.

*Severance Pay*: Pontius's second theory as to an adverse employment action under Title VII is that that she was deprived of severance pay, and the opportunity to negotiate an amicable parting. The evidence as to this theory would permit a jury to find an adverse employment action. The provision of materially lower severance benefits, relative to similarly situated colleagues, can be an adverse action under Title VII. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see also Magnan v. Manhattan Eye, Ear & Throat Hosp.*, No. 01 Civ. 6306 (HB), 2002 WL 334505, at \*4 (S.D.N.Y. Feb. 28, 2002) (failure to pay severance package, even without a preexisting obligation to do so, could qualify as adverse employment action when similarly situated employees received a severance package). And here, Pontius makes such a claim. She posits that the failure of the company to pay her severance upon her resignation, when it made such payments to Mueller, who she casts as a comparator, constituted an adverse employment action.

ii.     Inference of discriminatory intent

The Court accordingly turns to the fourth element of the Title VII *prima facie* case: whether Pontius has adduced sufficient evidence that she experienced an adverse employment action under circumstances giving rise to an inference of discrimination (as alleged here, based on Pontius's gender). For completeness, the Court considers Pontius's claims based both on her

diminished job responsibilities and on the denial of severance benefits, even though the Court

has found the evidence to permit a finding that only the latter was an adverse employment action.

"[T]here is no unbending or rigid rule about what circumstances allow an inference of

discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life*

*Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  A plaintiff can support such an inference by (a)

"demonstrating that similarly situated employees of a different [sex or gender] were treated more

favorably," (b) "showing that there were remarks made by decisionmakers that could be viewed

as reflecting a discriminatory animus," or (c) "proving that there were other circumstances giving

rise to an inference of discrimination on the basis of [the] plaintiff's [sex or gender]."  *Gelin v.*

*Geithner*, No. 06 Civ. 10176 (KMK), 2009 WL 804144, at *15 (S.D.N.Y. Mar. 26, 2009)

(citations and internal quotation marks omitted), *aff'd*, 376 F. App'x 127 (2d Cir. 2010)

(summary order).  However, "[c]onclusory and speculative allegations will not suffice to

demonstrate discriminatory intent."  *Nguyen*, 169 F. Supp. 3d at 388; *see also Goenaga v. March*

*of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (a discrimination plaintiff "may not

rely simply on conclusory statements").  And a plaintiff may not rely on her subjective "feelings

and perceptions of being discriminated against" to defeat summary judgment.  *Ya-Chen Chen v.*

*City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015); *see also Rosario v. Hilton Worldwide, Inc.*,

No. 09 Civ. 5336, 2011 WL 336394, at *4 (E.D.N.Y. Jan. 24, 2011) (granting summary

judgment to employer because plaintiff's "gut feelings, however genuine, do not allow for an

inference of discrimination to be drawn"), *aff'd sub nom. Rosario v. Hilton Hotels Corp.*, 476 F.

App'x 900 (2d Cir. 2012) (summary order); *Adeniji v. Admin. for Child. Servs., NYC*, 43 F.

Supp. 2d 407, 424 (S.D.N.Y. 1999) ("plaintiff cannot satisfy his burden of proof by offers of

speculative beliefs and gut feelings" (quoting *Burrell v. Bentsen*, 1993 WL 535076 at *10

(S.D.N.Y. Dec. 21, 1993))), *aff'd*, 50 F.3d 3 (2d Cir. 1995).  Although the burden of establishing a *prima facie* case is often described as "*de minimis*," a plaintiff must nonetheless show, through admissible evidence, "circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994).

   ***Diminution of Pontius's role***:  Pontius's basis for attributing her ostensibly lessened role to gender discrimination is what she portrays as the misogynist atmospherics of the company and comments by Spanfeller towards her that she portrays as sexist.  *See* McAvoy Decl. ¶¶ 5–11, 19, 22 (describing, in vague terms, Spanfeller's more favorable attitude toward men than women); *see also* Pontius Dep. at 156–57 (describing Spanfeller referring to himself as "moi" and asking her, "how does that feel Madam C-suite?" after offering her the CTO job).

   But even assuming, improbably, that these modest shards could enable a jury to find a toxic work environment for women that existed only after the acquisition, or that Spanfeller's references to himself as "moi" and to Pontius as "Madam C-Suite" reflected hostility to women, this evidence cannot support Pontius's claim that her lessened role was due to gender discrimination.  That is because, by Pontius's own account, the cause for this diminution was not sex- or gender-motivated or indeed particular to her.  Rather, it flowed from changes in the corporate structure after G/O's acquisition.  Pontius herself repeatedly attributed her loss of responsibility and authority to the "one-company" transition and cost cutting.  *See* Elmaleh-Sachs Decl., Ex. 47 (July 11, 2019 letter from Pontius's counsel, Blackstone, to G/O counsel, Lauri Rasnick, claiming that a cure is "effectively impossible" and that Pontius's role had been "irreparably diminished" due to the re-structuring in favor of a more centralized approach).  Even assuming the reduction in her role could be found to be an adverse employment act,

Pontius thus fails to adduce evidence sufficient to make out a *prima facie* case that her role was diminished on account of her gender.

      ***Disparate treatment with respect to severance pay***:  Pontius claims that, as a result of gender discrimination, she received a less favorable severance package than Mueller, her former colleague.  Her sole basis for attributing this disparity to gender discrimination is that the two are similarly situated comparators.  She does not point to other evidence that her severance terms were the product of gender discrimination (*e.g.*, gendered comments or writings).

      When a plaintiff seeks to establish a *prima facie* case based on the disparate treatment relative to that of a similarly situated employee outside the protected class, she "must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated."  *McGuinness*, 263 F.3d at 53.  "This means that such an employee must be similarly situated in all material respects—not in all respects and that a plaintiff is not obligated to show disparate treatment of an identically situated employee."  *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010) (quoting *McGuinness*, 263 F.3d at 54) (internal quotation marks omitted).  Further, such employee "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *Id.* (quoting *McGuinness*, 263 F.3d at 54) (internal quotation marks omitted).  Employment characteristics which can support a finding that two employees are "similarly situated" include "similarities in education, seniority, performance, and specific work duties," *DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort and responsibility for jobs performed "under similar working conditions," *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ. 1315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013).  However, "[w]hat constitutes

'all material respects' . . . varies somewhat from case to case," but "there should be an 'objectively identifiable basis for comparability.'" *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citations omitted).  A court may properly grant summary judgment on disparate treatment claims "where it is clear that no reasonable jury could find the similarly situated prong met." *Britt v. Merrill Lynch & Co., Inc.*, 08 Civ. 5356 (GBD), 2011 WL 4000992, at *6 (S.D.N.Y. Aug. 26, 2011) (quoting *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 791 (2d Cir. 2007)) (internal quotation marks omitted).

A different and less desirable severance package relative to that received by a similarly situated comparator who lacked plaintiff's protected characteristic *can* form the basis of a *prima facie* disparate treatment claim under Title VII.  *See McGuinness*, 263 F.3d at 53.  Accordingly, were Pontius to have shown that she and Mueller were similarly situated in all material respects, and that Mueller received a more generous severance package than she, Pontius would clearly make out a sufficient *prima facie* case of disparate treatment.

Here, however, based on the undisputed facts, a fact finder, viewing the evidence in the light most favorable to non-movant Pontius, could not find that she and Mueller had been similarly situated in any relevant respect.  Pontius emphasizes that she and Mueller were of similar rank and held in similar regard before G/O took over.  But she and Mueller had different job responsibilities: Pontius focused on personnel and HR, Mueller on sales and marketing; Pontius's formal responsibilities were limited to the Onion, whereas Mueller had both Onion and FMG roles.  Pontius Dep. at 86–87, 212.

Even more problematic, on the undisputed facts, the two were in materially different circumstances after G/O's acquisition, and departed under vastly different circumstances.  *Albury v. J.P. Morgan Chase*, No. 03 Civ. 2007 (HBP), 2005 WL 746440, at *10 (S.D.N.Y. Mar. 31,

43

2005) (finding relevant the facts and circumstances surrounding plaintiff's and comparator's terminations to establish a disparate treatment claim); *Goenaga*, 51 F.3d at 18. Soon after G/O's takeover, defendants decided to cut Mueller's role. Def. 56.1 ¶ 120. G/O offered him a different role, instead, which Mueller communicated would be a step back for him. JSF ¶ 65. Accordingly, with no further offer from G/O, G/O and Mueller mutually decided to end the employment relationship. *Id.* ¶ 67.

By contrast, Pontius's future at the Company following the acquisition was by no means at a dead end—nor was her departure mutual. Initially, in contrast to G/O's approach to Mueller, Spanfeller offered Pontius a promotion, to chief talent officer. That offer was rescinded—either on a mutual basis or unilaterally—only after Pontius expressed discomfort with Spanfeller's "first order of business": to participate in the termination of Banikarim's employment and the larger layoff. After rescinding the offer, Spanfeller told McAvoy to tell Pontius reach out to him if she still wanted to be considered for the role. Pontius did not do so. As of this point, Pontius, unlike Mueller—who had not been offered any promotion, and who had experienced a "step back," JSF ¶ 65—retained her pre-acquisition title and roles. And, as is undisputed, when Pontius complained that these roles had been diminished, G/O and Spanfeller made efforts to cure Pontius's concerns and to retain her—in contrast to its prompt pivot to negotiate Mueller's exit. The documentary evidence is clear that Spanfeller attempted to retain Pontius, viewing her as valuable, and offered her additional portfolios, including oversight of the A.V. Club editorial and video operations, and the TakeOut. *See* Mellk Decl., Ex. II. G/O also indicated that it was open to otherwise increasing her spheres of authority and invited her to make a proposal. Mellk Decl., Ex. HHH. She did not do so.

In this context, an inference of gender discrimination cannot fairly arise from G/O's having offered Mueller—whose departure was mutually negotiated—severance pay that it did not offer Pontius, whose resignation G/O did not seek or encourage.  Mueller and Pontius were in notably different circumstances at the time their ties with G/O were cut.  Mueller's role had been diminished, and, with he and G/O having agreed he had no future at the company commensurate with his former title and skills, the two negotiated a mutually agreeable severance package.  In contrast, G/O did not wish to lose Pontius, and offered her increased responsibilities and authority upon request.  Her decision to depart, unlike Mueller's, was unilateral.[11]  With Pontius not having adduced other probative evidence on which an inference of gender discrimination could arise, a finder of fact could not find for Pontius as to this required element of a *prima facie* case.  *See, e.g.*, *Britt*, 2011 WL 4000992, at *6; *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 15–16 (2d Cir. 2009) (summary order) (affirming grant of summary judgment where plaintiff failed to adduce evidence on which a reasonable jury could find a similarly situated comparator); *Perkins v. United States Dep't of the Treasury*, No. 18 Civ. 08911 (NSR), 2022 WL 19772, at *7 (S.D.N.Y. Jan. 3, 2022) (same); *Jean-Pierre*, 2019 WL 5887479 at *11 (same).

### b.  Legitimate non-discriminatory reason

Even were Pontius found to have adduced sufficient facts on which a reasonable trier of fact could find a *prima facie* case of gender discrimination, defendants have proffered legitimate, non-discriminatory reasons for her post-acquisition role and the lack of severance pay.  As to the

---

[11] As another point of contrast, defendants note that Mueller's departure occurred in May 2019, two months earlier than Pontius's, and at time when Spanfeller perceived the Company's finances to be sounder than they were.  *See* Def. 56.1 ¶ 216.  Spanfeller testified that his understanding of G/O's finances at the time of Mueller's and Pontius's departures played a role in the severance packages offered.  *Id.*

45

former, defendants assert that any changes to her role and authority resulted from the acquisition and move to the "one company" approach.  Pontius, notably, lent support to this, ascribing her lessened influence to the acquisition.  As to Pontius's not receiving the severance pay Mueller received, defendants' non-discriminatory reason is that, unlike with Mueller, defendants were seeking to retain Pontius, whom it viewed as "smart," "competent," and with a more adaptable skillset than Mueller, not to financially incent her to leave.  Def. 56.1 ¶ 214.  These explanations are legitimate and non-discriminatory—they are unrelated to gender.

### c.  Pretext

The burden then—assuming Pontius had adduced evidence sufficient to make out a *prima facie* case of discrimination—would shift to Pontius to show that defendant's legitimate and non-discriminatory reasons for the ostensibly adverse actions against her were pretextual.  Strikingly, Pontius does not does not argue this point at all.  And the Court, reviewing the record *sua sponte*, cannot identify sufficient evidence to establish pretext.

To establish pretext, a plaintiff must show that the employer was more likely than not motivated by a discriminatory reason or that the employer's reason is unworthy of belief. *Burdine*, 450 U.S. at 256.  A plaintiff claiming employment discrimination may demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009) (quoting *Droutman v. N.Y. Blood Ctr., Inc.*, No. 03 Civ. 5384 (DRH) (ARL), 2005 WL 1796120, at *8 (E.D.N.Y. July 27, 2005)).  A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the

'motivating' factors."  *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

At most, Pontius could point to limited evidence of a misogynist culture at G/O, on the basis of the largely conclusory testimony above, and of her disputable constructions of phrases used by Spanfeller.  *See* McAvoy Decl. ¶¶ 5–11, 19, 22.  But there is no more.  And here, the existence of such a culture, however regrettable, would not credibly explain Pontius's ostensibly diminished role, which Pontius herself attributed to G/O's "one company" philosophy and its budget cuts.  Nor would generalized evidence of Spanfeller's sexism non-speculatively establish that the different exit terms attendant to the departures of Pontius and Mueller bespoke sexism.  On the contrary, the documentary record reflects Spanfeller's attempt to retain Pontius and to offer her augmented responsibilities, in contrast to Mueller, whom he did not view as worthy of retention.  *See* Def. 56.1 ¶ 214; Spanfeller Dep. at 118, 166 (describing Pontius as "smart," "competent," adaptable, and having valuable institutional knowledge).  And to the extent other executives who departed after the G/O acquisition besides Mueller and Pontius were considered, as defendants note, these would refute any claim of pretext.  A former female executive for FMG was provided severance after her role was eliminated, McAvoy Dep. at 189–90, whereas McAvoy, a male, was not provided severance upon his termination, Spanfeller Dep. at 141.  *See Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 31 (2d Cir. 2015) (summary order) (affirming grant of summary judgment where plaintiff failed to show that that men, as a group, were not paid more than women, as a group); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, No. 09 Civ. 4675 (JFB) (ARL), 2012 WL 4483046, at *14 (E.D.N.Y. Sept. 27, 2012) ("An inference of gender discrimination is undermined where plaintiff identifies both women and men who receive preferential treatment.").

Summary judgment, accordingly, must be entered for defendants on Pontius's Title VII

claim of discrimination, because the evidence would not permit a reasonable jury to find a *prima

facie* case of gender discrimination, or if it did, that defendants' legitimate explanations for its

challenged conduct toward Pontius were pretextual.

### B.    Retaliation[12]

####     1.    Applicable Legal Standards

Title VII forbids an employer from discriminating against an employee because the

employee "has opposed any practice made an unlawful employment practice by this subchapter,

or because [s]he has made a charge, testified, assisted, or participated in any manner in any

investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).

Retaliation claims, like discrimination claims, are analyzed using the *McDonnell Douglas*

burden-shifting framework.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir.

2013).  To demonstrate a *prima facie* case of retaliation, a plaintiff must establish: "(1) that she

participated in an activity protected by Title VII, (2) that her participation was known to her

employer, (3) that her employer thereafter subjected her to a materially adverse employment

action, and (4) that there was a causal connection between the protected activity and the adverse

employment action."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The

plaintiff's burden of proof at the *prima facie* stage is "*de minimis.*"  *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010).

As to the fourth prong of the *prima facie* case, "proof of causation can be shown either:

(1) indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as disparate treatment of fellow

---

[12] Pontius did not address her retaliation claims in her reply brief.  Although her intent to pursue
these claims is unclear, the Court, in an abundance of caution, considers these claims.

employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

If the initial burden is met, "a 'presumption of retaliation'" arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.'"  *Chen*, 805 F.3d at 70 (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  If the employer provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* (citation omitted).

Here, Pontius has articulated two theories of retaliation.

### 2.      Retaliation for Pontius's Comments About Banikarim

First, Pontius claims, after accepting the CTO role, she protested the termination of Banikarim, a woman of color.  In retaliation, she asserts, Spanfeller withdrew the CTO offer (or put it indefinitely on ice); and diminished her then-current roles of CRO and chief of staff.

This claim requires treating Pontius's comments to Spanfeller during their April 22 phone conversation and in their April 24 New York meeting as a "protected activity" on which defendants retaliated against Pontius.  This claim fails because, even relying solely on Pontius's deposition testimony (and ignoring all other evidence) as to what she told Mueller about Banikarim's termination, she did not engage in "protected activity" under Title VII, or close.

Under Title VII, a plaintiff may show she engaged in a protected activity by opposing a practice that Title VII forbids.  42 U.S.C.A. § 2000e–3(a); *Risco v. McHugh*, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012).  "[P]rotected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of other employees and complaints of discriminatory practices generally."  *Littlejohn v.*

*City of New York*, 795 F.3d 297, 317 (2d Cir. 2015).  A plaintiff is not required to show that the conduct she opposed was in fact unlawful; it is sufficient if the plaintiff had a good faith, reasonable belief that she was opposing a practice prohibited by Title VII.  *Risco*, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)).[13]

Were Pontius to have adduced any evidence that that she, in fact, opposed Banikarim's termination believing in good faith that it was motivated by discriminatory intent, Pontius would have engaged in protected activity.  But that is not even Pontius's account.

First, Pontius claims she questioned Spanfeller's reasons for terminating Banikarim when Spanfeller first raised the prospect during their April 23 phone conversation.  But, according to Pontius, her reaction of surprise was not because Banikarim was a woman of color.  Instead, it was because Pontius's understanding at the time was that Banikarim was "pretty well respected." Pontius Dep. at 155.

Second—and more significantly—Pontius did not protest Banikarim's termination, at all. Instead, by her account her comments in opposition related only to the timing of it, given what Pontius perceived as the Onion's bad cultural climate at the time.  According to Pontius, she encouraged Spanfeller to be mindful of the "optics" of singling out a woman of color for termination.  She suggested that G/O instead terminate Banikarim later, along with a larger group of non-protected class employees, so as to "mitigate" internal distress and potential employment discrimination liability.  Def. 56.1 ¶¶ 106, 109; Pontius Dep. at 191; *see also* McAvoy Dep. at

---

[13] The Court therefore does not consider whether Spanfeller's termination of Banikarim was indeed motivated by discriminatory intent, as Pontius claims.  *See* Mellk Decl., Ex. QQ (email from Spanfeller about Banikarim including what Pontius deems "coded" language).  Defendants do not contest Pontius's good faith basis to believe that Spanfeller was motivated by discriminatory intent.

111, 285 (confirming that Pontius had recommended that Spanfeller terminate Banikarim with the larger group of layoffs).  Far from protecting Banikarim from conduct Title VII prohibits, Pontius's cosmetic suggestion stood to make it more difficult for Banikarim to bring a Title VII claim of her own against G/O, by packaging Banikarim's dismissal with others.  Indeed, Pontius, by her own account, so advised Spanfeller in her HR capacity with that very goal.

That is not a protected activity.  Pontius did not oppose Banikarim's termination.  And Title VII does not protect efforts to insulate otherwise *prohibited* activity.  *See Ezuma v. City Univ. of New York*, 665 F. Supp. 2d 116, 124 (E.D.N.Y. 2009), *aff'd*, 367 F. App'x 178 (2d Cir. 2010) (summary order); *Correa v. Mana Prod., Inc.*, 550 F. Supp. 2d 319, 328 (E.D.N.Y. 2008) (finding no protected activity where plaintiff, an HR manager, presented no evidence that she opposed treatment of employees in a protected class or protested plan to terminate them); *Reyes v. Vill. of Spring Valley*, No. 20 Civ. 1883 (NSR), 2021 WL 4067134, at *4 (S.D.N.Y. Sept. 7, 2021) ("[C]ourts have concluded that a third party fails to allege protected activity in connection with their disclosure of an alleged Title VII violation where the complainant does not condemn the at-issue conduct or convey an assessment that discrimination has occurred, or where the disclosure itself was within the scope of the complainant's job responsibilities."); *but see Hagan v. City of New York*, 39 F. Supp. 3d 481, 501 (S.D.N.Y. 2014) (concluding that plaintiff, an EEO officer, plausibly pled a retaliation claim where her "allegations suggest that . . . she advocated for systemic reform and the rights of minority employees and, in so doing, became a thorn in the side of officials who wanted to persist in unlawful discriminatory practices.  This is quintessential opposition activity that goes beyond mere participation in her role as an EEO Officer.").

Accordingly, the Court grants defendants' summary judgment motion as to this aspect of Pontius's Title VII retaliation claim.[14]

### 3.    Retaliation for Filing This Lawsuit

Pontius alternatively argues that defendants' filing of counterclaims in this lawsuit is an adverse employment action and retaliatory.

A frivolous counterclaim or instituting litigation in bad faith against an employee claiming violations of Title VII can constitute actionable retaliation. *See Yankelevitz v. Cornell Univ.*, No. 95 Civ. 4593 (PKL), 1996 WL 447749, at *4 (S.D.N.Y. Aug. 7, 1996), *on reconsideration in part*, No. 95 Civ. 4593 (PKL), 1997 WL 115651 (S.D.N.Y. Mar. 14, 1997); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 342 (S.D.N.Y. 2009).   But "[t]he courts in this District have repeatedly held that a counterclaim is not actionable for retaliation unless it is totally baseless."  *Sherman v. Fivesky, LLC*, No. 19 Civ. 8015 (LJL), 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31, 2020) (refusing to distinguish between compulsory and permissive counterclaims) (citing *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 474 (S.D.N.Y. 2008)); *see also Eng-Hatcher v. Sprint Nextel Corp.*, No. 07 Civ 7350 (BSJ) (KNF), 2008 WL 4865194, at *4 (S.D.N.Y. Oct. 31, 2008) ("[W]here an employer seeks to amend a pleading to assert a compulsory counterclaim to avoid the risk of being foreclosed from raising the claim in a

---

[14] Having found an unambiguous lack of a protected activity, the Court does not have occasion to resolve definitively whether the other *prima facie* elements of Pontius's claim were met, and if so, whether the balance of the *McDonnell-Douglas* inquiry, applied to the evidence, would have permitted her claim to reach a jury.  Had the Court found a protected activity, however, the other elements of a *prima facie* case appear in place.  The withdrawal of the CTO job, after it had been offered and accepted, would have constituted an "adverse employment action," and the timing of such withdrawal—right after the meeting—would have given rise to a causal inference.  *See Littlejohn*, 795 F.3d at 319; *Lulo v. OTG Mgmt., LLC*, No. 19 Civ. 3776 (PAE), 2022 WL 409224, at *5 (S.D.N.Y. Feb. 10, 2022); *Brown v. City of New York*, No. 14 Civ. 2668 (PAE), 2014 WL 5861995, at *2 (S.D.N.Y. Nov. 12, 2014), *aff'd*, 622 F. App'x 19 (2d Cir. 2015) (summary order).

subsequent action, that conduct cannot constitute retaliation, unless the counterclaim is 'totally baseless.'") (quoting *Ergo v. Int'l Merchant Servs., Inc.*, 519 F. Supp. 2d 765, 781 (N.D. Ill. 2007)); *Schanfield*, 663 F. Supp. 2d at 342.

Here, Pontius does not assert—and has not adduced evidence sufficient to raise a triable question of fact—that defendants' counterclaims were frivolous, or without any basis in fact or law.  To be sure, the Court dismissed the initial three counterclaims as deficiently pled.  But nothing in the Court's decision stamped any of those as frivolous.  On the contrary, the Court authorized defendants to file an amended counterclaim for breach of contract, and, after defendants did so, Pontius did not move to dismiss that counterclaim.  *Cf. Pawlowski v. Kitchen Expressions Inc.*, No. 17 Civ. 2943 (ARR) (VMS), 2017 WL 10259773, at *5 (E.D.N.Y. Dec. 15, 2017) (finding defendants' counterclaim nonfrivolous and therefore non-retaliatory under Title VII where counterclaim withstood a motion to dismiss).  And, even assuming that that counterclaim ultimately proves non-meritorious, evidence adduced in discovery appear to have lent it at least some factual support.  That counterclaim alleges that Pontius breached her duty of good faith and fair dealing implied in her Employment Contract by failing to work with defendants in their efforts to cure any alleged material diminution of her duties.  *See* Dkt. 64 ¶¶ 63–64.  Evidence adduced by defendants reflects that Pontius never responded to G/O's request to counter-propose any increase in responsibilities or authority, if she found defendants' proposal insufficient.  *See* Mellk Decl., Ex. HHH.

Separately, Pontius fails to adduce evidence sufficient to establish retaliatory causation.  Pontius asserts only that the timing of defendants' counterclaims—filed shortly after Pontius filed this lawsuit—supports that these were filed to punish her for speaking out, and not because defendants genuinely desired relief for Pontius' asserted breaches of contract and fiduciary duty.

Pl. Opp. Memo at 28. But defendants note that it was only after Pontius filed her lawsuit that they acquired a sufficient factual portrait to warrant bringing these claims. Pontius notably did not contest this in her reply. Although temporal proximity can support a causal connection at the *prima facie* stage, it is "insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847 (2d Cir. 2013); *see also Cooper v. N.Y. State Nurses Ass'n*, 847 F. Supp. 2d 437, 449 (E.D.N.Y. 2012). Instead, Pontius must present some additional evidence that retaliation was the cause of defendants' filing of their counterclaims. *See Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820–21 (2d Cir. 2014) (summary order) ("We have been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext[.]") (citations omitted). Pontius has proffered no evidence that would suggest that defendants' explanation as to their timing—that they only gained the full factual picture to warrant bringing counterclaims after she filed suit—is pretextual.

The Court accordingly grants defendants' motion for summary judgment on this dimension of Pontius's Title VII retaliation claim, too.

### C.      Hostile Work Environment

#### 1.      Applicable Legal Standard

"An employee seeking to bring a hostile work environment claim must demonstrate that: (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Rogers v. Bank of N.Y. Mellon*, No. 09 Civ. 8551 (HBP), 2016 WL 4362204, at *11 (S.D.N.Y. Aug. 15, 2016) (quoting *Miller v. McHugh*, 814 F. Supp. 2d 299, 314 (S.D.N.Y. 2011) and collecting cases), *on reconsideration*, No. 09 Civ. 8551 (HBP), 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017); *see also Tolbert*, 790 F.3d at 439. Adverse employment actions are

54

not required to sustain a hostile work environment claim.  *See Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).

Under Title VII, for the harassment to be sufficiently pervasive or severe, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult" that it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment.'" *Littlejohn*, 795 F.3d at 320 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

The hostile work environment test has both objective and subjective elements.  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22).  "In determining whether a plaintiff suffered a hostile work environment," the Court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (citing *Littlejohn*, 795 F.3d at 321).  The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009); *see also Panchishak v. Cnty. of Rockland*, No. 20 Civ. 10095 (KMK), 2021 WL 4429840, at *4 (S.D.N.Y. Sept. 27, 2021).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Terry*, 336 F.3d at 148 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

55

### 2.      Application

Pontius does not defend her hostile work environment claim against defendants' motion for summary judgment in either her opposition or reply briefs.  The Court accordingly finds that she has abandoned this claim.  *See Pincover v. J.P. Morgan Chase Bank, N.A.*, No. 21 Civ. 3524 (PAE), 2022 WL 864246, at *12 (S.D.N.Y. Mar. 22, 2022); *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

In any event, the record evidence, as made known to the Court, is far too thin to enable this claim to reach a jury.  Pontius notes that during their April 24 meeting, Spanfeller referred to himself as "moi" and to her as "Madam C-Suite."  Although a reasonable person could well find these phrases immature and unprofessional, they do not suggest gender-based bias, let alone of the degree of severity to support a hostile work environment claim.  *See Dde Chukwuka v. City of New York*, 513 F. App'x 34, 35–36 (2d Cir. 2013) (summary order) (for a single incident to be the basis for a hostile work environment claim, it must be "extraordinarily severe") (citation omitted); *see also Pierre v. Napolitano*, 958 F. Supp. 2d 461, 487 (S.D.N.Y. 2013).

Beyond this meeting, Pontius has not adduced evidence of any other statements, writings, or other conduct probative of a hostile workplace environment.  To the extent that Pontius—had she defended this claim—might have relied on her subjective perception of Spanfeller as sexist, this cannot raise an inference of discrimination.  *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."); *see also Jackson v. City of New York*, 29 F. Supp. 3d 161, 172 (E.D.N.Y. 2014) (finding the plaintiff's "gut feeling" insufficient to create an inference of

discrimination); *Alvarez v. Rosa*, No. 11 Civ. 3818 (KBF), 2012 WL 651630, at *4 (S.D.N.Y.

Feb. 28, 2012) (dismissing discrimination claim where plaintiff did not allege "particular conduct

or remarks . . . that could be viewed as reflecting discriminatory animus").

     The Court accordingly grants summary judgment to defendants on Pontius's Title VII

hostile work environment claim.

     **D.**     **Pontius's Equal Pay Act Claim**

          **1.**     **Applicable Legal Standard**

     The Equal Pay Act "prohibits employers from discriminating among employees on the

basis of sex by paying higher wages to employees of the opposite sex for 'equal work.'"

*Ryduchowski v. Port Auth.*, 203 F.3d 135, 142 (2d Cir. 2000) (internal quotation omitted). "The

purpose behind the enactment of the EPA was to legislate out of existence a long-held, but

outmoded societal view that a man should be paid more than a woman for the same work." *Id.*

(internal quotation omitted); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195

(1974). To establish a *prima facie* violation of the Equal Pay Act, a plaintiff must demonstrate

(1) the payment of different wages to employees of the opposite sex; (2) that the employees

perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs

are performed under similar working conditions. *Ryduchowski*, 203 F.3d at 142; *see also Belfi v.

Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999); 29 U.S.C. § 206(d)(1).

          **2.**     **Application**

     Pontius does not oppose defendants' summary judgment motion on her Equal Pay Act

claim, which defendants assume is premised on the difference in severance pay between Pontius

and Mueller. *See* Dkt. 31 ¶ 218. In any event, she and Mueller were demonstrably not similarly

situated, for all the reasons discussed *supra*. The Court accordingly grants defendants' summary

judgment motion as to this claim.

### E.        The Remaining Claims

The Court's rulings above have granted summary judgment to defendants on all of Pontius's federal claims.  Defendants also move against Pontius's NYSHRL, NYCHRL, and NYLL, and breach of contract claims, on the grounds that Pontius is excluded from the protections of each statute as an Illinois resident and that these claims are not supported by sufficient evidence.  Pontius, in turn, moves against defendants' common law counterclaim for breach of contract.[15]

The Court must first determine whether to exercise supplemental jurisdiction over these state-law claims.

### 1.        Applicable Legal Standards

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, "such jurisdiction is discretionary," *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)), and "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction,'" *id.* (quoting 28 U.S.C. § 1367(c)(3)).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

---

[15] As noted, defendants have withdrawn their counterclaims (for breach of contract and breach of fiduciary duty) based on Pontius's purported wrongful retention of the two emails McAvoy sent to her personal account after her termination.  That leaves defendants' only counterclaim as for breach of contract based on Pontius's lack of good faith and fair dealing in refusing to assist G/O in finding a cure for her purported diminishment.

convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sefovic v. Mem'l Sloan Kettering Cancer Ctr.*, No. 15 Civ. 5792 (PAC), 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

### 2.    Application

Pontius properly invoked this federal court's jurisdiction solely on the basis of federal question jurisdiction, 28 U.S.C. § 1331,[16] and she and defendants brought their respective claims under state statutory and common law on the basis of supplemental jurisdiction, 28 U.S.C. § 1367.  With the Court having entered judgment for defendants on Pontius's federal claims, the only surviving claims (statutory and common law) are brought under state law.  Defendants' one counterclaim is also brought under state law.

Thus, the only basis upon which this Court could continue to exercise jurisdiction over the remaining claims is supplemental jurisdiction.  But, as noted, such jurisdiction is discretionary where the court has dismissed all federal claims.  *See Vuona*, 919 F. Supp. 2d at 393.  And courts commonly decline to exercise supplemental jurisdiction at this stage—after

---

[16] Although the FAC asserted that the Court had diversity jurisdiction over the state law claims, *see* FAC ¶ 10, that is demonstrably incorrect.  The parties have stipulated that both Pontius and the Onion, Inc., a defendant, are Illinois citizens.  *See* JSF ¶¶ 1, 2.  Although the Onion is a subsidiary of defendant G/O, a Delaware corporation, subsidiary and parent corporations are considered separate entities for diversity jurisdiction purposes if the two have preserved their separate corporate entities.  *See OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 222 (2d Cir. 2016) ("a subsidiary corporation has its own principal place of business for purposes of diversity of citizenship jurisdiction, unless it is merely an 'alter ego' or agent of the parent corporation") (quoting Charles Alan Wright, et al., 13F Federal Practice and Procedure § 3625 (3d ed.).  And Pontius has not adduced any evidence that the Onion was an alter ego or agent of G/O.  Accordingly, there is no basis on which to find diversity jurisdiction.

entering summary judgment on all federal claims.  *See, e.g.*, *Hsueh v. N.Y.S. Dep't of Fin. Servs.*, 15 Civ. 3401 (PAC), 2017 WL 3671179, at *8 (S.D.N.Y. Aug. 25, 2017) ("Because the Court grants the [defendant's] motion for summary judgment on Hsueh's sole federal-law claim, the Court declines to exercise supplemental jurisdiction over Hsueh's state-law claims."); *Thomas v. Ariel West*, 242 F. Supp. 3d 293, 306 (S.D.N.Y. 2017) (granting summary judgment dismissing plaintiff's federal claims and "declin[ing] to exercise supplemental jurisdiction [over the] Plaintiff's state- and city-law claims relating to those alleged violations"); *Johnson v. City of New York*, 09 Civ. 4685 (PGG), 2011 WL 1044852, at *13 (S.D.N.Y. Mar. 18, 2011) ("Defendants' motion for summary judgment will be granted as to all of Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining pend[e]nt state law claims."); *236 Cannon Realty, LLC v. Ziss*, No. 02 Civ. 6683 (WHP), 2005 WL 289752, at *10 (S.D.N.Y. Feb. 8, 2005) ("Having granted summary judgment dismissing all of Cannon's federal claims, this Court declines to exercise supplemental jurisdiction over Cannon's pendant state law claims pursuant to 28 U.S.C. § 1367.").

In deciding whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity."  *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013) (quoting *Cohill*, 484 U.S. at 350).  In the typical case, however, once all federal claims have been dismissed, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Cohill*, 484 U.S. at 350 n.7.

Here, consistent with that norm, the interests of judicial economy, convenience, and comity strongly favor declining to exercise supplemental jurisdiction.

First, though the issue has been briefed, the Court has not had occasion to consider—in this case or any other—the threshold, open question of New York State law raised by the defense as to Pontius' NYSHRL, NYCHRL, and NYLL claims: whether, as an Illinois resident, Pontius is entitled to the protection of any of these statutes.  Retaining jurisdiction to decide an as-yet unresolved question of state law, on which the New York State courts have greater expertise, would not promote comity, let alone judicial economy.[17]  *See, e.g.*, *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he state law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present."); *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 102–03 (2d Cir. 1998) (affirming dismissal of state-law claims where "the interests of comity and federalism are best served by the presentation of these uncertain state law issues to a state court"); *Dudley v. N.Y.C. Hous. Auth.*, 14 Civ. 5116 (PGG), 2017 WL 4315010, at *23 (S.D.N.Y. Sept. 25, 2017) (exercising supplemental jurisdiction over state- and city-law claims where the federal analysis dictated state-law results, but declining to review issues that "require[d] separate consideration").

Second, declining to exercise supplemental jurisdiction in favor of the New York State courts ought not delay the efficient forward progress of this case.  Because discovery is complete

---

[17] Upon its brief review of the applicable law, whether an Illinois resident is entitled to the protection of the NYSHRL and NYCHRL based on acts of discrimination or retaliation that occurred while she was in New York appears to be an open question.  *See Benham v. eCommission Sols., LLC*, (2014) ("Whether New York courts have subject matter jurisdiction over a nonresident plaintiff's claims under the HRLs turns primarily on her physical location at the time of the alleged discriminatory acts[.]"); *Kraiem v. JonesTrading Institutional Servs. LLC*, 492 F. Supp. 3d 184, 200 (S.D.N.Y. 2020) ("To the degree incidents of harassment or retaliation occurred while [plaintiff] was in New York City, the Court sees no reason those claims cannot proceed."); *but see Hoffman v. Parade Publ'ns*, (N.Y. 2010) (holding that non-residents must "work in the city" in order to gain the protection of either the NYSHRL or NYCHRL); *Pakniat v. Moor*,  (2021), *leave to appeal denied*, 37  (N.Y. 2022) (same).

and the parties have already briefed this state-law question, the parties are equipped to present that question to a state court expeditiously upon Pontius's re-filing in state court.[18] *See Vuona*, 919 F. Supp. 2d at 394 ("The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery."); *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 280–81 (S.D.N.Y. 2006) ("While discovery has been completed and the instant case has proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if plaintiff's pendent claims were brought in state court.").

Third, even assuming Pontius were held entitled to pursue her state statutory claims, the case embeds additional potentially complex questions of state law. With respect to her claims of discrimination and retaliation under the NYCHRL, these are subject to a different standard that under Title VII. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011); *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 116 (1st Dep't 2011); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010); *Williams*, 836 F. Supp. 2d at 174–75. The Court hearing the remaining claims in this case will likely be tasked with determining the distinctly state-law question of whether, on the NYCHRL's more relaxed liability standards, Pontius' discrimination and retaliation claims—even though clearly deficient under Title VII— may reach a jury. And with respect to Pontius's NYLL claim, no party has moved for summary judgment based on the sufficiency of the evidence, as opposed to based on Pontius' residence.

---

[18] New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations. *Trinidad v. NYC Dep't of Corr.*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006).

Familiarity with this state statute will assist the court ultimately assigned to this case, insofar as these claims prove destined to reach a jury.

Fourth, as to the parties' reciprocal breach of contract claims, these appear to present the heart of this dispute. Yet these common law claims are well afield from the federal law claims that the Court has resolved. There is no material gain in efficiency in this Court's retaining jurisdiction over claims of this nature, which turn on the construction and application of contractual materials that have not played any role in the Court's review or resolution of the federal claims in this case.

Fifth and finally, Pontius—who invoked this Court's jurisdiction—cannot be heard to complain about a decision not to exercise supplemental jurisdiction. As reflected above, Pontius, presented by defendants' motion for summary judgment, all but entirely elected not to defend her federal claims. With the benefit of hindsight, it is difficult to resist the conclusion that, at all times, this case centered on state-law claims. That Pontius was able to plead the elements of Title VII and the Equal Pay Act federal statutes does not provide a normative basis for retention of federal jurisdiction, with those claims having been decisively dispatched on summary judgment, largely without Pontius's opposition. *Cf. Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 439 (2d Cir. 2011) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727 (1966)) ("Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed."); *Wright v. Tenergy Christ Water, LLC*, 606 F. Supp. 2d 241, 244 (D. Conn. 2009) (declining to extend supplemental jurisdiction where plaintiff abandoned federal claims).

The Court accordingly declines to exercise supplemental jurisdiction over the remaining claims. Pontius's remaining claims under state statutory and common law, and defendants'

breach of contract counterclaim are dismissed without prejudice to their being pursued in state

court.  *See Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 348 (S.D.N.Y. 2020).

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment

as to Pontius's federal claims under Title VII and the Equal Pay Act.  The Court dismisses,

without prejudice, Pontius's remaining claims, all brought under state statutory or common law,

and defendants' breach of contract counterclaim.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 88

and 94 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 30, 2022
       New York, New York